# In the United States Court of Federal Claims

No. 03-446C
(Re-issued: September 7, 2006)[1]

* * * * * * * * * * * * * * * * * * * * * * *

LEROY BISHOP, *et al.*,

*Plaintiffs*,

v.

THE UNITED STATES,

*Defendant*.

* * * * * * * * * * * * * * * * * * * * * * * *

Partial Summary Judgment; Overtime Pay; Federal Employees Pay Act, 5 U.S.C. § 5542; 5 C.F.R. § 550.111; Written Orders for Overtime

*Alan Banov*, Washington, D.C., argued for plaintiffs.

*Domenique Kirchner*, Trial Attorney, Commercial Litigation Branch, Department of Justice, Washington, D.C. argued for defendant. With her on the briefs were *Peter D. Keisler*, Assistant Attorney General, *David M. Cohen*, Director, *Kathryn A. Bleecker*, Assistant Director, and *Nicole Heiser* and *Erika Turner*, Bureau of Prisons, Washington, D.C., as of counsel.

## OPINION

BRUGGINK, *Judge*

This is an action for unpaid overtime brought by various employees of the U.S. Bureau of Prisons ("BOP"). Approximately 582 employees remain

---

[1] This opinion was first filed on August 9, 2006, under seal. The parties made minor redactions, reflected here by three consecutive asterisks throughout. Also, the court has made minor editorial corrections herein.

as plaintiffs in a number of related cases.[2] Plaintiffs in these cases claim that the BOP violated the Federal Employee Pay Act, as amended, 5 U.S.C. § 5542 (2000) ("FEPA"),[3] by failing to compensate them for pre-shift and post-shift activities, including activities such as picking up equipment, walking to posts, briefing incoming replacements, checking in equipment, and attending meetings. Plaintiffs have moved for partial summary judgment with regard to claims brought by plaintiff Patrick Shea for such unpaid pre-shift and post-shift activities and meetings in excess of an eight-hour work shift. Defendant has cross-moved. The matter has been fully briefed and argued and is ready for disposition.

## BACKGROUND

These BOP cases are complicated by the fact that plaintiffs work at different facilities and hold different positions. Discovery has been prolonged as the parties gathered evidence as to all the claims for overtime by each plaintiff. During the pendency of this action, however, the Federal Circuit issued its decision in *Doe v. United States*, 372 F.3d 1347 (Fed. Cir. 2004) ("*Doe II*"). The court ruled, in an action brought by federal employees under FEPA, that overtime was not compensable unless it had been ordered or approved in writing by an authorized official. Because that ruling had the potential to jeopardize plaintiffs' claims here, during a February 2005 status conference, we invited them to submit motions for partial summary judgment on claims which plaintiffs believed could clearly satisfy any requirement for written orders or approvals to perform overtime. Pursuant to our invitation, plaintiffs seek partial summary judgment only with respect to Patrick Shea.

**Lieutenant Patrick Shea**

Patrick Shea ("Shea" or "Lt. Shea") was a lieutenant at the Federal Corrections Institution ("FCI") in Otisville, New York. Shea was employed by BOP from February 16, 1986, until he retired during the pendency of this

---

[2]In September 2005, these related cases were consolidated under *Aaron v. United States*, No. 00-315C, for the purpose of entering a show cause order and dismissing 170 plaintiffs from the case for failure to prosecute.

[3]Some plaintiffs also bring claims under the Fair Labor Standards Act, 29 U.S.C. § 216 (2000) ("FLSA"). Patrick Shea's claims, however, are limited to FEPA overtime.

motion.[4] During the claim period, he was a GS-11 Supervisor and served as a lieutenant. Lt. Shea's claims for unpaid overtime begin on April 19, 2000, after settlement of related prior litigation in *Adams v. United States* in which he was a plaintiff,[5] and continue through his retirement.

As a lieutenant, Shea's job at Otisville included a number of positions and duties. At various points during the time in question, Shea worked the Evening, Morning, and Day Watch shifts. He usually served as Operations Lieutenant during these shifts, but also served as Quarters Lieutenant, Emergency Preparedness Lieutenant, and Training Lieutenant, according to the Quarterly Rosters.[6] During the claim period, Lt. Shea has served under three successive commanding officers, Captains Billy Romero, Anthony Haynes, and Douglas White. These captains acted as Lt. Shea's direct supervisors, with the authority to order Lt. Shea to perform certain tasks. Most of Lt. Shea's claims originate from the time which he was under Capt. Haynes' supervision, from November of 2000 until July of 2003.

Plaintiff Shea was made aware of his duties in each of his various positions by several documents. Most notably, lieutenants' assignments were addressed by "post orders"–documents revised and issued quarterly to provide daily instructions for certain lieutenant posts. They were drafted, and usually signed, by a captain. Post orders reflect shift hours and corresponding tasks. They also contain a list of the equipment employees need to have at the start of their shift, such as radio, keys, and handcuffs. Some of the post orders included in the summary judgment materials also listed several tasks above the start time for the shift. Other tasks, including reporting to the duty post, were listed immediately adjacent to the exact time of the beginning of the shift.

---

[4]The court was verbally informed during a status conference that Patrick Shea has now retired. We never received, however, any written documentation regarding the date of this occurrence.

[5]Plaintiffs entered into a Stipulation of Dismissal in *Adams v. United States*, No. 97-140C and consolidated cases, for all claims prior to April 18, 2000. These cases are commonly referred to as "*BOP II*."

[6]Lt. Shea only brings claims for pre- and post-shift overtime for the times he served as an Operations Lieutenant, a Training Lieutenant, and an Emergency Preparedness Lieutenant. We are therefore unsure if he did indeed serve as a Quarters Lieutenant as indicated on the Quarterly Rosters.

Below, for example, is an excerpt from a June 30, 2002 post order for the Operations Lieutenant on the Evening Watch:

> POST: OPERATIONS LIEUTENANT
> HOURS: 4:00 PM-12:00 MN
> SHIFT: 12
> EQUIPMENT: KEY RING * * *
> RADIO, HANDCUFFS / ISSUE
>
> ALL LIEUTENANTS WILL REPORT TO THE INSTITUTION IN A TIMELY MANNER. EXCHANGE CHITS FOR EQUIPMENT. ESTABLISH YOUR PRESENCE WITH THE SHIFT LIEUTENANT AND CAPTAIN. RECEIVE ALL PERTINENT INFORMATION AND INSTRUCTIONS FOR YOUR SHIFT.
>
> 4:00 PM REPORT TO THE LIEUTENANTS' OFFICE. ASSUME RESPONSIBILITY FOR THE SHIFT. HOLD ROLL CALL. ALL OFFICERS MUST CHECK IN WITH THE LIEUTENANT. CHECK THE LIEUTENANTS' CLIP BOARD FOR ANY PENDING RELEASES, FURLOUGHS, BUS MOVEMENTS, MARSHALS' COMMITMENTS OR RELEASES. NOTIFY THE CONTROL CENTER OF ALL ACTIVITY. AT LEAST ONCE DURING YOUR SHIFT, VISIT ALL UNITS AND OFFICERS, CHECKING FOR SECURITY OR SAFETY DISCREPANCIES.
>
> * * * * *
>
> 12:00 MN ENTER YOUR SHIFT ACTIVITIES INTO THE LIEUTENANTS' LOG. PRINT THE LIEUTENANTS' DAILY LOG FOR THE CAPTAIN'S REVIEW.

