FILED UNDER SEAL[1]

# In the United States Court of Federal Claims

No. 03-446C
(Re-Issued: December 4, 2006)

* * * * * * * * * * * * * * * * * * * * *

LEROY BISHOP, *et al.*,

                    *Plaintiffs*,

v.

THE UNITED STATES,

                    *Defendant*.

Overtime Pay; Federal Employees Pay Act, 5 U.S.C. § 5542; 5 C.F.R. § 550.112; De Minimis Overtime

* * * * * * * * * * * * * * * * * * * * *

    *Alan Banov*, Washington, D.C., argued for plaintiffs.

    *Domenique Kirchner*, Trial Attorney, Commercial Litigation Branch, Department of Justice, Washington, D.C. and *Nicole Heiser* and *Erika Turner*, Bureau of Prisons, argued for defendant.  With them on the briefs were *Peter D. Keisler*, Assistant Attorney General, *David M. Cohen*, Director, and *Kathryn A. Bleecker*, Assistant Director.

## OPINION

BRUGGINK, *Judge*

    This is an action brought under the Federal Employees Pay Act, 5 U.S.C. §§ 5541-5550a (2000) ("FEPA").  Plaintiffs claim that the Bureau of Prisons ("BOP") owes them compensation for overtime work they performed before and after their assigned shifts.  Approximately 582 plaintiffs are

---

    [1]This opinion was first filed under seal on November 20, 2006.  The parties proposed various redactions, which are reflected herein by three consecutive asterisks.

involved in this and other similar cases against the BOP.  Plaintiffs filed this case in 2003, but other cases were filed as early as 2000.  Plaintiffs serve in a variety of positions throughout BOP facilities scattered across the country. During the pendency of discovery in this case, the Federal Circuit decided a similar FEPA issue in *Doe v. United States*, 372 F.3d 1347 (Fed. Cir. 2004) ("*Doe II*").  The court held that an authorized official must order or approve overtime in writing for it to be compensable.  Plaintiffs proceeded with a motion for partial summary judgment with respect to the claims of one of the plaintiffs, Lieutenant ("Lt.") Patrick Shea, because they believed that even if *Doe II* applied in the context of FEPA, his claims could clearly satisfy the requirement for written overtime orders.

On plaintiffs' motion for partial summary judgment with respect to Lt. Shea, and defendant's cross-motion, we determined that the holding in *Doe II* applied to BOP employees' requests for overtime compensation. *See Bishop v. United States*, No. 03-446C, 2006 U.S. Claims 266 LEXIS (Aug. 9, 2006) ("*Bishop I*").  Lt. Shea thus had to present documents which proved that an authorized official ordered him in writing to perform overtime.  We rejected all of Lt. Shea's evidence of written orders or approvals, except for one type of document.  We found that written post orders requiring two lieutenants, one off-duty, to be present at the same time in order to exchange information and equipment constituted written orders for at least one lieutenant to work overtime.  Lt. Shea presented post orders which required this exchange at the beginning and the end of his shifts.  A dispute of fact existed, however, regarding the amount of overtime necessary to complete the tasks and whether the time was "de minimis" according to the regulatory standard.  It was, therefore, unclear whether the overtime was legally de minimis and thus non-compensable.  We denied plaintiffs' motion, and granted in part and denied in part defendant's cross-motion, deferring judgment for a subsequent trial on the remaining issue.[2]  We held trial on August 16-18, 2006, in Middletown, New

---

[2]During the pendency of this motion, we concurrently considered a motion for summary judgment in *Carlsen v. United States*, No. 00-617C, 2006 WL 2590388 (Fed. Cl. Sept. 7, 2006), a related BOP case.  We denied nearly all the claims asserted by the four plaintiffs because they lacked sufficient evidence to prove that their overtime was ordered or approved in writing.  One plaintiff, Mr. John Tucker, served as a lieutenant and had post orders directing him to brief his relief and exchange equipment for chits at the end of his shift.

(continued...)

York.  As part of the trial, and with consent of the parties, we conducted a site visit of the Federal Corrections Institution in Otisville, New York.  For the reasons explained below, we find that Lt. Shea's overtime activities were of a de minimis nature and that he is not entitled to compensation.

## BACKGROUND

The Federal Corrections Institution ("FCI") in Otisville, New York is sited on the crest of a small mountain approximately seventy miles outside of New York City.  FCI-Otisville is an all-male, medium security facility that houses approximately 1100-1200 inmates.  The institution is surrounded by multiple fences, secure doors, and security posts.  It contains numerous buildings, large outdoor grounds and many facilities for the inmates, including a recreational facility, a library, a commissary, a "UNICOR" work division (trade name for the Federal Prisons Industries), and a psychiatric office.  Most of the inmates have the autonomy to use these facilities at their convenience during the day, as long as they are in specified locations for the daily inmate counts.  The inmates only switch locations during the specified controlled movement time each hour.