Pl. App. at 330. Although this is a typical Operations Lieutenant post order, the particular tasks varied. Almost all of the post orders, however, stated, "receive all pertinent information . . . for your shift" at the beginning of the shift and "pass on all pertinent information to your relief and exchange chits for keys and equipment" at the end of the shift. Post orders were of limited duration, normally being effective for three months before a new set was issued.

Irrespective of the particulars of the post order requirements, Lt. Shea started and ended his days in generally the same manner. He would arrive and enter the institution through secure doors. He would first report to the Control Center to pick up keys or a chit[7] and possibly some of his equipment. Depending on what Lt. Shea needed, he may have had to wait in a short line to pick up keys or equipment. He then proceeded to the Lieutenants' Office, a walk taking approximately one and a half to two minutes, according to BOP timing.[8] There, he met with the lieutenant he was relieving and usually received the lieutenant's keys and possibly some equipment. The outgoing lieutenant would usually brief Lt. Shea about any matters affecting Lt. Shea's shift. Lt. Shea may have also, at any point during this process, received information from the captain or other lieutenants. At this point, the outgoing lieutenant was usually free to go and Lt. Shea would hold roll call or check documents containing information about his shift. Sometimes, he had to go directly to another part of the institution to supervise an activity, such as meals.

At the end of Lt. Shea's shift, he was responsible for entering shift activities into the Lieutenants' Log. Depending on the shift, he was sometimes responsible for printing the log out for the Captain's review. His replacement would meet with him to retrieve the keys and any equipment the incoming

---

[7]The parties described a chit as a small piece of plastic or metal that identified an employee. Employees were to leave their chit in place of any keys they may have so the Control Center would know who was responsible for that set of keys. Lt. Shea would sometimes go to the Control Center to drop off his chit and pick up the chit of the lieutenant he relieved. He would then return the outgoing lieutenant's chit to him and the outgoing lieutenant would give the keys directly to Lt. Shea, instead of returning them to the Control Center.

[8]Although it is unclear if plaintiffs dispute this particular estimate, they do not offer a timed alternative to controvert it.

lieutenant may need. Lt. Shea would then pass on pertinent information to the oncoming lieutenant and he was relieved of duty. He would then exit the institution. Lt. Shea stated that he usually passed through the Control Center on average three times a week to drop off equipment. Other days he proceeded directly out of the institution.

Plaintiffs contend that the post orders "mandated" that Lt. Shea arrive at the institution "a minimum of 15 minutes early [before the shift began] to get [his] equipment, receive all pertinent information about the shift, take roll calls and begin [his] tour." Pl. App. at 325 (Shea's Answer to Interrogatory #1). Lt. Shea interpreted a post order as a directive that he arrive early enough to be at his post by the designated time, after having performed all the tasks listed both next to or above the start time of his shift. For some shifts, such as the Operations Lieutenant on the Evening Watch, Lt. Shea felt it was necessary to arrive up to thirty minutes early. Plaintiffs also point out that the post orders frequently listed a number of tasks next to the time Lt. Shea's shift ended. He interpreted this as an order that none of these tasks could be performed prior to the end of his shift. By performing these tasks no earlier than the end of his shift, he left his post ten to fifteen minutes after his shift ended.

One task listed at the start time of a shift in several of the post orders during the claim period was holding roll call.[9] Post orders state that roll calls should occur at the lieutenant's shift starting time. Plaintiff Shea alleges, however, that the post order did not reflect reality. He contends that he had to come in early to hold roll calls before his shift began because the employees attending roll call were supposed to be at their posts by the beginning of his shift.[10] He further avers that Capt. Haynes would sometimes e-mail information to him to pass on at these roll calls, making roll calls more time consuming.[11]

---

[9]The parties disagree as to whether roll calls were mandatory and at what point they were no longer required at all. This fact, however, is irrelevant to our analysis.

[10]Lt. Shea's shifts did not necessarily correspond exactly with those of his subordinates.

[11]Plaintiffs have not produced these e-mails and therefore their content is unclear.

Defendant counters this description with the affidavit of Capt. White, who states that "[a]t FCI Otisville, a Lieutenant always was on duty at the time of any roll call for correctional officers, and it was not necessary for another Lieutenant to come in early before his or her scheduled shift to give a roll call for correctional officers." Def. App. at 333 (Declaration of Douglas White). Additionally, Capt. White states that roll calls were optional and did not occur if correctional officers did not show up. *Id.*

According to Plaintiffs' Proposed Findings of Uncontroverted Fact, we deduce that Lt. Shea is claiming the following overtime for these shifts:

> Morning Operations Lieutenant, 12:00 am to 8:00 am, under Capt. Haynes- Lt. Shea claims he arrived approximately fifteen to thirty minutes early to pick up equipment from the Control Center, read reports and Lieutenants' Logs, and hold roll call. He does not, however, make any specific claims for post-shift overtime with this shift. Pl. App. at 342 (Post Order dated June 13, 2003).
>
> Day Operations Lieutenant, 7:30 am to 4:00 pm, under Capt. Haynes- Lt. Shea makes no explicit claims for overtime for preliminary work, but states that he exited the institution ten to fifteen minutes late, after he entered shift activities, passed on pertinent information, and exchanged equipment. Pl. App. at 329 (Post Order dated June 20, 2002).
>
> Evening Operations Lieutenant, 4:00 pm to 12:00 am, under Capt. Haynes- Lt. Shea claims he arrived a half hour early in order to obtain keys and a radio from the Control Center, receive pertinent information, report to the Lieutenants' Office, hold roll call, and exchange equipment. Lt. Shea also claims that he had to pass on information and exchange equipment with the oncoming lieutenant at the end of his shift and he would not leave the institution until 12:10 am. Pl. App. at 339 (Post Order dated March 17, 2003 ).
>
> Training Lieutenant, 7:30 am to 4:00 pm, under Capt. Haynes- Lt. Shea claims he arrived early to pick up his equipment from the Control Center, receive pertinent information, and check in once a week with the employee development coordinator. He

> never quantifies this claim, however, and does not claim any post-shift time. Pl. App. at 340 (Post Order dated March, 17, 2003).
>
> Day Emergency Preparedness Lieutenant, 7:30 am to 4:00 pm, under Capt. Haynes- Lt. Shea does not make any preliminary claims in regard to this shift, but he mentions that he exited the institution about five minutes after the end of his shift. Lt. Shea never articulates this claim any further.
>
> Day Operations Lieutenant, 8:00 am to 4:00 pm, under Capt. White- In March 2005, FCI-Otisville adjusted its schedules again, this time removing the overlap between all shifts. Lt. Shea claims he then had to arrive at 7:30 am to prepare for the start of his 8:00 am shift. It is unclear what he claims as postliminary overtime.