Operation of the institution requires hundreds of employees.  The warden oversees the facility and its employees.  Under the warden, there are several associate wardens, a captain, 10-20 lieutenants, over 110 correctional officers, and various other types of staff to assist in the operation of the institution.  The correctional officers serve as the principal security force at the institution.  The captain and the lieutenants are primarily responsible for overseeing the day-to-day security and operations of the facility.  The captain acts as the primary, on-the-ground supervisor for the lieutenants and correctional officers. The captain, however, is only available on site during his

---

[2](...continued)
Mr. Tucker only had viable claims for the time he served as an Activities Lieutenant.  This position only had two shifts that abutted one another once a day.  Mr. Tucker, therefore, only had one shift in which he claimed he stayed late to brief his relief and exchange the equipment for his chits.  We found that Mr. Tucker's overtime was de minimis based on the limited amount of time necessary for him to exchange information and equipment once per day and the administrative difficulty of recording that time.  We therefore dismissed all claims and the complaint.

eight-hour work shift, which occurs during normal working hours. A lieutenant, usually the operations lieutenant, is placed in charge during the remaining sixteen hours of the day.

Most of the lieutenant posts require the lieutenants to work only during the same hours as the captain's shift. The operations lieutenant post, however, requires an operations lieutenant to be on duty twenty-four hours each day because it is a critical position in the operation of the prison. The operations lieutenant effectively supervises all the inmate control functions and activities and is directly responsible for the security apparatus, even when the captain and the warden are on duty. For the remaining sixteen hours of the day, however, when his superiors are not on duty, the operations lieutenant supervises all functions of the prison.

Three lieutenants each take eight-hour shifts to cover a twenty-four hour period. These shifts include the "morning watch," "day watch," and "evening watch." The beginning and end times to each of these shifts varied slightly during Lt. Shea's claim period, which runs from April 19, 2000 through his retirement on March 4, 2006.[3] Because the operations lieutenants relieve each other and resume command of the outgoing lieutenant's post, it is imperative for them to communicate with each other regarding important events that occurred during the previous shifts. Any concerns become the incoming lieutenant's responsibility upon relieving the outgoing lieutenant.

---

[3] Under Captains ("Capt.") Romero and Haynes, the following were shift times: morning watch, 12:00 AM to 8:00 AM; day watch, 7:30 AM to 4:00 PM; and evening watch, 4:00 PM to 12:00 AM. Lt. Shea claims overtime at the beginning and end of all of these shifts, with one exception. Lt. Shea does not claim that he performed briefing at the end of his morning shift or the beginning of his day shift, because these two shifts overlapped, allowing two lieutenants to be present at the same time for a half-hour. On September 26, 2004, Capt. White altered the shift times: morning watch, 12:00 AM to 8:00 AM; day watch, 7:45 AM to 4:15 PM; and evening watch, 4:10 PM to 12:10 AM. Under this schedule, all shifts overlapped for at least five minutes. Lt. Shea maintains no claims for this period. These shift times changed again, however, on March 27, 2005, to the following: morning watch, 12:00 AM to 8:00 AM; day watch, 8:00 AM to 4:00 PM; and evening watch, 4:00 PM to 12:00 AM. Lt. Shea's claims resume at that point.

The outgoing lieutenant must also transfer his equipment to the incoming lieutenant.

The court observed the physical layout of the prison during the site visit. BOP employees enter the institution through Building A-1. Employees pass by an identification check and then through a set of double electronically-controlled doors called a "sally port." An officer in a control booth controls entry and exit to the sally port. Only one door to the sally port can be open at a time. Inside the sally port, all employees hang a plastic chit on an accountability board, indicating that they are inside the compound. After passing through the sally port, lieutenants walk a very short distance to the administration building, which houses the "control center." The control center monitors all security cameras, access to the secure areas of the prison, and serves as the place for obtaining keys and equipment.

The control center is a raised booth area enclosed by glass and filled with monitors, key/chit boards, and equipment. Depending on the time of day, one or two officers man the control center booth. No other employees have access to the key and equipment area. The control booth officers are responsible for confirming the identity of incoming employees and distributing equipment. An incoming employee must pass through a second sally port door to exit the control center area and enter the secure part of the prison.

After leaving the second sally port, an incoming lieutenant reports directly to the lieutenants' office, which is located a short walk down an outside corridor from the control center. The lieutenants' office is normally kept unlocked. It is a suite of four or five rooms which provide office space for the captain, his secretary, the operations lieutenants, and other lieutenants, as well as a small amount of muster space for the lieutenants and correctional officers during shift changes.

The lieutenants' office is the administrative center for the lieutenants' activities, where lieutenants hold meetings and briefings, as well as maintain files. The lieutenants' office is also where incoming lieutenants receive their shift assignments and various responsibilities for the three-month quarter. This information is provided in a series of documents called post orders. Post orders are documents drafted or revised quarterly by the administrative lieutenant and approved by the captain.