While Lt. Shea makes claims for the time it took to perform preliminary duties in order to be at his post by the shift start time listed on the post order, it is important to understand that official BOP policy did not require employees to be at their post at the start or end of their shift. In 1995, the BOP issued Operations Memorandum 214-95, which explained that employees were to be considered "on time" for their shift if they were obtaining necessary keys at the Control Center at their official start time, and that their shift ended at the key line as well:

> 2. SCHEDULING CONSIDERATIONS
>
> a. An institution employee whose shift starts at 7:30 a.m. must be at the Control Center and have received his/her equipment no later than 7:30 a.m. to be considered "on time" for the start of his/her shift. To accomplish this, each location should ensure minimum waiting time for the employee in the key line.
>
> If that same employee's shift ends at 4:00 p.m., he/she should drop-off his/her keys/equipment in the Control Center at 4:00 p.m., the scheduled quitting time. Reasonable travel time to and from

> the duty post to the control center would be compensable as part of the employee's tour of duty. . . .

Def. App. at 316-20 (Operations Memorandum 214-95, November 1, 1995). The memorandum further states: "Time in Key Line: If an employee arrives at the key line in a reasonable time to get equipment prior to the shift, but does not receive the equipment/keys by the beginning of the shift, this employee is not to be considered late." Def. App. at 322. These policies were incorporated into the Human Resources Management Manual by Change Notice 3000.02, issued on April 16, 1996, and are still currently in place throughout all BOP institutions.

Lt. Shea initially claimed overtime for the beginning and end of all of his shifts. His proposed findings of fact and his deposition testimony, however, demonstrate that Lt. Shea does not have claims for every shift under every captain. Further, on September 26, 2004, Capt. White issued a change to the Monday through Friday rosters and adjusted the start and stop times of the lieutenant shifts. The new times created at least five minutes of overlap between every shift: Day Watch- 7:45am to 4:15 pm; Evening Watch- 4:10 pm to 12:10 am; and Morning Watch stayed the same- 12:00 am to 8:00 am. *See* Pl. Proposed Findings of Uncontroverted Fact ("PFUF") at 54-55. Lt. Shea has no preliminary or postliminary claims for that period. On March 27, 2005, however, Capt. White re-adjusted the schedules and removed all overlap from the shifts. Plaintiff Shea's claims for overtime resume at that point.

Lt. Shea's claims also include overtime for time outside his shift spent at lieutenants' meetings. He argues that he was eligible for overtime pay for each of these meetings. In supplemental briefing, however, Lt. Shea explains that he was approved for overtime compensation for each of the meetings he attended outside of his shift. When an employee performs overtime, the employee may be compensated in one of two ways: 1) overtime pay at a rate of one and one half of the employee's normal pay rate, subject to a cap, or 2) compensatory time off, equal to the amount of extra time worked. Shea makes monetary claims now for the extra half of his pay rate that he did not receive when he received compensatory time as opposed to overtime pay for his extra work. Lt. Shea asserts that he was required to take compensatory time and could not seek overtime pay, even though he wanted it instead.

In Lt. Shea's final affidavit, he also, for the first time, claims overtime pay for that half pay difference for other instances in which he performed overtime and received compensatory time instead of overtime pay. His affidavit includes eleven dates beginning in June 2000 through May 2002 in which he received compensatory time for overtime work, not including the lieutenants' meetings discussed above.

This particular complaint was filed on February 25, 2003. Pursuant to the court's request for plaintiffs to advance a case for partial summary judgment in which the employee could meet the written order or approval requirement of *Doe II*, "Plaintiff Patrick Shea's Motion for Partial Summary Judgment" was filed on May 27, 2005. The government opposed the motion and cross-moved for partial summary judgment with regard to Patrick Shea. Because the same law is applicable, this case was stayed, pending the completion of briefing in a summary judgment motion in another BOP case, *Carlsen v. United States*, No. 00-617C. Oral argument for both cases was held simultaneously on May 16, 2006, and continued on June 20, 2006.

## DISCUSSION

Plaintiffs' motion for partial summary judgment is based on two theories: 1) the Federal Circuit's 2004 decision in *Doe v. United States* should not apply because "the Doe factual model just does not fit the [BOP];" and 2) even if *Doe* applies, plaintiff Patrick Shea can prove that he was ordered, in writing, to work overtime. Defendant responds that *Doe* is not distinguishable and controls this case and that Patrick Shea's written documents fail as sufficient proof of written orders under the *Doe II* test.

### I. Partial Summary Judgment Standard

Both parties agree that summary judgment is appropriate in this case. Under Rule 56(c), the moving party is entitled to summary judgment if the pleadings, depositions, answers to interrogatories, admissions, and affidavits show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. *Telemac Cellular Corp. v. Topp Telecom, Inc.*, 247 F.3d 1316, 1323 (Fed. Cir. 2001). Because no dispute of material fact exists on most of the claims, it is proper to decide them on summary judgment.

## II. Admission by Plaintiff Patrick Shea

Defendant argues that plaintiffs' failure to timely answer a "Request for Admission" on October 22, 2004 amounts to an admission[12] to the lack of a FEPA violation and, therefore, all evidence to the contrary should be ignored. Defendant asserts that by answering the request a month late, without requesting an enlargement of time, plaintiff Shea admitted that "during the period February 25, 1997 to the present, PATRICK SHEA was not ordered or approved <u>in writing</u> to work overtime for BOP, without receiving either compensatory time or overtime pay for such overtime work." Def. App. at 19-25a.

As we held in our August 2, 2005 order in *Aaron v. United States*, No. 00-315C, and consolidated cases, although plaintiff Shea's tardiness in submitting an answer creates grounds to accept defendant's motion to deem these matters admitted, deeming the lack of claims admitted is an inappropriate penalty. Plaintiff Shea was a month late in filing his response. Defendant did not bring this argument until it filed its response and cross-motion for summary judgment on August 11, 2005, nearly eleven months after the deadline for the "Request for Admission" had passed. Defendant's failure to pursue this claim earlier strongly suggests a lack of prejudice. We decline to deem the late response as a concession.