The shifts we considered for trial were those operations lieutenant shifts in which Lt. Shea was required by post order to brief or be briefed by a replacement when arriving or departing. We heard testimony from Lt. Shea and Lt. Joseph Miraglia regarding the matter. We also heard testimony from Lt. Shea's three supervisors during the claim period, Captains Billy Romero, Anthony Haynes, and Douglas White. All three had previously served as operations lieutenants in other institutions and testified as to their experiences in that position as well. BOP employee Donna Hill also testified regarding her measurement of the typical time it takes to walk from the control center to various points within the institution. With the testimony of these witnesses, the court was able to understand more clearly Lt. Shea's duty to exchange equipment and pertinent information as a lieutenant and the amount of time necessary to complete the tasks.

## DISCUSSION

I.     Overview

A federal employee's entitlement to compensation for overtime is established, and limited, by regulation. The relevant regulation provides:

> If the head of a department reasonably determines that a preshift or postshift activity is closely related to an employee's principal activities, and is indispensable to the performance of the principal activities, and that the total time spent in that activity is more than 10 minutes per daily tour of duty, he or she shall credit all of the time spent in that activity, including the 10 minutes, as hours of work.

5 C.F.R. § 550.112(b)(1)(i). Lt. Shea must prove, therefore, that any pre- and post-shift activities for which he is claiming overtime compensation were indispensable to the performance of his principal activities and required more than ten minutes per day for him to perform.[4]

---

[4]In *Bishop I*, we established that overtime is only compensable when ordered in writing by an authorized official, and that the post orders did, in fact, order Lt. Shea to work overtime. That finding, however, was limited to instances in which the incoming and outgoing lieutenants had to exchange

(continued...)

A.      Pre- and Post-Shift Activities Indispensable for Performance of
        Principal Activities

We have previously established limitations on compensable overtime work with respect to BOP lieutenants.  In *Bishop I*, we relied on *IBP, Inc. v. Alvarez*, 546 U.S. 21 (2005) to conclude that the picking-up and dropping-off of keys or chits and equipment is an indispensable part of the principal activity for which BOP lieutenants were hired.[5]  We held, therefore, that all activities occurring between the time a lieutenant received chits at the control center and when he turned over keys and equipment at the end of his shift were within the workday and compensable as overtime if ordered to be performed before or after shift hours.[6]  We also found, however, that the time waiting in the key line at the control center and walking out of the institution after a shift is not an "integral and indispensable part of the principal activities" of a lieutenant, and thus not compensable overtime.  *See Bishop I* at 46-47.

────────────────────

[4](...continued)

pertinent information and equipment.  An example of such a requirement appears in a post order issued June 17, 2001:

> 4:00 PM      Enter your shift activities into the lieutenant's log
>              on computer.  Make certain a notation exists in
>              your shift log about the status of the fence alarms,
>              cameras, and monitors.  *Pass on all pertinent
>              information to your relief and exchange chits for
>              keys and equipment.*

(Ex. 55 (emphasis added)).

[5]We see no meaningful difference between the picking up of a chit at the control center in order to later obtain keys or equipment, and the actual act of obtaining the keys (whether in the control center or the lieutenants' office), given the importance of protecting key integrity at a corrections institution.

[6]As we discussed at length in *Bishop I*, BOP adopted a regulation in 1995 to the effect that shifts begin at the key line at the control center if the employee has to pick up any keys or equipment.  Because we find a chit constitutes a piece of equipment, this regulation is consistent with the holding of *IBP*.

In *Carlsen*, we found that because a lieutenant is considered on time if he receives keys or chits at the control center at the shift starting time, then the time the incoming lieutenant spends walking to the lieutenants' office is compensable overtime for the outgoing lieutenant who must wait for the incoming lieutenant to arrive. The outgoing lieutenant is not authorized to leave until he briefs the incoming lieutenant and exchanges equipment.

B.   De Minimis Rule

The controlling regulation, 5 C.F.R. § 550.112(b)(1)(i), implies that an agency is not obligated to pay overtime when the work takes ten minutes or less. Courts have termed this minimum requirement as "de minimis overtime." *See Abrahams v. United States*, 1 Cl. Ct. 305 (1982) (applying the de minimis rule to plaintiffs' FEPA claims). *See also Anderson v. Mt. Clements Pottery Co.*, 328 U.S. 680, 692 (1942) (defining de minimis as "a few seconds or minutes of work beyond the scheduled working hours"); *Baylor v. United States*, 198 Ct. Cl. 331(1972); *Ayres v. United States*, 186 Ct. Cl. 350 (1965).