## III. The Impact of *Doe v. United States*

The parties recognize the importance of the 2004 Federal Circuit's decision in *Doe II* to the outcome here. The court there rejected an overtime

---

[12]Defendant's argument is based on the Rules of the Court of Federal Claims ("RCFC") Rule 36(a). RCFC 36(a) states, in relevant part:

> The matter is admitted unless, within 30 days after service of the request, or within such shorter or longer time as the court may allow or as the parties may agree to in writing, subject to RCFC 29, the party to whom the request is directed serves upon the party requesting the admission a written answer or objection addressed to the matter, signed by the party or by the party's attorney.

claim under FEPA because plaintiffs did not work overtime that had been "ordered or approved" in writing by an authorized official. Plaintiffs in the case at bar concede that their argument is substantially undercut if the present facts cannot be distinguished from *Doe*.

Plaintiffs in *Doe* served as representatives for a class of more than nine thousand past and present Department of Justice ("DOJ") attorneys claiming overtime for work performed between 1992 and 1999. Plaintiffs claimed overtime under FEPA, which states: "hours of work officially ordered or approved in excess of 40 hours in an administrative workweek, or . . . in excess of 8 hours in a day, performed by an employee are overtime work and shall be paid for . . . ." 5 U.S.C. § 5542(a). In *Doe v. United States*, 54 Fed. Cl. 404 (2002) ("*Doe I*"), this court held the government liable for overtime compensation for time worked by plaintiffs in excess of forty hours per week. Plaintiffs offered various forms of evidence, ranging from testimony of the former Assistant Attorney General, to attorneys' manuals, to internal memoranda and time-keeping books, in order to prove that overtime had been ordered or approved.

The government conceded that at least some members of the class at some times worked over forty hours per week. However, defendant argued that FEPA and the applicable Office of Personnel Management ("OPM") regulation[13] barred plaintiffs from additional compensation because the overtime was not "ordered or approved . . . in writing by an officer or employee to whom this authority has been specifically delegated." 5 C.F.R. § 550.111(c) (2005) ("OPM regulation"). The government argued that plaintiffs did not have the requisite written orders or approvals to satisfy the overtime compensation requirement. This court disagreed. We refused to follow the stringent writing requirement of the OPM regulation and instead relied on the approach applied in *Anderson v. United States*, 136 Ct. Cl. 365 (1956), and subsequent cases. The court found that in recent years, a broader interpretation of the phrase "ordered or approved" had developed and we therefore concluded that the inducement by government officials to work overtime warranted additional payment. *Doe I*, 54 Fed. Cl. at 407. The court certified its summary judgment order for interlocutory appeal.

---

[13]The regulation was enacted by OPM's predecessor, the Civil Service Commission, and has been applicable since 1945.

The Federal Circuit reviewed the prior decisions of the Court of Federal Claims and the Court of Claims regarding overtime. The court focused closely on the language of the OPM regulation: "overtime work in excess of any included in a regularly scheduled administrative workweek may be ordered or approved only in writing by an officer or employee to whom this authority has been specifically delegated." 5 C.F.R. § 550.111(c). Two inconsistent lines of cases had developed regarding this regulation. In *Post v. United States*, the court found that compensation is only due when overtime is officially and explicitly ordered and approved. Further, the court mentioned in dicta that the OPM regulation seemed to be "a necessary safeguard against subjecting the Government to improper expense." *Post v. United States*, 121 Ct. Cl. 94, 99 (1951); *see also Gray v. United States*, 136 Ct. Cl. 312, 317 (1956) ("[I]t is recommended that the plaintiff's petition be dismissed since the overtime was performed by the plaintiff having clear knowledge that it had not been ordered or approved in writing by the Commissioner of the Bureau of Narcotics."); *Gaines v. United States*, 132 Ct. Cl. 408, 413 (1955) ("Absent the written authorization or approval as required by the statute and regulations, plaintiff is not entitled to recover."); *Tabbutt v. United States*, 121 Ct. Cl. 495, 505 (1952) ("The findings show that [authorized officials never] ordered or approved the overtime worked by the plaintiffs in these cases.").

On the other hand, in 1956, the court held in *Anderson v. United States* that this strict interpretation allowed agency officials to withhold written orders or approvals for overtime in order to avoid compensation. *Anderson*, 136 Ct. Cl. at 393. The *Anderson* court held that the Civil Service Commission did not have the authority to create procedural limitations on the substantive policy of FEPA through regulation. Over the years, a number of cases followed in which the Court of Claims applied the *Anderson* decision in circumstances in which written orders did not exist but employees were induced by government officials to work overtime. *See McQuown v. United States*, 199 Ct. Cl. 858 (1972); *Baylor v. United States*, 198 Ct. Cl. 331 (1972); *Fix v. United States*, 177 Ct. Cl. 369 (1966); *Rapp v. United States*, 167 Ct. Cl. 852 (1964); *Byrnes v. United States*, 163 Ct. Cl. 167 (1963); *Adams v. United States*, 162 Ct. Cl. 766 (1963).

In *Doe II*, however, the Federal Circuit concluded that the Supreme Court's decision in *Schweiker v. Hansen*, 450 U.S. 785 (1981), effectively overruled the *Anderson* line of cases. *Hansen* was inconsistent with two of the rationales of the *Anderson* decision: 1) that the OPM regulation was invalid

because it added a procedural requirement to FEPA; and 2) that equity required overtime compensation where the government "induced" the overtime work.

*Hansen* involved the Social Security Act, 42 U.S.C. § 402(1)(D) (1974), and one of its corresponding regulations. The Social Security Act allows persons to receive the social security benefits to which they are entitled if they have filed an application. One of the accompanying regulations requires that the application be in writing. 20 C.F.R. § 404.602 (1974). The plaintiff in *Hansen* was not informed of this requirement and failed to submit a written application. The Second Circuit concluded that the regulation requiring the written application was a "mere 'procedural requirement' of lesser import than the fact that [the plaintiff] . . . had been 'substantively eligible' for the benefits" under the Act. 450 U.S. at 787 (citing *Schweiker v. Hansen*, 619 F.2d 942 (2d. Cir. 1980)). The Supreme Court disagreed and held that the agency was wholly within its power to promulgate and enforce a regulation providing the procedure necessary for the application of benefits. The Court stated, "A court is no more authorized to overlook the valid regulation requiring that applications be in writing than it is to overlook any other valid requirement for the receipt of benefits." *Id.* at 790.

In *Doe II*, the Federal Circuit stated, "the Supreme Court necessarily concluded that the writing requirement was not invalid simply because it added an additional procedural requirement to the substantive requirements of the statute." 372 F.3d at 1356. The Federal Circuit agreed with the D.C. Circuit's statement regarding *Hansen* that "no distinction between substantive and procedural requirements suffices to mitigate the court's responsibility to ensure observance of regulations governing claims on the public fisc." *Boulez v. Commissioner*, 810 F.2d 209, 218 n.68 (D.C. Cir. 1987) (citing *Hansen*, 450 U.S. at 790).