There is not a hard and fast rule as to what constitutes de minimis overtime. Factors include: "(1) the practical administrative difficulty of recording additional time; (2) the aggregate amount of compensable time; and (3) the regularity of the work." *Bobo v. United States*, 136 F.3d 1465, 1468 (Fed. Cir. 1998) (quoting *Lindow v. United States*, 738 F.2d 1057, 1063 (9th Cir. 1984)). The Federal Circuit adopted the de minimis factors from the Ninth Circuit in *Lindow*, a similar case involving the Fair Labor Standards Act, 29 U.S.C. § 216. Because the de minimis rule applies to cases involving FEPA, *see Abrahams,* 1 Cl. Ct. at 311, we apply these factors here as well. The purpose of this decision, therefore, is to apply these factors to the evidence at trial and determine whether the amount of overtime required for lieutenants to exchange equipment and pertinent information per instructions in the post orders is sufficient (i.e., not "de minimis") to be compensable.

II.   Lt. Shea's Overtime Claims

Lt. Shea seeks compensation for both pre- and post-shift overtime allegedly worked while employed by BOP as an operations lieutenant. Lt. Shea's pre- and post-shift work activities occurred during one of three watches: day watch, evening watch, and morning watch. We group the time when Lt. Shea served as an operations lieutenant into four general periods

because, during those years, changes in the various requirements in the post orders affected Lt. Shea's pre- and post-shift activities.

1.      First Period — April 19, 2000 through March 2004:

During this period, the day watch covered 7:30 AM to 4:00 PM, the evening watch covered 4:00 PM to 12:00 AM, and the morning watch covered 12:00 AM to 8:00 AM.  Lt. Shea worked all three watches throughout this period and has claims for both pre- and post-shift activities, except for his pre-shift activities on the day watch.  Roll calls were part of the post orders throughout this first period.

2.      Second Period — March 2004 through September 26, 2004:

The second period begins when Capt. White no longer required roll calls at the start of each shift.  During this period, Lt. Shea only worked the day watch and has claims only for post-shift activities.

3.      Third Period — September 26, 2004 through March 26, 2005:

Lt. Shea has no claims for this third period because on September 26, 2004, Capt. White adjusted all three watches to create an overlap between the incoming and outgoing lieutenants.  Under the new schedule, the day watch covered 7:45 AM to 4:15 PM, the evening watch covered 4:10 PM to 12:10 AM, and the morning watch covered 12:00 AM to 8:00 AM.

4.      Fourth Period — March 27, 2005 through March 4, 2006:

The fourth period begins on March 27, 2005 when Capt. White eliminated the overlap between shifts.  Under the new shift schedule, the day watch covered 8:00 AM to 4:00 PM, the evening watch covered 4:00 PM to 12:00 AM, and the morning watch covered 12:00 AM to 8:00 AM.  Capt. White also changed procedures.  Rather than exchanging chits with the outgoing lieutenant, incoming lieutenants were allowed to bypass the control center and report directly to the lieutenants' office for equipment, where they would sign a location inventory sheet in lieu of exchanging chits.  During this period, Lt. Shea only worked the day watch and has claims only for post-shift activities.  This fourth period ends when Lt. Shea retired from the BOP.

We begin our analysis with a description of the pre- and post-shift activities, drawn from the testimony of plaintiff Lt. Shea. Most of his testimony applies to all three of the periods for which he makes overtime claims (i.e., the first, second, and fourth periods).

A.    Pre-Shift Activities

At trial, Lt. Shea testified about various pre-shift activities, which he explained are required according to the written instructions in the post orders. Lt. Shea explained that when he arrived at FCI-Otisville to begin a shift, he would enter Building A-1, go through the first sally port door, place a chit on the accountability board in the area between the two sally port doors, and then wait for the second sally port door to open to enter the institution. Lt. Shea then walked to the control center window, waited in line if necessary, and exchanged his chits for keys and a radio, or for other chits. The line could have as many as "15, 20 people sometimes." (Trial Tr. at 64.)[7] Lt. Shea explained that it would take "between 10 and 15 minutes" to retrieve his equipment at the control center from the time he first entered the line. *Id.* We have previously held that time spent waiting in line is not compensable.

Next, Lt. Shea would pass through a second sally port adjacent to the control center. After passing through, Lt. Shea was in the "compound" and would walk down a walkway to reach the lieutenants' office.[8] Lt. Shea testified that, along the way, if he was working the day watch, he might pass "hundreds of inmates walking around." *Id.* at 46. Before reaching the lieutenants' office, Lt. Shea might "deal with those inmates" by answering any of their questions. *Id.* at 71. He explained that it was "important in the Bureau of Prisons to have good communications with the inmates" and that he had "to

_____

[7]Lt. Shea testified that it was only recently that the incoming lieutenant would sign the inventory location sheet in the lieutenants' office in order to receive equipment and keys, bypassing the control center. This change occurred on March 27, 2005.