The *Doe II* court also rejected plaintiffs' equitable considerations argument. The court found that *Hansen* and subsequent cases required courts to follow stringent regulations, regardless of equity concerns. "The Supreme Court has left no doubt that it is 'the duty of all courts to observe the conditions defined by Congress for charging the public treasury.'" *Koyen v. Office of Pers. Mgmt*, 973 F.2d 919, 922-23 (Fed. Cir. 1992) (quoting *Hansen*, 450 U.S. at 788). *See also Office of Pers. Mgmt v. Richmond*, 496 U.S. 414, 425 (1990) ("Any exercise of a power granted by the Constitution to one of the other branches of government is limited by a valid reservation of congressional control over funds in the Treasury.").

The *Doe II* court overturned *Anderson* and subsequent cases which followed its rationale:

> In light of *Hansen* and *Richmond*, we are compelled to hold that the *Anderson* line of cases is no longer good law and that the written order requirement is not invalid on the ground that it imposes a procedural requirement that limits the right to overtime compensation under the statute or because it is inequitable.

*Doe II*, 372 F.3d at 1357 (citing *Bankers Trust N.Y. Corp. v. United States*, 225 F.3d 1368, 1373 (Fed. Cir. 2000)). The Federal Circuit rejected the remainder of plaintiffs' arguments that the writing requirement was invalid under the statute, finding that the OPM was not limited to promulgating administrative directives, but did, in fact, have the authority to adopt substantive requirements by regulation.[14]

The *Doe II* court then moved on to determine if the writings submitted by plaintiffs met the requirements of the regulation. The court found two problems with the writings: 1) many were not authored by those with authority to "officially order[] or approve[]" overtime, and 2) those that were authorized "[did] not order attorneys to work any amount of overtime–[they did] not even, as the plaintiffs contend, order an indefinite number of overtime hours." 372 F.3d at 1363. Upon reviewing the remainder of the written documents, the court concluded that "none of them includes an express directive to work overtime, and none communicates the approval of overtime work by those officials authorized to order overtime." *Id.*

---

[14]The Federal Circuit also subjected the regulation to the two-step deference analysis enunciated in *Chevron U.S.A. Inc. v. Natural Res. Def. Council*, 467 U.S. 837 (1984). First, the court determined that the statute was ambiguous with respect to whether orders and approvals could be oral, written, or both. Second, the court held that the OPM regulation did not contradict, and was a reasonable interpretation of, the statute. In fact, the legislative history of FEPA suggested that one of the purposes of the statute was to limit unanticipated government liabilities to pay overtime. *Doe II*, 372 F.3d 1347 (citing *Salary and Wage Administration in the Federal Service: Hearing on H.R. 2497 and H.R. 2703 Before the House Comm. on the Civil Service*, 79th Cong. 42 (1945)).

Thus, the Federal Circuit held that the *Doe* plaintiffs did not prove that their overtime was ordered or approved in writing by an official with authority to make such decisions. The court reversed the Court of Federal Claims grant of summary judgment and ordered entry of summary judgment in favor of defendant.

Plaintiffs filed a motion for reconsideration in this court. We found that the Federal Circuit's decision that "knowledge, encouragement, and inducement by management or supervisory personnel do not authorize overtime pay" precluded the remainder of plaintiffs' claims and therefore all issues had been decided by our and the Federal Circuit's previous opinions. *Doe v. United States*, 63 Fed. Cl. 798, 801 (2005) ("*Doe III*").

## IV. Distinguishing *Doe v. United States*

Plaintiffs contend that *Doe II* is distinguishable from these BOP cases for several reasons: 1) DOJ attorneys are professionals who operate independently, unlike BOP employees; 2) BOP employees work in a more secure, dangerous environment; 3) the Bureau's mission necessitates rigid work scheduling; 4) Congress recognizes that law enforcement employees are unique; 5) it is difficult to schedule overtime in advance in the BOP; 6) plaintiffs received direct orders in writing; 7) BOP employees must follow orders, whether oral or written; and 8) the BOP discourages requests for overtime.[15]

Plaintiffs argue that they are not as autonomous as DOJ attorneys because they are or were members of an agency that defines itself as a quasi-military organization; they are considered law enforcement officers, irrespective of their title. Plaintiffs stress the importance of following orders, written or oral,[16] because BOP has a mission to "protect society by confining

---

[15]Plaintiffs also claim that applying *Doe II* would violate the substantive purpose of FEPA to ensure overtime compensation, but we do not offer analysis on this point, as this argument was the basis of the *Anderson* decision overturned by the Federal Circuit in *Doe II*. 372 F.3d at 1353, 1357.

[16]Plaintiffs stress that the Standards of Employee Conduct require them to follow all orders, whether written or oral. "Employees are to obey the orders of their superiors at all times. In an emergency situation, carrying out (continued...)

offenders in the controlled environments of prisons and community-based facilities that are . . . appropriately secure." Pl. App. at 1 (BOP Mission Statement). Plaintiffs argue that this secure environment requires time-consuming barriers to entry and exit, tighter key control before and after shifts, and an unofficial overlap in shifts in order to brief reliefs, exchange equipment, and not leave posts unattended. Additionally, they contend the work culture within the BOP rewards those who work longer hours with more opportunities for promotion. Internal promotion is more important than at DOJ, they argue, because the skill set learned at the correctional institution is less transferable to the private market.

Further, plaintiffs argue that Congress recognizes that law enforcement employees are unique. Different overtime requirements exist for law enforcement personnel under the FLSA, 29 U.S.C. § 207(k), and FEPA, 5 U.S.C. § 5542(a)(4). *See also* 29 U.S.C. § 213(b)(20) (no maximum hours for law enforcement employees). While it is true that these statutes have been enacted specifically for law enforcement and other safety officers, no statute exists exempting the officers from the writing requirement of the OPM regulation addressing overtime authorization. Congress certainly did not explicitly exempt them from the requirements of FEPA and its implementing regulations.

Plaintiffs also argue that it is more difficult for BOP to schedule and approve overtime in advance due to the unpredictable nature of the work. We find this irrelevant. The statute and regulation in question do not require that the overtime be authorized or approved in writing in advance. In fact, in most instances in which BOP employees have performed approved overtime, the written authorization was subsequent to the actual work, but it was still approved and compensated.

In addition, plaintiffs stress that BOP discourages requests for overtime, particularly from higher-ranking managers. Assistant wardens, for example, were told not to ask for overtime pay or compensatory time for pre-shift activities. This, however, also does not affect the OPM writing requirement

---

[16](...continued)
the orders of those in command is imperative to ensure the security of the institution." Pl. App. at 265 (BOP Program Statement, Standards of Employee Conduct).

regulation. While plaintiffs offer an array of evidence and case law to support these distinguishing factors, we find it unnecessary to address them in detail. We are bound to follow *Doe II*, and thus plaintiffs' alleged distinguishing factors fail. The Federal Circuit did not condition application of the OPM regulations on the independence or work environment of DOJ attorneys or on how work was scheduled.