[8]Ms. Hill testified that it took her one minute and twenty-five seconds to walk from outside of the control center, through the sally port, and down the walk-way to the lieutenants' office, uninterrupted, and walking at a normal pace. Based on our own site visit to FCI-Otisville, we find this estimate to be a fair and reasonable gauge of the time it takes to pass through the control center and walk to the lieutenants' office.

be responsive to the inmates." *Id.* The communications with the inmates varied. Sometimes the inmates told Lt. Shea that something was wrong; on other occasions, Lt. Shea might tell an inmate to tuck in his shirt, clean up litter on the ground, or exchange other trivialities. These "almost" daily communications usually lasted "at least five minutes," depending on the number of inmates that wanted to talk to him. *Id.*

Lt. Shea explained that when he reached the lieutenants' office, he would "generally check in with the captain" and "make [his] presence known to the outgoing lieutenant." *Id.* at 52. At this time, Lt. Shea would give chits to the outgoing lieutenant in exchange for his equipment and keys, and then count the keys to make sure he had all of the ones he needed. He testified that the exchange of equipment typically lasted "a minute or a couple minutes." *Id.* at 318.

In addition to exchanging equipment, Lt. Shea would also receive a briefing from the outgoing lieutenant. Lt. Shea described the briefing he typically received:

> He would brief me on the happenings of the day. You know, sometimes the captain would tell me if there are certain things he wanted me to do throughout the day. The outgoing lieutenant would brief me about what happened, what things I needed to be looking out for; the staffing, if there's any staffing issues; if there's an inmate on suicide watch; if there's an inmate at a local hospital; how the feeding went. If there's adverse weather coming or going, things we need to be looking out for; if there's any incident reports that I need to check out, you know, on my shift; any issues with any other officers, if there's maybe some officer had an issue with his mother or called in sick, or he called in sick because his mother was sick or something, things like that. If there's an escorted trip out; if there's someone that needs to be relieved because he gets off at 8:00 and he's working a post, and he needs to get relieved; how many inmates are in a Special Housing Unit; is there anybody acting up down there that we need to keep an eye on, is anybody restrained . . . .

11

*Id.* at 53-54.  Lt. Shea testified that the briefing from the outgoing lieutenant "would take about 15, 20 minutes."[9]  *Id.* at 75.  Lt. Miraglia similarly testified that it would take the outgoing lieutenant "maybe ten minutes or more" to exchange pertinent information and "up to a minute" to exchange the chits for the radio and keys.  *Id.* at 697.

Lt. Shea testified that one of his duties as operations lieutenant was to conduct roll call, which involved checking to make sure all of the correctional officers coming on duty were present and discussing various issues and concerns.  In particular, Lt. Shea would discuss the *** with the incoming officers.  *** Lt. Shea explained that he would "get there early" to learn from the captain or another lieutenant what information he needed to pass on to the officers during roll call.  *Id.* at 57.

Roll calls were scheduled daily for each shift.  Lt. Shea testified that he would arrive early in order to conduct roll call before his shift began.  He was able to do this because the correctional officers he needed to count and brief "would come in early, also."  *Id.* at 84-85.  Lt. Shea said that roll call before the morning shift would typically take place fifteen to twenty minutes before midnight.  He specifically testified that the outgoing lieutenants could not conduct the roll call because they were still "wrapping up [their] shifts and filling out [their] log and . . . paperwork."[10]  *Id.* at 87.  Additionally, as the incoming lieutenant, Lt. Shea said that he conducted the roll call before the official start time of his shift because "I'm telling them the expectations of things I want them to do on the shift I'm taking over."  *Id.* at 86.

B.     Post-Shift Activities

Lt. Shea explained that his post-shift activities consisted of the following: "[F]illing out my log book, talking to the other oncoming

---

[9]We note, however, that during cross-examination, counsel for defendant read a question and answer transcribed from the November 2005 deposition of Lt. Shea, when he still worked for BOP and was performing briefings, in which he stated that a typical briefing takes "about five minutes."  *Id.* at 317.  At trial, he explained that "it probably took longer than five minutes in retrospect."  *Id.*

[10]The lieutenant's log is essentially an explanation of what happened on the lieutenant's shift and the times of these happenings.

lieutenant, exchanging equipment, [and] briefing him about things he should look out for during the day." *Id.* at 105.  He testified that he would not get his log electronically sent to him from the control center until "probably a few minutes before" the end of his shift, and that, because "it takes some time to fill out the lieutenant's log" and "pass on any pertinent information and your keys to the other lieutenant and exchanging chits," he could not complete these activities right at the end of his shift. *Id.* at 104.  Typically, the control center officer would enter much of the data into the log, which is an electronic template, because the control center keeps track of the exact time certain events occur.  Lt. Shea also testified, however, that he would generally get an electronic copy of the log for his day shift around 3:30 or 3:45 PM, approximately fifteen to thirty minutes before the end of the shift.