We conclude that the only remaining potential basis for plaintiffs to recover is if they can point to direct orders, in writing, to perform overtime. We therefore deny all claims for overtime based on oral orders made by supervisors and work performed in accordance with the culture and expectations of the agency.

*Preliminary and Postliminary Work*[17]

Post Orders

Lt. Shea offers post orders as written documentation of overtime orders authorized by a proper official. Post orders are described by various BOP employees as written instructions as to what needs to be accomplished and what is expected of certain individuals during their shift. *See* Def. App. at 15, 64, 128 (Depositions of Shea, Menifee, and Wilner). The post orders list lieutenant activities for each shift as well as their beginning and end times. The Correctional Services Manual explains that post orders list "activities chronologically with responsibilities clearly defined." Pl. Supp. App. at 7. Plaintiffs contend that post orders have to be followed and that the activities set out must be performed at the exact time listed, or the employee may be subject to discipline. Plaintiff Shea claims that in order to complete the tasks required by the post orders he was required to work before and after his

[17]Plaintiffs offer other documents, such as weekly rosters, minutes of lieutenants' meetings, and general training documents and manuals in an attempt to fulfill the writing requirement necessary for overtime compensation. In the following section, we address only the writings addressed to lieutenants, or Lt. Shea specifically, that could feasibly lead to an overtime claim. Rosters, and other documents listing only the starting and ending times of shifts, the absentee list at meetings, or explanations that employees must follow supervisor orders do not present evidence of an order or approval for overtime and are rejected as claims of written overtime orders or approvals.

regularly scheduled shift. In effect, the post orders implicitly required him to work overtime. Plaintiffs argue, "In simple terms, the captain approves the post orders, and if the post orders require the lieutenants, directly or indirectly, to perform activities necessarily before their scheduled shift, it is reasonable to infer that the captain is granting the lieutenants permission to work overtime or ordering them to do so." Pl. Reply and Opp. at 16.

Defendant asserts, however, that post orders are merely "guidelines for what is expected during a shift" and that listing tasks next to a certain time "doesn't mean you have to do everything right at [that time]." Def. App. at 64 (Deposition of Warden Frederick Menifee). Defendant also points out that none of the post orders explicitly required lieutenants to arrive early or stay late. Moreover, according to the Lieutenants' Logs, plaintiff Shea was usually relieved of duty by the end of his shift.

An example of an explicit order for overtime can be found in *Albright v. United States*, 161 Ct. Cl. 356 (1963). There, naval shipyard guards were ordered, by regulation, to "[r]eport to police headquarters 15 minutes before going on duty." *Id.* at 359. The guards claimed twenty minutes of overtime, the fifteen required by regulation and five which they asserted were implicitly expected by their supervisors. *Id.* at 360-61. The court only allowed overtime pay for the fifteen minutes officially ordered and not the additional five that were expected. *Id.* at 361. It is also important to point out that plaintiffs in *Albright* and *Bilello v. United States*, another naval shipyard guard case, were in law enforcement positions similar to plaintiff Shea. *See Bilello v. United States*, 174 Ct. Cl. 1253 (1966) (holding that even though explicit written orders for thirty minutes pre-shift overtime previously existed, verbal orders from supervisors without authority to order overtime were insufficient to prove overtime was ordered or approved).

We agree with plaintiffs that post orders are sufficiently directive to meet the *Doe II* test.[18] We find, however, that most of these orders do not explicitly order or approve overtime. None of the post orders presented here, in explicit terms, orders a lieutenant to report early or stay late. The only explicit statement regarding timing of tasks is "report to the institution in a

[18]Unlike in *Doe II*, the government does not suggest the post orders here were unauthorized. They were signed by captains, supervisors with the authority to order overtime.

timely manner." Although post orders place a number of tasks ahead of the starting time of the shift and a number of tasks next to the specific starting time, we think it is unreasonable to interpret this as a directive to arrive early. The tasks cannot all be completed at that exact time. This fact, coupled with the statement on the BOP policy that the shift begins while employees are picking up keys preclude treating the schedule as an order to appear early or stay late.

The only exception we find is with respect to those tasks listed at the beginning and end of each shift which inherently require the presence of two employees, one of whom is off-duty. Most of the post orders presented required lieutenants beginning and ending their shifts to exchange information and equipment with the oncoming or outgoing lieutenants. For example, the Day Operations Lieutenant post order from June 30, 2002 stated at 4:00 pm that the lieutenant was to "pass on all pertinent information to [his or her] relief and exchange chits for keys and equipment." The Operations Lieutenant shifts,[19] during Capt. Haynes' tenure, only overlapped at one period during the day. Two lieutenants were both on duty for the same position from 7:30 am to 8:00 am. When lieutenants changed over at 4:00 pm and 12:00 am, however, there was no overlap.

Defendant contends that even these post orders are insufficient as a matter of law because they do not explicitly order plaintiffs to arrive early or stay late to work overtime.[20] We disagree. Although it is correct that the post orders do not explicitly order overtime, for at least one of the individuals the post orders constitute an instruction to perform work which occurs outside of a shift.

Defendant advances several factual arguments as well. Defendant disputes plaintiffs' estimates of the time necessary to complete these tasks,

---

[19]Training and Emergency Preparedness Lieutenants only had one shift per day and the overlap and exchanging information issue was therefore not a problem.

[20]Defendant points to a statement made by plaintiffs in their briefing, that post orders indicate activities "to be performed during a shift" and therefore did not list tasks necessary before or after a shift. *See* Pl. Mot. Sum. J. at 26. *See also* Def. Reply at 7. These documents control, however.

claiming that they required so little extra time as to be legally de minimis. The government presents depositions of all three successive captains stating that all significant information was available for the lieutenants to read during their shift in the Lieutenants' Log and therefore the passing on of information should take no longer than one to two minutes. Lt. Shea claims, however, that briefing required "about five minutes" and exchanging equipment took an additional one to two minutes. Def. App. at 6 (Deposition of Patrick Shea). Lt. Shea fails to offer any explanation as to what exactly took place during these activities.

Further, defendant cites BOP regulations and memoranda pursuant to which employees were ordered to obtain prior authorization before performing non-emergency overtime: "Prior approval of your Supervisor and Associate Warden must be obtained to work beyond your normal work hours. In case of an emergency, an Associate Warden must be notified as soon as possible." Def. App. at 193 (Memorandum from Warden Menifee to All Staff, dated July 16, 2003). If the overtime work was ordered through post orders, however, this would constitute prior authorization.

Plaintiffs offer many examples of how much time Lt. Shea worked prior or subsequent to his shift, but they do not break down the activities. For example, Lt. Shea claims that he arrived approximately thirty minutes early for the Evening Operations Lieutenant shift in order to obtain keys and equipment from the Control Center, exchange equipment and information, report to the Lieutenants' Office, and hold roll call. Lt. Shea, does not tell us, however, how long he spent performing each of those activities individually and what *exactly* that routine entailed. Without further information, therefore, a dispute arises with respect to the amount of time necessarily involved in overlapping duties. As discussed *infra*, if these activities required less than ten minutes of time outside of each employee's normal work day, then they qualify as de minimis and compensation is not required. We must therefore withhold ruling on this one claim.