After Lt. Shea concluded his briefing with the incoming lieutenant and completed the log book, his shift ended and he would "walk out of the institution." *Id.* at 107.  Sometimes Lt. Shea would stop by the control center on his way out of the institution to turn in a radio or an extra set of keys that the incoming lieutenant did not need when they previously exchanged equipment.  Whether Lt. Shea turned in equipment at the control center after this shift, or left the institution directly, he would generally leave ten to fifteen minutes after the ending time of the shift.

Lt. Shea also explained that daily "counts" occasionally affected his post-shift departure time.  The post orders scheduled various "counts" throughout each day.  This was the procedure used at FCI-Otisville to account for the presence of all of the inmates.  The various correctional officers would telephone the control center and report the number of inmates under their watch.  ***  Lt. Shea testified that he "wouldn't leave until they called a good [count]," which could further delay his post-shift departure. *Id.* at 99.

III.    Overtime for Exchange of Information and Equipment is De Minimis

We previously determined in *Bishop I* that the only overtime that satisfies the requirements of *Doe II* is the exchange of information and equipment between shifts because those activities require both lieutenants to be on duty at the same time.  If, for example, the incoming lieutenant receives chits at the control center precisely at 4:00 PM, the beginning of the evening shift, the incoming lieutenant is considered on-time.  At that moment, however, the outgoing lieutenant must wait for the incoming lieutenant to arrive, usually in the lieutenants' office, to exchange pertinent information and

13

equipment.  After the exchange, the outgoing lieutenant is free to leave the institution.  In this scenario, the outgoing lieutenant, whose shift ended at 4:00, works overtime while he waits for the incoming lieutenant to reach the lieutenants' office to complete the required exchange.  Alternatively, the incoming lieutenant could arrive prior to 4:00 in order to complete his walk to the lieutenant's office and conduct the exchange in sufficient time for the outgoing lieutenant to be free at 4:00.  In either scenario, the exchange of pertinent information and equipment, called for in the written post orders, requires either the incoming lieutenant to arrive early, or the outgoing lieutenant to stay late, or both.

While the exchange of information and equipment thus satisfies the writing and authorization requirement of *Doe II*, we do not believe it is more than de minimis.  Testimony from Capt. White and Capt. Haynes contradicts Lt. Shea and Lt. Miraglia, and sheds additional light on the amount of time required to exchange pertinent information and equipment.  Capt. White testified that while the outgoing lieutenant is giving equipment to the incoming lieutenant, he is simultaneously exchanging pertinent information because "[he can] be talking to the individual while . . . passing the equipment to them" and because the lieutenants can do "more than one thing at one time."  *Id.* at 255-256.  He described the exchange of information and equipment as follows: "The information that is normally conveyed is, how are you doing; this is what happened on the shift; here's your keys, here's your radio; and then sometimes they would have personal conversations with each other."  *Id.* at 186-187.  When asked how long this exchange usually takes, he testified, "Again, it could take thirty seconds, a minute, two minutes.  It's really based on how well that lieutenant wants to pass on information.  He actually controls how he passes that information, how long it takes him."  *Id.* at 208; *see also id.* at 183 (Capt. White testified that when he was an operations lieutenant, the longest he ever stayed after his shift was "two, three minutes" to exchange information and equipment with an incoming lieutenant).

Likewise, Capt. Haynes testified that he did not believe it should take ten minutes to brief the incoming lieutenant.  When he was an operations lieutenant, the exchange of equipment "probably took two or three seconds . . . [m]aybe five seconds because they do need to exchange and count the keys . . . ."  *Id.* at 361-362.  He also testified that while he was captain, he observed lieutenants exchanging information and equipment, which together took "thirty seconds to a minute to two minutes."  *Id*. at 389.  Capt. Haynes further

14

explained that the amount of time necessary to exchange pertinent information and equipment varies:

> From my experience as operations lieutenant, again if you're talking just Bureau transactions . . . you're exchanging equipment for the keys, you're stating that something happened on the shift or if it didn't, you're using the logs and you're giving examples of things that you have, I can do an exchange in thirty seconds or less to pass on the information. That's my experience. Things that can change the times on that is each individual person. I mean, are you talking straight job info or are you throwing in stuff about the ball game last night? Are you talking about events and stuff like that? So if you're coming in — some staff are talkative, some aren't.

*Id.* at 390.