*Lieutenants' Meetings*

Lt. Shea claims that the collective effect of various written documents constitutes an order to attend lieutenants' meetings during his days off or before or after his scheduled shift. Plaintiffs point, for example, to the Correctional Services Manual of the Bureau of Prisons as a written document requiring overtime attendance at lieutenants' meetings. The manual states, "a

lieutenant's meeting will be held monthly . . . ." Pl. App. at 269-70. No differentiation is made between lieutenants' attendance during their regular shifts or during time off. Plaintiffs interpret this to mean that attendance at monthly lieutenants' meetings was a requirement regardless.

This is an unreasonable interpretation. The manual only states that these meetings will be held. In fact, the manual goes on to state that "Executive staff, Department Heads, and other interested persons *should be encouraged* to attend." Def. App. at 441 (emphasis added).

Plaintiffs also claim that the FCI-Otisville Institution Supplement required attendance at lieutenants' meetings. The Institution Supplement states that its purpose is to "establish a schedule of regular meetings." Def. App. at 173. The supplement, however, merely recites the name of the meeting, the day of the month, the time, and the location. It is not a written order for attendance by all lieutenants, irrespective of schedule. In any event, other evidence is to the contrary. Neither lieutenants nor department heads attended all meetings. Minutes from the meetings consistently show lieutenants absent because the meeting was held on their day off or outside of their shift. *See e.g.*, Def. App. at 462, 465, 469-538. It was common practice that if a department head had the day off, they would simply send someone from their department to attend as the acting department head. Def. App. at 99 (Deposition of Frederick Menifee). *See also* Def. App. at 166-67.

Plaintiffs also rely on post orders to prove that Lt. Shea was ordered to appear at lieutenants' meetings during his off hours. The quarterly-issued post orders sometimes had "Special Instructions (Lieutenants)" attached behind them. A section of the special instructions stated, "All lieutenants are required to attend the monthly lieutenant's meeting held on the first Wednesday of each month, or as otherwise scheduled by the captain." Pl. App. at 475 (Post Order dated June 17, 2001). The special instructions are signed by Capt. Haynes, an official who is authorized to order overtime for lieutenants. While the order makes no exception for those lieutenants on their day off on the "first Wednesday of [the] month," an examination of the minutes of the meetings makes it clear that lieutenants routinely did not attend meetings held on their days off or beyond their duty hours. For example, the official minutes for the March 7, 2001 meeting listed the following absences:

> The following Correctional Supervisors were not present for the meeting:

Lieutenant Hussey (Evening Watch)
Lieutenant Johnson (ART [Annual Refresher Training])
Lieutenant Miles (Admin Leave)
Lieutenant Pucilowski (Military Leave)

Def. App. at 466. In fact, a chart furnished by defendant lists the meeting dates, times, and the "Lieutenants Not Attending on Day Off or Another Shift" for some of the meetings in the period from February 2001 through January 2004. Def. App. at 460. The chart indicates that Lt. Shea was not in attendance at several meetings throughout 2001 and 2002 because he was working another shift or was on his day off.

Plaintiffs also bring to our attention e-mail reminders that Janine Banks, the Warden's secretary, sent out to lieutenants and department heads before meetings. Plaintiffs claim that Warden Menifee's secretary was acting on his behalf when sending these e-mails. These reminders consisted of a list of recipients, the type of meeting, the time it was being held, and the date. The e-mails did not state who was supposed to attend the meetings or that lieutenants on their days off were supposed to attend. Plaintiffs argue that, the e-mails taken together with documents discussed above, offer proof that lieutenants, including Lt. Shea, attended lieutenants' meetings when he was not scheduled on the roster to work. We disagree. The e-mails do not explicitly order any employees to attend these meetings or work overtime, and they cannot overcome the proof, cited above, that lieutenants in fact routinely did not attend lieutenants' meetings during their off hours.

Plaintiffs' final evidentiary support for this claim consists of overtime authorization forms for lieutenants' meetings. Plaintiffs claim that these are orders to work overtime. Plaintiffs state "the authorizations specifically and expressly ordered Lt. Shea to 'attend mandatory monthly department head meeting[s] on his day off' and thus approved his overtime work at the times stated." Pl. Reply & Opp. at 19 (quoting Pl. App. at 385, 401 (Overtime Authorization Forms)). While these forms are plainly authorizations for overtime, what they prove is that Lt. Shea received compensatory time for his overtime work.

Defendant points out that Warden Menifee, the associate wardens and the captains all stated in depositions that lieutenants normally are not required to attend meetings on days off or outside their scheduled shift, but that if attendance was required, they were compensated. According to Lt. Shea's

supplemental affidavit of May 23, 2006, he attended seven off-schedule meetings during the claim period for which he did not receive overtime pay. He admits, however, that he was offered, and written documentation proves that he accepted, compensatory time off in exchange for these overtime hours.[21]

We find that most of plaintiffs' offer of documentary proof of ordered overtime fails under the test set forth in *Doe II*. With the exception of those post orders discussed above which direct the presence of two employees at one time, the documents do not order employees to specifically work overtime and/or are not authored by an official with authority to order overtime. The only issue remaining therefore, is the amount of time necessary to exchange information and equipment and any tasks that must be accomplished before the exchange.

## V. The Portal-To-Portal Act

While the Portal-to-Portal Act[22] applies to FLSA but not FEPA claims, both parties look to the Act and the Supreme Court's recent decision in *IBP, Inc. v. Alvarez*, 126 S. Ct. 514 (2005), for additional direction. Many courts, including our predecessor court, have found the Act instructive on compensable preliminary and postliminary tasks under FEPA. In *IBP*, the appellate court found that activities, such as donning and doffing required specialized protective gear, which were an "integral and indispensable part of the principal activities" for which these workers were employed were compensable as overtime. 339 F.3d 894, 902 (9th Cir. 2003). The Supreme Court, while not asked to re-evaluate this specific decision on appeal, endorsed the decision by also finding that time spent traveling from the locker rooms, where employees donned the safety gear, to their actual place of work was also compensable because the locker room was the relevant "place of performance" of the first principal activity which commenced the workday. The following activities, therefore, were within the workday. The Court, did hold however, that the time spent walking to the locker rooms before donning the equipment

---

[21]Because compensatory time is not worth as much as overtime pay on an hour for hour basis, Lt. Shea still makes claims for the additional overtime pay he would have preferred, discussed *infra*.

[22]The Portal-to-Portal Act was passed in 1947 to amend the FLSA. It is codified at 29 U.S.C. § 251 et seq. (2000).

and starting the workday was not covered by the FLSA. *IBP*, 126 S. Ct. at 524.