When asked for specific arrival and departure times, Lt. Shea explained that he arrived anywhere from five to thirty minutes before the official start time of his shift, and regularly left his shift ten to fifteen minutes after the official end time of his shift. This is somewhat inconsistent with his testimony relating to specific pre-shift tasks. He stated that it would take ten to fifteen minutes to retrieve equipment or chits from the control center line, five minutes to communicate with inmates, fifteen to twenty minutes to conduct roll call before the shift, another fifteen to twenty minutes to exchange pertinent information with the outgoing lieutenant, and several minutes to exchange chits and equipment. Adding these times suggests that Lt. Shea would have to arrive forty-five minutes to over an hour before the start of his shift. He testified, however, that his typical arrival time was only five to thirty minutes prior to each shift.[11]

---

[11]Lt. Shea testified that lieutenants who reported to their posts exactly on time (e.g., at 8:00 AM or 4:00 PM) were known disparagingly as "minutemen" and were not popular in the BOP because, by not reporting to duty prior to the start time of their shift, the "minutemen lieutenants" forced the outgoing lieutenant to remain longer on his shift to relay various pertinent information. *Id.* at 109.

While we have no reason to question the credibility of any of the witnesses, there is an obvious conflict in the testimony. Although the difference between two or three minutes and a maximum of thirty minutes is substantial, it is sufficient for our purposes to come to a conclusion as to whether the amount of time spent by any one individual at the beginning and end of a shift exceeded ten minutes. We think the Captains are closer to the mark for two reasons. The first has to do with the distinction between the time actually spent and the time *required* to accomplish the ordered tasks. Lt. Shea may have arrived at the control center as much as thirty minutes prior to the beginning of his watch. We are satisfied, however, that he did not *have to* do so in order to perform those limited tasks which were ordered in conjunction with the presence of the predecessor or replacement lieutenant. We believe the Captains' testimony that it was possible to do the exchange of information and equipment within a matter of a very few minutes. The physical hand-off could be accomplished in seconds, and we heard nothing to suggest that the information exchanges were anything other than routine and brief. Specific details, in any event, were available by reading the electronic logs.[12]

The second reason is related. We believe that Lt. Shea and Lt. Miraglia's testimony concerned the time they actually and typically spent prior to or after watches. They included, in other words, time spent on activities which were not ordered in writing or not otherwise within the compensable work day. We must exclude, for example, time spent waiting in the key line, time spent talking to prisoners, and, of course, time spent on personal matters. While it may be unrealistic to assume that personnel will conduct themselves with this unnatural degree of efficiency and adherence to minimally required tasks, our inquiry has to be truncated in this way. What *had to be done* with two people on the job was limited to the time spent actually picking up the keys, chits, or equipment, walking down the corridor, and conducting the exchange. At that point the outgoing lieutenant could leave. We believe that on an ordinary day it would take no more than five minutes to exchange keys and a radio for chits with another lieutenant, to count the keys, and discuss any important information relating to the previous shift. Any amount of time used by the outgoing lieutenant to engage in personal conversation with the

---

[12]The exchange of pertinent information did not have to be oral because an incoming lieutenant could also review the outgoing lieutenant's written log from the previous shift.

16

incoming lieutenant, while probably inevitable, is not mandated by the written post orders and is not compensable overtime.

With respect to the amount of time actually needed to pick up keys, chits, or equipment at the control center and walk to the lieutenants' office, we have Ms. Hill's calculation. She measured the amount of time needed to walk at a normal pace from the control center to the lieutenants' office to be approximately a minute and a half. That strikes the court as accurate. Some short amount of time could be added for picking up the chits or keys and going through the sally port. In our judgment, it should not take more than three or four minutes to do these tasks and reach the lieutenants' office. When this period of time is added to even a maximum of five minutes to do the exchange and briefing, which must be shared between the incoming and outgoing lieutenants, the total *required* time should not have exceeded ten minutes on a typical day. Although it may have taken Lt. Shea longer than ten minutes to exchange equipment and pertinent information, the post orders did not require the exchanges to take that long. To the extent that an unusual event occurred to interrupt this pattern, it was possible to request overtime.

Of all of the pre- and post-shift activities described by Lt. Shea, the only activities that satisfy the requirement of *Doe II* are the exchange of pertinent information and equipment and the possible wait by the outgoing lieutenant leading to that exchange. We conclude that the time necessary to exchange pertinent information and equipment was no more than ten minutes each day and, therefore, the overtime required to accomplish this exchange was de minimis.[13]

---

[13]Our conclusion is supported by the amount of overlap between shifts. This overlap reduces the amount of uncompensated overtime required to exchange pertinent information and equipment. During the first and second periods, the morning watch and day watch (the shift Lt. Shea worked most often) overlapped between 7:30 AM to 8:00 AM, allowing up to thirty minutes to accomplish the tasks that we believe required no more than ten minutes. Lt. Shea, thus, has no viable claims for this period. Lt. Shea also has no viable claim for the third period, when an overlap existed between all three shifts.