Plaintiff argues, and defendant concedes,[23] that the picking up and dropping off of keys is an indispensable part of the principal activity for which these employees were hired. Safety is such an integral function of the institution's mission that it is impossible to deny that protecting the keys is part of the principal activity. The act of picking up and dropping off keys or chits is a principal activity, and therefore the place where this occurs becomes the "relevant place of performance" for the beginning and end of the workday. All activities that happen within the time period between that first principal activity and the last are considered within the workday and are compensable according to the FLSA and *IBP*. *Id*.

This particular claim only involves FEPA, so we must still determine how much of the principal activity stemmed from written orders for overtime. As discussed above, we only find the overlap for the exchange of information and equipment that requires one lieutenant to be present outside of his or her shift to meet the requirements for ordered overtime under *Doe II*. To the extent that Lt. Shea chooses to arrive early to perform other activities, such as picking up keys or chits from the Control Center and walking to the Lieutenants' Office, they do not constitute officially ordered overtime and are therefore non-compensable.

---

[23]When defendant addresses *IBP*, it makes the argument that the handing over of the keys and the radio at the end of a lieutenant's shift tolls the end of his work responsibility and no time beyond that point is compensable. *See* Def. Resp. of June 2, 2006 at 4, 7. This argument impliedly concedes that the employee's responsibility to pick up the keys and radio is also included in the principal activity of the workday. While defendant argues that picking up a chit in the Control Center is not the same as picking up an actual physical set of keys, we decline to differentiate between keys and a chit, because an employee must have a chit in order to receive the keys from another employee. *See* Def. Resp. of June 2, 2006 at 5. We view this as a necessary step in protecting key integrity.

## VI. De Minimis Overtime

Finally, we must determine if plaintiff Shea's preliminary and postliminary activities still at issue require so little extra time that they should be treated as legally de minimis, thus excepting them from overtime compensation requirements. Plaintiffs do not claim that the amounts of overtime are undisputed. They only assert that the overtime is not de minimis in nature. The relevant regulation states:

> If the head of a department reasonably determines that a preshift or postshift activity is closely related to an employee's principal activities, and is indispensible to the performance of the principal activities, and that the total time spent in that activity is more than 10 minutes per daily tour of duty, he or she shall credit all of the time spent in that activity, including the 10 minutes, as hours of work.

5 C.F.R. § 550.112(b)(1)(i) (2003). Plaintiffs must prove, therefore, that the pre- and post-shift tasks in question took more than ten minutes per day, per employee, in order for them to be compensable.

The Federal Circuit has adopted a list of factors that must be considered when determining if overtime work is de minimis: "(1) the practical administrative difficulty of recording additional time; (2) the aggregate amount of compensable time; and (3) the regularity of the work." *Bobo v. United States*, 136 F.3d 1465, 1468 (Fed. Cir. 1998) (quoting *Lindow v. United States*, 738 F.2d 1057, 1063 (9th Cir. 1984)). The Federal Circuit adopted these factors from *Lindow v. United States*, a Ninth Circuit case with facts similar to those relevant here. In *Lindow*, Army Corps of Engineers employees claimed that they performed overtime under the FLSA when they had to review log books and exchange information before their shifts. 738 F.2d at 1059-60. Because these claims were based on the FLSA, the court had to apply a different analysis, based on the Portal-To-Portal Act, to the preliminary and postliminary work. The de minimis rule used by the court, however, has been applied to FEPA cases. *See Abrahams v. United States*, 1 Cl. Ct. 305 (1982) (applying the de minimis rule to plaintiffs' FEPA claims). *See also Anderson v. Mt. Clements Pottery Co.*, 328 U.S. 680, 692 (1942) (defining de minimis); *Baylor v. United States*, 198 Ct. Cl. 331(1972); *Ayres v. United States*, 186 Ct. Cl. 350 (1965). The Ninth Circuit concluded that, irrespective of whether plaintiffs' aggregate claim was for substantial work, "their claim

[was] de minimis because of the administrative difficulty of recording the time and the irregularity of the additional pre-shift work." *Lindow*, 738 F.2d at 1064.

In *Bobo*, the court held that plaintiffs' claims "concerned de minimis duties and restrictions and consequently were noncompensable under the FLSA." 136 F.3d at 1468. At issue in *Bobo* was whether work-related stops and restrictions on plaintiffs' commute were compensable. The court held that these minor duties were "infrequent, of trivial aggregate duration, and administratively impracticable to measure." *Id.* Although the facts in *Bobo* are distinguishable from our situation here, the de minimis rule adopted by the Federal Circuit must still be applied to the facts in the same manner.

The only written orders that plaintiff Shea has produced which may pass the scrutiny of *Doe* are post orders that require lieutenants on different shifts to come together to exchange information and equipment before or after their shift. Because there is a dispute of fact over the amount of time necessary for these individual tasks, it is impossible to determine if they are de minimis in nature. We therefore, reserve this question for determination at trial.

**VII. Compensatory Time Versus Overtime Pay**

Plaintiff concedes that he received compensatory time for all of the lieutenants' meetings that he attended. He argues, however, that he wanted overtime pay but that his supervisors required him to take compensatory time instead. As discussed *supra*, compensatory time is awarded on a one-for-one hourly basis while overtime is paid out at one and a half times the hourly wage basis, subject to a cap. Lt. Shea requests the half time difference between the compensatory time he received and the overtime pay he wanted.[24]

Defendant argues that Lt. Shea's receipt of compensatory time was sufficient overtime compensation. We agree. The relevant regulation regarding compensatory time states:

---

[24]In Lt. Shea's last affidavit, dated May 23, 2006, he also argues that he should receive the half time pay for other occasions where he received compensatory time for his overtime duty.

> The head of an agency may provide that an employee whose rate of basic pay exceeds the maximum rate for GS-10 . . . shall be compensated for irregular or occasional overtime work with an equivalent amount of compensatory time off from the employee's tour of duty instead of payment under § 550.113 of this part.

5 C.F.R. § 550.114(c) (2005). Because the regulation states that either form of compensation is sufficient, we find that Lt. Shea received proper compensation for his time. Further, Lt. Shea presented overtime authorization forms to the court. *See, e.g.*, Def. App. at 178. These forms indicate that Lt. Shea elected compensatory time and received it. Lt. Shea has presented no proof that he wanted overtime pay at the time but was denied it.

CONCLUSION

For the foregoing reasons, we deny plaintiffs' motion for partial summary judgment with regard to Patrick Shea and we grant in part and deny in part defendant's cross-motion for partial summary judgment. Trial on the remaining issues is set for August 16-18, 2006 in Otisville, New York. Judgment is deferred pending resolution of the remaining claims at trial.

s/ Eric Bruggink
ERIC G. BRUGGINK
Judge