IV    Overtime for Rolls Calls and Counts is De Minimis and Does Not
      Satisfy *Doe II*

    A.    Roll Calls

Although not anticipated to be an issue for trial, we permitted plaintiff to put on evidence regarding the time spent on roll calls and completing the counts.  Roll calls were required until March 2004, when Capt. White made them voluntary. The post orders directed operations lieutenants to conduct roll calls at the beginning of each shift.  For example, the evening shift roll call was scheduled for 4:00 PM.  Lt. Shea testified, however, that it was his practice to conduct roll call before the shift began, which, in turn, required him to arrive early to be briefed by the person he was replacing.  It was also more convenient to be in place early because some of the correctional officers reporting for roll call would have to be at their duty station at the same time when Lt. Shea's watch began.  We have no reason to doubt that this was his motivation.  And the correctional officers and the prison no doubt benefitted from Lt. Shea taking roll earlier.  As defendant points out, however, he was not ordered to make himself available prior to the start of each shift and thus any claim based on conducting rolls calls fails under *Doe II*.[14]

    B.    Counts

FCI-Otisville conducted five "counts" of inmates each day to ensure that all of the inmates were present in the institution. Lt. Shea testified that the afternoon count usually began at 3:45 PM and concluded in approximately fifteen minutes.  Typically, at the end of the day watch, the departing lieutenant would not leave until the count was completed successfully.  We heard testimony, for example, that Lt. Shea might wait at the control center several minutes after 4:00 for the "all clear" before leaving the institution.

---

[14]We also note, moreover, that roll calls, even when required, were considerably looser events than one might imagine.  Apparently it was a rare moment when officers actually assembled before Lt. Shea for the purpose of taking attendance and receiving a briefing.  In actuality, individuals would stop by the lieutenants' office, indicate their presence, and leave.  If Lt. Shea had something to tell them with respect to the shift, he would tell them as they come in.  Others were permitted to phone-in their presence at their duty stations.

While we believe that the operations lieutenants may have been expected to remain at the institution if there was a problem with the count, there is a *Doe II* problem with any claim originating in what amounts to no more than an informal and unwritten expectation.[15]  In any event, as with roll calls, we are satisfied that departure delays due to incomplete counts were inconsequential due to infrequency or because they were so brief as not to materially add to the delay.

V.      Measuring Overtime is an Administrative Burden

        As an additional matter, we believe that the facts above plainly demonstrate that the administrative burden of recording the piecemeal overtime claimed by plaintiffs would be excessively high and impractical. This is a relevant factor when making a de minimis determination.  *See Bobo*, 136 F.3d at 1468.  Additionally, 5 C.F.R. § 550.112(b)(1)(i) recognizes the impracticality of measuring small amounts of irregular overtime.  It is difficult to imagine how the BOP could efficiently clock the exchange of information and equipment between incoming and outgoing lieutenants, especially when the exchange often occurred outside of the lieutenants' office and involved conversations about non-shift related matters.  When asked whether it would be practical for the captain on duty to time the exchange of information and equipment, Capt. White explained that it "would not be practical . . . to utilize my time in monitoring the exchange between lieutenants." (Trial Tr. at 210-211.)  Capt. Haynes also testified that it would not be practical to measure the amount of time lieutenants expended while exchanging equipment and pertinent information.  He noted that "you'd have to have somebody assigned to every shift 24 hours a day, seven days a week" and that "if I need to follow around an operations lieutenant to watch what time they come to work, what they're doing, et cetera, then I might as well be working the shift." *Id.* at 391-392.  Because the time requirement is typically less than ten minutes, we agree that it is unreasonable to measure the overtime required for the lieutenants to exchange pertinent information and equipment.

---

[15]Capt. Haynes testified that the day watch operations lieutenant was not required to stay for a clear count.  If there was a problem, the incoming operations lieutenant would be in charge of resolving it.

CONCLUSION

The requirement for a written order by an authorized individual approving overtime and the de minimis rule serve to protect the public fisc. We are mindful, however, that the combination of the writing requirement and the de minimis rule creates two scenarios in which the agency can take advantage of its employees' goodwill: the agency could either (1) require its employees to work overtime, but in a measure less than the de minimis threshold, or (2) create a work environment that pressures employees through unwritten expectations to work more than ten minutes of overtime each day. In both scenarios, the agency benefits from overtime work without compensating its employees.  The potential for abuse clearly exists. Nevertheless, despite our concern, we do not believe the written instructions to Lt. Shea to exchange pertinent information and equipment between shifts required overtime work sufficient to exceed the regulatory threshold.  Lt. Shea is not entitled to compensation for the de minimis overtime work he performed.  We, therefore, deny plaintiffs' motion for partial summary judgment with respect to Lt. Shea, and grant defendant's cross-motion for summary judgment. Lt. Patrick Shea is dismissed from the complaint. Final judgment is deferred pending resolution of the claims of the remaining plaintiffs.  The court will schedule a status conference with counsel to discuss the impact of our decision on the claims of the remaining plaintiffs in this and related cases.


 s/ Eric Bruggink
ERIC G. BRUGGINK
Judge