IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| LEROY BISHOP, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | No. 03-446C |
| | ) | (Senior Judge Bruggink) |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |

DEFENDANT'S RESPONSE TO PLAINTIFF CRAIG CHALMERS'S PROPOSED FINDINGS OF UNCONTROVERTED FACTS

1. Plaintiff Craig B. Chalmers began his employment at the Bureau of Prisons in May 1980. App. 1.

RESPONSE: Admitted.

2. He held the positions of Captain at FCI-Phoenix (February 9, 1992, to October 1, 1995), Captain at MDC-Los Angeles (October 1, 1995-May 8, 1999), Associate Warden ("AW") at MDC-Philadelphia (May 9, 1999-January 13, 2001), and AW at FCI-Otisville. App. 2, 100-101.

RESPONSE: Admitted, except that the third institution is correctly identified as the Federal Detention Center ("FDC") Philadelphia. Def. App. 82.[1]

3. Plaintiff Chalmers was a GS-14 AW for Operations at FCI-Otisville from January 14, 2001, to May 2003. App. 105. The entire time Plaintiff Chalmers was at FCI-Otisville, he was an AW under Warden Frederick Menifee, mostly as an AW for Operations and as AW for Programs for several months in 2001. App. 94, 105.

RESPONSE: Admitted.

[1] "Def. App." refers to the Defendant's Appendix. "Pl. App." refers to Plaintiff's Appendix.

4. The departments under his control were human resources, business office, food services, facilities, and volunteer coordinator, among others. App. 105.

RESPONSE: Admitted only that those departments were under his control when he was serving as the AW for Operations; otherwise denied. Pl. App. 105.

5. Associate Wardens report directly to the Warden, serving as the Warden's deputies. App. 16, 27, 41.

RESPONSE: Admitted that Associate Wardens report directly to the Warden; denied that they serve as the Warden's deputies. There were no Deputy Warden positions at FCI Otisville. Pl. App. 2, 14-43.

6. Plaintiff Chalmers's claims began on February 25, 1997, when he was at MDC-Los Angeles. See App. 101. He retired effective May 30, 2003, but was on leave after May 3, 2003. App. 117.

RESPONSE: With respect to the first sentence, admitted that only some of his claims begin on February 25, 1997; otherwise denied. With respect to the second sentence, admitted that Mr. Chalmers was on sick leave after May 3, 2003, until he retired effective May 30, 2003. Pl. App. 117.

7. The instant motion concerns only Plaintiff Chalmer's claims for overtime pay that he earned by preparing for his shift and by preparing for his shift and by attending executive closeouts and other meetings at FCI-Otisville.

RESPONSE: This is a characterization of plaintiff's motion and not a statement of fact and requires no response. If it is viewed as a statement of fact, it is denied.

8. Following orders is critical in the BOP. "If it's not illegal and it doesn't put you in a

life-threatening situation you are told and you ask or grieve later." App. 127. It makes no difference whether the order is oral or written. Id.

RESPONSE: The first sentence is admitted. The second sentence is denied. As a former Associate Warden for FCI Otisville, Joseph Wilner, testified, whether BOP employees must follow the orders of their supervisors "would depend on the situation" and employees should "consider whether the order given was detrimental to the security and safety of the institution." Def. App. 219 (Dep. 65). He explained that supervisors gave directions and instructions and made assignments, but they did not routinely issue orders to their subordinates. Def. App. 220-23 (Dep. 66-69). In addition, whether an employee was "subject to discipline" for failure to carry out an assignment or follow an order would "depend on the circumstances." Def. App. 225 (Dep. 77). As Mr. Wilner explained, the BOP considers whether the failure to complete an assignment was purposeful in nature, and whether the employee had reasons for not completing an assignment, including other work or emergencies. Id. Further, "if there's intent and purposeful efforts [of] the employee not to do their job, that's when the conduct comes into play. But because they haven't performed all of their duties does not mean they get disciplined." Def. App. 225-26 (Dep. 77-78). The third sentence is denied as ambiguous. For purposes of the FEPA, an order to work overtime must be in writing.

9. Punctuality is vital to effective operations. Employees in the Bureau derogatorily use the term, "minuteman" to describe "someone who [just] shows up" at the start of their shift. App. 26. The Bureau's culture has disdain for "minutemen." Id. See also App. 102.

RESPONSE: The first sentence is admitted, but the second and third sentences are denied. While some line staff in the Bureau use the term "minuteman" to describe employees who show

up at the exact time they are supposed to, the term "minuteman" is not used in a derogatory sense, Def. App. 248 (former Warden Hedrick Dep. 15-16), and that the Bureau's culture does not have disdain for minutemen. Id. As defined by plaintiff, a minuteman is on time for work and his conduct is acceptable, and the Bureau does not have disdain for minutemen. Id. Warden Menifee denied using the term "minuteman." Def. App. 118 (Dep. 86-87). Warden Menifee expected eight hours of work for eight hours of pay. Def. App. 117-18 (Dep. 85-86).

10. Particularly if you are a manager, it is very important to arrive at the institution before your supervisor, to obtain pertinent information about prior shifts as soon as possible. See App. 109-110, 222-224, 229, 235-236. "[E]verybody had to know first before somebody else knew." App. 223. "[E]veryone's trying to get [the lieutenants' logs], all the department heads, everyone tries to get it ...." App. 227.

RESPONSE: Denied. There was no requirement for managers to arrive at the institution before their supervisors arrived or for other staff to arrive before their supervisors arrived. Def. App. 182-83 (Wilner); Def. App. 120-22, 133 (Menifee Dep. 110-12, 115-16, 117-18, 199). There was no requirement that staff try to obtain the Lieutenants' logs and read them before their supervisor reads them. Id. It was not important for the supervisors at FCI Otisville to arrive at the institution before their supervisors. Id. Supervisors at FCI Otisville were not required to arrive at the institution before their immediate supervisors arrived or before the Warden arrived. Id.

The Associate Wardens, the Executive Assistant, and the Department Heads at FCI Otisville were not required to arrive at the institution before the start of their shift to read the Lieutenants' logs. Id. The Associate Wardens, the Executive Assistant, and the Department

Heads were not authorized to come in early before the start of their shift to read the Lieutenants' logs. Id. At FCI Otisville, the Associate Wardens, the Executive Assistant, and the Department Heads were required to read the Lieutenants' logs at any time during the course of their shift. Def. App. 120 (Menifee Dep. 110).

Mr. Chalmers was not required to report to the institution early before the start of his shift to read the Lieutenants' logs. Def. App. 182-83 (Wilner); Def. App. 120-22, 133 (Menifee Dep. 110-12, 115-16, 117-18, 199). Mr. Chalmers was not authorized to report to the institution early before the start of his shift to read the Lieutenants' logs. Id. Mr. Chalmers was required to review the Lieutenants' log at some point during the course of his shift. Def. App. 182-83 (Wilner); Def. App. 120 (Menifee Dep. 110).

11. "There are certain standards that [are] set throughout the Bureau; one of them [is] . . . you never let the warden beat you to the institution." App. 228.

RESPONSE: Denied. BOP employees are not required to report to their institution before the Warden arrives at the institution. Def. App. 182-83 (Wilner), 94-99, 176-80; Def. App. 120-22, 133 (Menifee Dep. 110-12, 115-16, 117-18, 199). At FCI Otisville, Warden Menifee sometimes arrived at the institution before the Associate Wardens arrived. Def. App. 122-23 (Menifee Dep. 121-22).

12. The BOP is a paramilitary organization with a strict ranking structure and a very clear chain of command. As in any chain of command organization, to be effective, the information flow must use this chain of command. Information flows up and down though the ranks to ensure effective communications. Therefore, it is imperative for managers to receive information and act upon it before their supervisors receive it. To do this, an intelligent manager must

attempt to arrive at the institution before the warden and read the log books and sensitive reports before he/she receives that information. It does not reflect very favorably upon your management skills if the warden obtains the information before you do. If so, the warden is doing your job and you are not needed. Therefore, if the warden reports to the institution around 7:15-7:30 a.m. and immediately reports to the lieutenants' office to read the lieutenants' logs and sensitive reports, as Warden Menifee did during his day (see App.154, 155), the Associate Warden needed to report to the institution between 7:00 and 7:15 a.m. to read those documents and act upon incidents reported in them, or research further to ensure he/she could respond intelligently to the warden when, he/she inquires further on the subject. This is the BOP'S culture, time tested, and learned through experience and training over an extended period of time.

RESPONSE: With respect to the first sentence, denied that the BOP is a paramilitary organization, but admitted that it has a rank structure and a clear chain of command. Def. App. 249 (former Warden Hedrick Dep. 10-12). With respect to the second sentence, denied for ambiguity, but admitted that information flows both up and down the chain of command and also sideways from an employee to his peers. The third sentence is admitted.

The fourth sentence is denied. There was no requirement for managers to receive information and act upon it before their supervisors received it. Def. App. 182-83 (Wilner); Def. App. 120-22, 133 (Menifee Dep. 110-12, 115-16, 117-18, 199). The fifth sentence is denied. There was no requirement that a BOP manager, or an intelligent BOP manager, attempt to arrive at the institution before the warden and read the log books and other documents before the Warden receives that information. Id.

With regard to the sixth sentence, in some circumstances, it would not reflect well upon a

manager if the Warden obtained certain information before the manager did so; otherwise, the assertion is denied. Def. App. 182-83 (Wilner). For example, if the Warden learned from the Food Service Administrator that the institution was out of certain food but was not informed of that by the AW, who was on duty, this might indicate that the AW had failed to communicate with his subordinate, the Food Service Administrator. The seventh sentence is denied; a particular AW may be less than sterling in his performance, but that would not mean that he is not needed or that the Warden is doing the AW's job.

With regard to the eighth sentence, admitted that Warden Menifee reported to FCI Otisville at about 7:15 a.m. and then read the Lieutenants' log and other documents. Def. App. 122 (Menifee Dep. 119). However, the remainder of the eighth sentence is denied. Def. App. 182-83 (Wilner); Def. App. 120-22, 133 (Menifee Dep. 110-12, 115-16, 117-18, 199). The AW was not required to report to the institution between 7:00 and 7:15 a.m. to read documents and act upon incidents reported in them or research how to respond to them so he could be ready to talk with the Warden. Id. The ninth sentence also is denied. Id.

13. Part of plaintiff Chalmers's responsibility therefore was to know essential information to provide a safe and secure institution, act upon it appropriately, and report to the warden about the information and the institution's reaction to it before the warden could learn about it or take action himself. Repeated failure to do so would jeopardize Plaintiff Chalmers's effectiveness as a supervisor and would elicit an immediate negative response from the warden, with an admonishment to correct this failure.

RESPONSE: With regard to the first sentence, admitted that Mr. Chalmers's responsibilities included knowing essential information to provide a safe and secure institution, and acting upon

it appropriately; the remainder of the first sentence is denied. Def. App. 182-83 (Wilner); Def. App. 120-22, 133 (Menifee Dep. 110-12, 115-16, 117-18, 199). The second sentence also is denied. Id. Mr. Chalmers was expected to communicate with his staff during working hours and to communicate issues to the Warden, also during work hours. Id. If an AW failed to communicate with his staff during work hours and if the Warden learned of this, the AW could be advised to talk to his staff and learn what is going on in the areas under his responsibility. Def. App. 121 (Menifee Dep. 115-16).

14. There were occasions when the warden gleaned information germane to Plaintiff Chalmers's area of responsibility before he learned about it, and the warden wanted to know why his staff did not inform him first or, assuming that AW Chalmers knew about it, why didn't he inform the warden of this information before he learned it through another source.

RESPONSE: Admitted that there were times when Warden Menifee learned of information before an AW learned of the information; but the remainder of the assertion is denied. Def. App. 121 (Menifee Dep. 117-18)("oftentimes I will hear things and find out things before my AWs, so it's not uncommon"). Warden Menifee testified that the AWs were not required to learn about things under their control before the Warden learned of them. Def. App. 121 (Dep. 115). AWs, including Mr. Chalmers, were expected to talk to their staff during work hours and report what they learned to the Warden. Def. App. 182-83 (Wilner); Def. App. 120-22, 133 (Menifee Dep. 110-12, 115-16, 117-18, 199). If an AW failed to communicate with his own staff and if the Warden learned of this, he could inquire why the AW had failed to keep him informed of issues within the AW's scope of responsibilities. Def. App. 121 (Menifee Dep. 115-16).

15. The position description for Associate Wardens at FCI-Otisville states, among

other things (App. 33, 39):

> The Associate Warden serves as acting Warden during the Warden's absence.
>
> * * *
>
> The incumbent is called upon to serve on, or preside over, various committee meetings. The Associate Warden implements decisions of committees by making proper assignments of personnel. They attend staff conferences to solve problems, to appraise their progress of programs, and to evaluate the performance of subordinates.
>
> Supervising functions include a range of duties which include planning, organizing and reviewing work, administering personnel matters, and dealing effectively with employees and union representatives regarding employee-management concerns. Specific supervisory responsibilities may include assigning, directing and reviewing the work of subordinates; evaluating work performance; identifying training needs; recommending selections, promotions, awards, disciplinary or other actions; planning, scheduling and coordinating the work of the unit; giving advice and counsel to employees; hearing and resolving employee complaints and grievances; and determining the material, equipment, and facilities needed to perform the work.

RESPONSE: Admitted.

16. Plaintiff Chalmers's scheduled shift hours at FCI-Otisville were always 7:30 to 4 p.m. App. 3, 106.

RESPONSE: Admitted that his scheduled shift hours were 7:30 a.m. to 4:00 p.m., Mondays through Fridays, except for those days when Mr. Chalmers was on leave. Pl. App. 3, 106.

17. Typically Plaintiff Chalmers arrived at FCI-Otisville at 7 or 7:10 a.m. App. 110. Plaintiff Chalmers came into the front lobby area, passed through a sallyport, walked up the walkway to the front entrance to the main building, and would "get identified by [the] control center officer." App. 109.

RESPONSE: The first sentence is denied. Sometimes Mr. Chalmers arrived after Warden Menifee arrived. Def. App. 122 (Menifee Dep. 120-21). The second sentence is admitted.

18. It is very important for the officers in the Control Center to identify everyone who enters the secure perimeter of the institution. As Plaintiff Chalmers stated in his deposition (App. 130-132),

> You would make eye contact, make sure that you recognize each other. It's extremely important for the Control Center to know who is going in and out of the institution. We don't want people to be able to get in who are aren't supposed to be there and we don't want people to get out who aren't supposed to be out. The only way to do that is by making eye contact and recognizing that person or persons as either Bureau of Prisons employees or authorized guests.

RESPONSE: The first sentence is admitted. The quotation from Mr. Chalmers's deposition is denied. Def. App. 229-31 (Wilner Dep. 147-49). It was not necessary for an FCI Otisville employee, who is going in or out of the institution, to make eye contact with the Control Center officer. Id. It was the Control Center officer's responsibility to know who he was letting in or out of the institution. Id.

19. Plaintiff Chalmers would then exit through another sallyport onto the compound, "where anywhere from five to 15 inmates would accost [him] [to ask him questions or give him information,] and...would try to make [his] way down to the lieutenants' office." App. 109. At the lieutenant' s office he would read the logs, lieutenants' logs, and sensitive reports for about five to ten minutes and then talk to the captain for about five to ten minutes before proceeding to his own office. App. 109.

RESPONSE: Admitted with the clarification that these activities were to be done during duty hours; otherwise, the assertion is denied. Def. App. 182-83 (Wilner). Mr. Chalmers was not required to come in early before the start of his shift to read the Lieutenants' logs and other documents or to talk to the captain. Id.

20. Everything of note that occurs inside or outside the institution that impacts on it is noted in the lieutenants' logs and sensitive reports. That is why all staff are encouraged to review these logs. Indeed, it is mandatory for the lieutenants, department heads, acting department heads, AW's, and the Warden to review these logs each day, to ensure they know what's going on in their areas and the institution. Each has to initial off on these forrns, stating that they have reviewed both the lieutenants' and sensitive logs.

RESPONSE: The first sentence is admitted. With respect to the second and third sentences, admitted with the clarification that, at FCI Otisville, these staff were to review the Lieutenants' logs and other documents during the course of their shift. Def. App. 182-83 (Wilner).

21. It is a common practice in the BOP, during the course of reviewing the logs, if you note something of concern in your primary area of responsibility, you will also initial right next to that entry to let your supervisor(s) and peers know that you noted it and will address it appropriately. Both the lieutenants and sensitive log form are printed with the job titles of the staff, e.g., Facilities Manager, Food Service Administrator, AW for Programs, who have to review these logs. If the warden notes that any of them are not reviewing and initialing these reports, he will inform each to correct this non-compliance.

RESPONSE: The first sentence is denied. It was not a common BOP practice, during the course of reviewing logs, if you note something of concern in your primary area of responsibility to initial next to that entry to let your supervisor and peers know that you noted it and will address it. For example, the FCI Otisville Lieutenants' logs introduced into evidence in Patrick Shea's hearing in Bishop v. United States, Fed. Cl. No. 03-446, do not contain any such initials. See Defendant's Trial Exhibits Nos. 47-52 admitted in the Bishop hearing. The second and third

sentences are admitted with respect to some of the Lieutenants' logs and other documents, but others do not contain job titles of reviewers. Id.

22. Under Operations Memorandum 214-95, the Bureau purportedly compensates employees for the time they spend in picking up equipment at the Control Center, and walking to their duty posts, or performing some other sort of work before the start of their shift. App. 258. Since the Operations Memorandum "policy says that if they're in the key line when their shift starts, they are not to be considered late," when the employees are in the key line or walking to their assignments, they are in pay status. App. 258.

RESPONSE: Denied. Shift starting and stopping times are specifically addressed in BOP national policy, Operations Memorandum 214-95, issued November 1, 1995, that states as follows:

> Shift starting and stopping times for employees who work inside an institution shall be scheduled to begin and end at the point employees pick-up and drop-off equipment (keys, radios, body alarms, work detail pouches, etc.) at the control center. Therefore, employees who pick-up equipment at the control center shall have their shifts scheduled to include reasonable time to travel from the control center to their assigned duty post and return (at the end of the shift)....
>
> An institution employee whose shift starts at 7:30 a.m. must be at the control center and have received his/her equipment no later than 7:30 a.m. to be considered "on time" for the start of his/her shift. To accomplish this, each location should ensure minimum waiting time for the employee in the key line.
>
> If that same employee's shift ends at 4:00 p.m., he/she should drop-off his/her keys/equipment in the control center at 4:00 p.m., the scheduled quitting time. Reasonable travel time to and from the duty post to the control center would be compensable as part of the employee's tour of duty....

Pl. App. 44-46; Def. App. 176-80. BOP national policy further stated:

> Time in Key Line: If an employee arrives at the key line in a reasonable time to get equipment prior to the shift, but does not receive the equipment/keys by the beginning of the shift, this employee is not to be considered late.

Def. App. 94. BOP national policy on shift starting and stopping times for institutions is incorporated in its Human Resource Management Manual. Pl. App. 49-50; Def. App. 97-99.

23. At FCI-Otisville, the Institution Supplement announces that the department head meeting will be held the second payweek Wednesday of each month and that a combined department head/lieutenants' meeting will be on the first payweek Wednesday of each month. App. 51-61, 163; Shea App. 305, 309.

RESPONSE: Admitted. Def. App. 43-50, 59-61.

24. The meetings generally began at 7:30 a.m. App. 5, 60; Shea App. 378, 379.

RESPONSE: Denied that the Department Head meeting began at 7:30 a.m. The Department Head meeting was scheduled for 8:00 a.m. and generally began at 8:00 a.m. Pl. App. 55; Def. App. 43-50, 59-61; Pl. App. 62-91 (Warden Menifee's weekly calendars). The combined Lieutenants'/Department Head meeting generally began at 7:30 a.m. Id.

25. "It would be mandatory for the lieutenants that were on shift and the department heads and or their designees" to attend a Lieutenants'/Department Head meeting. App. 120-121. They would know the meetings were mandatory because of the Correctional Services Manual ("They're in the institution and they are available.'). App. 121-122.

RESPONSE: The first sentence is admitted with the clarification that it applies to those Lieutenants and Department Heads or Acting Department Heads who are on shift, i.e., on duty during the meeting, and that emergencies or similar matters might take precedence over attendance at meetings. Def. App. 125-27, 134, 136-37 (Menifee Dep. 133, 139, 141-42, 198, 246-47); Def. App. 53-54 (Menifee); Def. App. 236 (Wilner Dep. 232); Def. App. 246 (White Dep. 66-67). The second sentence is denied. The Correctional Services Manual does not speak

to who must attend the Lieutenants' meetings, and does not require any employees to attend the Lieutenants' meetings when they are off duty or not on shift. Def. App. 251-52, 254-55. Further, the 1997 version of the Correctional Services Manual stated: "The institution Executive Staff, Department Heads, and other interested persons, (ex. the union), should be encouraged to attend." Def. App. 252. The Correctional Services Manual does not address Department Head meetings or attendance at such meetings. Id.

26. "Department heads, executive staff and department heads and/or their representatives from their department if a department head wasn't available [are required to attend Department Head meetings] ." App. 122; Shea App. 309.

RESPONSE: Admitted with the clarification that these individuals are required to attend the Department head meeting if they are on shift, i.e., on duty during the meeting, and that emergencies or similar matters may take precedence over attendance at meetings; otherwise the statement is denied. Def. App. 125-27, 134, 136-37 (Menifee Dep. 133, 139, 141-42, 198, 246-47); Def. App. 53-54 (Menifee); Def. App. 236 (Wilner Dep. 232); Def. App. 246 (White Dep. 66-67).

27. At FCI-Otisville, Kathy Grabowski, the warden's secretary from August 1983 to about November 2002, would send e-mail announcements of meetings, such as the department head meetings. See, e.g, App. 62-63.

RESPONSE: Admitted only that Ms. Grabowski, who was Warden Menifee's secretary until November 1, 2002, sent e-mail appointments for Department Head meetings and combined Lieutenants'/Department Head meetings; the remainder is denied, and also denied that she sent e-mails regarding close-out meetings. Pl. App. 190-91 (LaForest Dep. 161-62); Def. App. 184-85

(Wilner). Further, plaintiff has not provided copies of any of these e-mails. Rather, Pl. App. 62-63 is a copy of a weekly calendar that Ms. Grabowski prepared for Warden Menifee; it is not an e-mail.

28. Similarly, Janine Banks, who became the warden's secretary in November 2002, sends out e-mails, such as announcements on the institution's LAN, to advise or remind employees of meetings, lieutenants meetings, and lieutenants'/department head meetings. App. 62-91, 190-192, 255-266. For example, Ms. Banks announced a Lieutenants/Department Head Meeting at 7:30-9 a.m. on April 2, 2003. See App. 190-191; Shea App. 378.

RESPONSE: With regard to the first sentence, admitted only that Ms. Banks, who became Warden Menifee's secretary in November 2002, sent out e-mail appointments for Department Head meetings and combined Lieutenants'/Department Head meetings. As explained by FCI Otisville employee Karen LaForest, these e-mails were appointments that an employee could electronically accept or reject, and, if one accepted the appointment, it was saved to the employee's electronic calendar; the remainder of the first sentence is denied and also denied that she sent out e-mails announcing close-out meetings. Pl. App. 190-91 (LaForest Dep. 161-62); Pl. App. 265-66; Def. App. 52-53 (Menifee), 62-63 (Banks's e-mails); Def. App. 184-85 (Wilner). The second sentence is admitted with the clarification that this was an electronic appointment that could be saved or rejected by the recipient; otherwise the second sentence is denied. Id.

29. When she sends out these announcements, the warden's secretary is acting for the warden. App. 193. These electronic messages are effectively instructions from the warden to attend such meetings.

RESPONSE: Denied. The e-mails were appointments that could be accepted or rejected by the

employee, and they were not instructions from the Warden to attend such meetings. Def. App. 52-53 (Menifee), 62-63 (Banks's e-mails); Def. App. 184-85 (Wilner).

30. As Associate Warden, Plaintiff Chalmers was required to attend Department Head meetings at FCI-Otisville.

RESPONSE: Admitted with the clarification that Mr. Chalmers was required to attend the Department Head meetings at FCI-Otisville when he was on-shift, i.e. during his duty hours, and that emergencies or similar matters might take precedence over attendance at meetings. Def. App. 125-27, 134, 136-37 (Menifee Dep. 133, 139, 141-42, 198, 246-47); Def. App. 53-54 (Menifee); Def. App. 236 (Wilner Dep. 232). Further, he was not required to attend such meetings when he was on leave or otherwise not scheduled to work. Id. He was not required to work overtime by attending such meetings. Id. While on duty, Mr. Chalmers sometimes did not attend Department Head meetings. Pl. App. 123.

31. Plaintiff Chalmers also knew that he was required to attend department head meetings because "as an executive staff member, you just . . . know you need to be there. The Warden lets you know." App. 122. If he or another AW forgot to attend, "[they] got a really, really irate Warden chewing [them] out. If we didn't know before, we knew then." App. 122-123. "Basically he just told us in no uncertain terms that [it] was not to happen again." App. 123.

RESPONSE: With regard to the first sentence, admitted with the clarification that Mr. Chalmers was required to attend the Department Head meetings at FCI Otisville when he was on-shift, i.e., during his duty hours, and that emergencies or similar matters might take precedence over attendance at meetings. Def. App. 125-27, 134, 136-37 (Menifee Dep. 133, 139, 141-42, 198,

246-47); Def. App. 53-54 (Menifee). Further, he was not required to attend such meetings when he was on leave or otherwise not scheduled to work. Id. He was not required to work overtime by attending such meetings. Id. The second, third, fourth, and fifth sentences are denied. Id.

32. Because the lieutenants'/department head meetings began at 7:30 and plaintiff's shift also began at 7:30, before going to the meeting, he had to perform the duties summarized in paragraph 18 above. To do so and to prepare for the meeting, he had to arrive at the institution at 7 or 7:10 a.m. App. 110.

RESPONSE: We assume plaintiff intended to refer to paragraph 19 above, not to paragraph 18. With that correction, the proposed finding is denied. Mr. Chalmers was not required to perform the duties summarized in paragraph 19 above before going to the combined Lieutenants'/Department head meeting which began at 7:30 a.m. Def. App. 120-22, 133 (Menifee Dep. 110-12, 115-16, 117-18, 199); Def. App. 182-84 (Wilner). Mr. Chalmers was not required to prepare for that meeting prior to the start of his scheduled shift at 7:30 a.m. Id. Mr. Chalmers was not required to arrive at the institution at 7:00 or 7:10 a.m. Id.

33. Further, there was a practical reason for attending all the department head and lieutenants'/department head meetings. Before an AW went to that meeting, he or she would need to know about all unusual occurrences on the night before (or even the weekend before if it was a three-day weekend) because such issues would be discussed at the meeting and the AW would need to know or at least that he was aware of the issue, if not already resolving it. See paragraphs 10-14 above.

RESPONSE: With regard to the first sentence, admitted that there were practical reasons for attending the Department Head and Lieutenants'/Department Head Meetings when Mr. Chalmers

was on-shift, i.e., during his duty hours, and that emergencies or similar matters might take precedence over attendance at meetings; the remainder of the first sentence is denied. Def. App. 125-27, 134, 136-37 (Menifee Dep. 133, 139, 141-42, 198, 246-47).

The second sentence is denied. With regard to the combined Lieutenants'/Department head meetings, an AW was not required to know about occurrences of the previous night (or even the weekend before if it was a three-day weekend) before attending the combined Lieutenants'/Department head meeting that starts at 7:30 a.m. Def. App. 182-84 (Wilner); Def. App. 120-22, 133 (Menifee Dep. 110-12, 115-16, 117-18, 199). Rather, the AW would be informed of the occurrences of the night before (or from the weekend before if it was a three-day weekend) at the 7:30 a.m. meeting. Id.

With regard to the Department Head meetings, those meetings were scheduled for 8:00 a.m. Def. App. 182-84 (Wilner). By 8:00 a.m., the AW would have learned what happened the night before and would be ready and able to discuss it at the meeting. Id.

The AW was not required to come in early before the start of his shift to prepare for either the combined Lieutenants'/Department head meeting or the Department Head meeting. Def. App. 120-22, 133 (Menifee Dep. 110-12, 115-16, 117-18, 199); Def. App. 182-84 (Wilner).

34. Some of these occurrences might affect only a few staff members, but they commonly concerned every employee in the institution. For example, if at the evening meal, Food Services did not prepare enough fried chicken for the entire inmate population (such as because it was stolen or burnt), and the last two units of inmates called to the dining room were served left over stew from the lunch meal in lieu of fried chicken, the inmates who ate last would be upset. Another example could be a minor fight between two inmates, which might not seem important

on the surface, but could reflect some inter-gang warfare.

RESPONSE: Admitted with the clarification that AWs were expected to learn of such occurrences during their duty hours, and not by coming in early before the start of their shift; otherwise the assertion is denied. Def. App. 120-22, 133 (Menifee Dep. 110-12, 115-16, 117-18, 199); Def. App. 182-84 (Wilner). See Defendant's Response to PFUF No. 33 above.

35. As AW, Plaintiff Chalmers needed to know about these incidents before he arrived at that meeting, so he could help resolve the problem at the meeting and brief the warden about it if necessary. Therefore, he had to review the Lieutenants' logs and talk to the department head to find out exactly what happened, because it will be a topic for discussion at that meeting. It is the AW's job to manage these things, and he cannot do it without knowing the exact details before the meeting starts. If he learns at the meeting, it is too late. If it appears that he did not know about the occurrence, the AW will look foolish and his lack of knowledge will reflect on the warden's views of his management skills.

RESPONSE: Denied. It is unclear whether plaintiff is referring to the combined Lieutenants'/Department Head meeting or the Department Head meeting. Assuming the proposed finding refers to the combined Lieutenants'/Department Head meetings, which were scheduled for 7:30 a.m., the entire proposed finding is denied. Def. App. 120-22, 133 (Menifee Dep. 110-12, 115-16, 117-18, 199); Def. App. 182-84 (Wilner); Def. App. 239-40 (Wilner Dep. 244-45).

Assuming the proposed finding refers to the Department Head meetings which were scheduled for 8:00 a.m., there normally was adequate time for the AW to review the Lieutenants' logs and other documents and talk to staff prior to the Department Head meeting. Def. App. 182-

84 (Wilner). Defendant also incorporates its response to PFUF No. 33 above.

36. The lieutenants'/department head meetings usually last two to three hours. Shea App. 309.

RESPONSE: Denied. At FCI Otisville, the length of these meetings varied. Def. App. 174. For example, the combined Lieutenants'/Department Head meeting on August 8, 2001 lasted about one hour, and was followed by a closed meeting for the Lieutenants, which lasted about one hour. Pl. App. 94-95.

37. The first part is an open department head meeting; the rest is a closed Lieutenants' meeting. Shea App. 310.

RESPONSE: Admitted with the clarification that, at FCI Otisville, the first part of the combined Lieutenants'/Department Head meeting is open; it is followed by is a closed Lieutenants' meeting. Pl. App. 94-95.

38. The open part generally lasted about 1.5 hours. Shea App. 310.

RESPONSE: Denied. At FCI Otisville, the length of the open part of these meetings varied. For example, the combined Lieutenants'/Department Head meeting on August 8, 2001 was open and lasted about one hour, and was followed by a closed meeting for the Lieutenants, which lasted about one hour. Pl. App. 94-95.

39. The Bureau requires institutions to take minutes of the meetings and to record attendance at them. App. 244, 267; Shea App. 269-270.

RESPONSE: Admitted that, with respect to Lieutenants' meetings, the BOP requires that institutions take minutes of the open portion of that meeting and that they record attendance; the remainder of the assertion is denied. Def. App. 252-53, 255; Pl. App. 92-95. Further, at FCI

Otisville, the Institution Supplement on Staff Meetings required that minutes be taken of Department Head meetings. Def. App. 43-50, 59-61.

40. At FCI-Otisville minutes are taken of those meetings, typically by the Warden's secretary. App. 156, 184.

RESPONSE: Denied that the minutes of the combined Lieutenants'/Department Head meetings were taken by the Warden's secretary. The Captain's secretary (Danielle Sperry) usually took the minutes of the combined Lieutenants'/Department Head meetings. Def. App. 232 (Wilner Dep. 152); Pl. App. 93, 95. The Warden's secretary (Janine Banks) usually took the minutes of the Department Head meetings. Def. App. 232 (Wilner Dep. 152); Pl. App. 98. Defendant incorporates its response to PFUF No. 39 above.

41. The FCI-Otisville minutes indicate who attended the department head and lieutenants'/department head meetings. App. 157-158. For many years, they also identified department heads and lieutenants who were absent. See, e.g., Shea App. 412-13.

RESPONSE: The first sentence is admitted. At FCI Otisville, the minutes of the combined Lieutenants'/Department Head meetings and the minutes of the Department Head meetings generally indicate who attended those meetings. Pl. App. 92-98.

With regard to the second sentence, denied that the combined Lieutenants'/Department Head meeting minutes and the Department Head meeting minutes indicated which Department Heads were not present at those meetings; such minutes did not indicate which Department Heads were not present at the meeting. Pl. App. 92-98. Admitted that, for many years, the FCI Otisville combined Lieutenants'/Department Head meeting minutes usually indicated which Lieutenants were not present at the meeting. Pl. App. 92-98.

42. Warden Menifee occasionally signed the minutes of department head meetings.

RESPONSE: Admitted. Pl. App. 98.

43. The Correctional Services Manual, dated October 27, 1997, stated: "Those lieutenants not attending [the lieutenant's meeting] will be listed and the reason for not attending recorded." App. 268-269. The Correctional Services Procedures Manual (dated October 2003) stated: "Lieutenants in attendance [at the lieutenants' meeting] will be listed in the minutes." Shea App. 270. Until October 2003, the minutes identified the lieutenants who did not attend the meeting. App. 246-247, 267.

RESPONSE: The first and second sentences are admitted. With respect to the third sentence, the practices at BOP institutions were varied. At FCI Otisville, until October 2003, the minutes of the combined Lieutenants'/Department Head meetings generally identified the Lieutenants who attended the meeting and the Lieutenants who did not attend the meeting.

44. A couple of times, when a department head under AW Chalmers was absent, Warden Menifee "whispered in [his] ear and told him not to let happen it again." App. 123-124. Warden Menifee "would always note who was in the room [and who was] not in the room and he would [ask one of the AW's to] find out where one of the department heads or representatives were if they weren't present." App. 24. It was easy for Warden Menifee to see who was present because "there were not enough chairs in the conference room for everybody to sit down, so the last couple of people in had to stand, so it was always obvious who came in late." App. 124.

RESPONSE: Denied. Def. App. 145 (Menifee Dep. 319, 320-22); Def. App. 239-40 (Wilner Dep. 244-45). Further, as Warden Menifee testified, FCI Otisville sent out minutes of the Department Head meeting to all staff and staff that were not present at the meeting could access

the information from the meeting. Def. App. 145 (Dep. 321).

45. According to minutes of the meetings, Plaintiff Chalmers attended Department Head and Lieutenants'/Department Head meetings at FCI-Otisville on the following dates in 2001: February 7 (7:30-9:15 a.m.), March 7 (7:30-8:50 a.m.), April 4 (7:30-9:30 a.m.), May 2 (7:30-8:50 a.m.), May 16 (department head), June 27 (7:30-9:30 a.m.), July 11 (presided over Department Head meeting as Acting Warden, at 8 a.m.), July 25 (7:30-8:35 a.m., as Acting Warden, plus 10 minutes at closed session meeting), August 8 (7:30-8:40 a.m., as AW for Programs), September 5 (7:30-8:30 a.m., as AW for Programs), October 3 (7:30-8:30 a.m., as AW for Programs), October 17 (department head), November 1 (department head), November 28 (department head, 8 a.m.), December 12 (7:30-9:00 a.m.).

RESPONSE: Plaintiff has failed to support this assertion in his Appendix and it also is irrelevant as plaintiff is not requesting overtime for his attendance at these meetings. These meetings all occurred during his scheduled shift and he is not claiming overtime for his attendance at such meetings. Def. App. 16 (Dep. 74).

46. According to minutes of the meetings, Plaintiff Chalmers attended Department Head and Lieutenants'/Department head meetings at FCI-Otisville on the following dates in 2002: January 9 (7:30-8:40 a.m., as AW of Operations), January 23 (department head), February 6 (7:30-9:35 a.m., as AW of Operations), February 20 (department head), March 6 (7:30-9:20 a.m., as AW of Operations), March 20 (department head), April 3 (7:30-8:50 a.m., as AW of Operations), April 17 (department head), May 1 (7:30-8:48 a.m., as AW of Operations), May 15 (department head), June 12 (7:30-8:35 a.m., as Acting Warden), July 10 (7:30-8:35 a.m., as AW of Operations), July 24 (department head, as Acting Warden), August 7 (department head),

August 21 (7:30-8:38 a.m., as AW of Operations), October 2 (7:30-9:40 a.m., as AW of Operations), October 16 (department head), November 13 (7:30-9:40 a.m., as AW of Operations], November 27 (department head, as Acting Warden), December 11 (7:30-9:30 a.m., as AW of Operations), December 31 (department head).

RESPONSE: Plaintiff has failed to support this assertion in his Appendix and it also is irrelevant as plaintiff is not requesting overtime for his attendance at these meetings. These meetings all occurred during his scheduled shift and he is not claiming overtime for his attendance at such meetings. Def. App. 16 (Dep. 74).

47. According to minutes of the meetings, Plaintiff Chalmers attended Department Head and Lieutenants'/Department head meetings at FCI-Otisville on the following dates in 2003: January 8 (7:30-10:00 a.m., as AW of Operations), January 22 (department head), February 5 (7:30-9:20 a.m., as AW of Operations), February 19 (department head), March 5 (7:30-8:55 a.m., as AW of Operations), March 19 (department head), April 2 (7:30-9:10 a.m., as AW of Operations).

RESPONSE: Plaintiff has failed to support this assertion in his Appendix and it also is irrelevant as plaintiff is not requesting overtime for his attendance at these meetings. These meetings all occurred during his scheduled shift and he is not claiming overtime for his attendance at such meetings. Def. App. 16 (Dep. 74).

48. Executive closeouts are meetings that occur at the end of the workday. They may sometimes go beyond the scheduled duty hours of the attendees. App. 256(A).

RESPONSE: With regard to the first sentence, admitted only that, at FCI Otisville, executive close-outs were held Tuesdays through Fridays, and scheduled for 3:00 p.m.; otherwise the

assertion is denied. Pl. App. 62-91. The second sentence is admitted only with respect to Warden Menifee's close-outs at FCI Otisville; otherwise the assertion is denied.

49. Warden Menifee held closeout meetings about everyday from Tuesday through Friday, in the warden's conference room. App. 62-91, 106-107.

RESPONSE: Admitted with the clarification that Warden Menifee did not hold close-outs on Mondays; he typically held close-outs at 3:00 p.m. on Tuesdays through Fridays, in the Warden's conference room. Def. App. 108 (Menifee Dep. 27); Def. App. 172 (LaForest Dep.103); Def. App. 175 (Pl. Dep. Ex. 28); Def. App. 184-85 (Wilner).

50. They were attended by the executive staff (the warden, two AW's, executive assistant, the captain, and the superintendent of UNICOR). App. 107.

RESPONSE: Admitted.

51. The closeouts began at 3 or 3:30 p.m. App. 107, 264.

RESPONSE: Denied. Warden Menifee typically held close-outs at 3:00 p.m. on Tuesdays through Fridays. Def. App. 108 (Menifee Dep. 27); Def. App. 172 (LaForest Dep.103); Def. App. 175 (Pl. Dep. Ex. 28); Def. App. 184-85 (Wilner).

52. According to copies of calendars provided by the BOP, during the period from October 25, 2002, through May 2003, closeouts were scheduled for 3:00 to 4:00 p.m. almost every day, Tuesday-Friday, unless it was a holiday or some other special day. App. 62-91.

RESPONSE: Admitted with the clarification that Warden Menifee did not hold close-outs on Mondays; his close-outs generally were scheduled for 3:00 to 4:00 p.m. on Tuesdays through Fridays, unless there was a holiday or some other reason not to hold the meeting. Def. App. 108 (Menifee Dep. 27); Def. App. 172 (LaForest Dep.103); Def. App. 175 (Pl. Dep. Ex. 28); Def.

App. 184-85 (Wilner).

53. Typically closeouts lasted until at least 4:30 p.m. App. 107.

RESPONSE: Denied. Def. App. 104, 106-07 (Menifee Dep. 12, 20-22); Def. App. 184-85 (Wilner).

54. Generally wardens schedule closeouts by telling the secretaries to put it on the calendar for a certain time and they let people know when the meeting is, and they do it. App. 256.

RESPONSE: Denied for lack of evidence as to what Wardens "generally" do. Some Wardens do not hold close-outs. Pl. App. 264. At FCI Otisville, Warden Menifee typically scheduled close-outs for 3:00 to 4:00 p.m., Tuesdays through Fridays, and his secretary placed those meetings on the weekly calendars that she prepared for him. Pl. App. 61-91; Def. App. 108 (Menifee Dep. 27); Def. App. 172 (LaForest Dep.103); Def. App. 175 (Pl. Dep. Ex. 28); Def. App. 184-85 (Wilner). The Associate Wardens learned from each other that Warden Menifee's close-outs were scheduled for 3:00 p.m. on Tuesdays-Fridays. Def. App. 184-85 (Wilner); Pl. App. 218 (Wilner Dep. 225).

55. When she was the warden's secretary, Ms. Grabowski would send out announcements that closeouts were scheduled for 3-4 p.m. See, e.g., App. 62, 63.

RESPONSE: Denied for lack of any evidence and also because it is unclear what is meant by "announcements." The document cited is a weekly calendar prepared by Ms. Grabowski for Warden Menifee, and it indicates that his close-out meetings were scheduled from 3:00 - 4:00 p.m. Pl. App. 62-63. Admitted that Ms. Grabowski prepared the weekly calendar at Pl. App. 62-63, and that such weekly calendars were available to the AWs. Def. App. 184-85 (Wilner).

There is no evidence that Ms. Grabowski sent out "announcements" that close-outs were scheduled from 3-4 p.m. Def. App. 185 (Wilner).

56. Ms. Banks, currently the warden's secretary, also notifies staff, including associate wardens, that closeouts are scheduled for 3 to 4 p.m. See, e.g., App. 64, 65.

RESPONSE: Denied. The Associate Wardens learned from each other that close-outs were scheduled from 3:00 to 4:00 p.m. on Tuesdays-Fridays, and the Warden's secretary generally would not inform them of the time of a close-out, unless for some reason the meeting time was changed. Def. App. 184-85 (Wilner). Ms. Banks prepared a weekly calendar for Warden Menifee that indicated that close-outs generally were scheduled from 3:00 - 4:00 p.m., Tuesdays through Fridays, and she prepared the weekly calendars at Pl. App. 64-91. Id. The Warden's weekly calendars were available to the AWs. Id.

57. Warden Menifee stated that Plaintiff Chalmers had to stay for the closeout meeting. App. 111.

RESPONSE: Denied. We assume that plaintiff intended to state that Warden Menifee stated that Mr. Chalmers had to stay past the end of his scheduled shift until the close-out meeting had ended, and that assertion is denied. Further, employees sometimes left the close-out meetings before they ended, and Warden Menifee did not require them to stay past 4:00 p.m. Def. App. 116, 117 (Menifee Dep. 79-80, 83)("I've had exec staff who had to leave and they let me know they have to go")("I've never denied anyone or prevented anyone from leaving who had to go.").

58. As explained by former FCI-Otisville Associate Warden Joseph Wilner, he knew to go to closeout meetings at Warden Menifee's office for the following reason: "Upon my arrival at Otisville the other Associate Wardens told me that we ha[d] closeout at 3 o'clock." App. 218.

RESPONSE: Admitted. Pl. App. 218 (Wilner Dep. 225).

59. "There was probably a schedule of meetings...that...indicated that there would be a closeout every day at a certain time. App. 80. "I knew I had to be there." App. 112.

RESPONSE: Admitted only that there was "a schedule of meetings" in that the weekly calendars prepared by Ms. Grabowski and Ms. Banks for Warden Menifee (i.e., the documents at Pl. App. 62-91), indicated that close-outs generally were scheduled on Tuesday through Friday, from 3:00 to 4:00 p.m.; the remainder of the first sentence is denied. Pl. App. 62-91; Def. App. 184-85 (Wilner). In addition, the FCI Otisville Institution Supplement did not state the date or time of close-out meetings. Pl. App. 51-61; Def. App. 43-50, 59-61. The second sentence is admitted with the clarification that Mr. Chalmers "had to be there" during his duty hours and that emergencies or similar matters could take precedence over attendance at meetings; otherwise the assertion is denied. Def. App. 116, 117 (Menifee Dep. 79-80, 83)("I've had exec staff who had to leave and they let me know they have to go")("I've never denied anyone or prevented anyone from leaving who had to go.").

60. The majority of the time the attendees stayed well past 4:00-until 4:15 or 4:30 p.m. App. 128.

RESPONSE: Denied. Close-outs usually ended by 4:00 p.m., but sometimes ran later. Def. App. 185 (Wilner); Def. App. 104, 106-07 (Menifee Dep. 12, 20-22). Defendant incorporates its response to PFUF No. 57.

61. The fact that the attendees were in a meeting with the warden that went beyond their regularly scheduled hours indicates that the warden "approved their attendance" at those times. App. 257.

RESPONSE: Denied. Def. App. 116-17. Employees sometimes left the close-out meetings before they ended, and Warden Menifee did not require them to stay past 4:00 p.m. Def. App. 116, 117 (Menifee Dep. 79-80, 83)("I've had exec staff who had to leave and they let me know they have to go")("I've never denied anyone or prevented anyone from leaving who had to go.").

62. After closeouts ended, Plaintiff Chalmers would usually go to the bathroom and then to the Control Center "to get identified" and then he went out the front sallyport. App. 108. Typically he would never leave before 4:30. App. 110.

RESPONSE: With regard to the first sentence, admitted that Mr. Chalmers usually would go to the bathroom after close-outs ended and then to the Control Center and that he went out the front sallyport; the remainder of the first sentence is denied. Def. App. 229-31 (Wilner Dep. 147-49). It was not necessary for an employee, who is going in or out of the institution, to make eye contact with the Control Center officer. Id. It was the Control Center officer's responsibility to know who he was letting in or out of the institution. Id. The second sentence is denied. Def. App. 116-117 (Menifee Dep. 79-80, 83).

63. The records provided thus far by the BOP show that during Plaintiff Chalmers's tensure as AW there, FCI Otisville held closeouts on the following dates, inter alia: October 29-31, 2002; November 1, 5, 6, 7, 13, 14, 15, 19, 20, 21, 22, 26, 27, 29, 2002; December 3, 4, 5, 6, 10, 11, 12, 13, 17, 18, 19, 20, 26, 27, 31, 2002; January 2, 3, 7, 8 ,9, 10, 14, 15, 17, 22, 24, 28, 29, 31, 2003; February 19, 21, 25, 26, 2003; March 4, 5, 7,11, 12, 14, 18, 19, 20, 21, 21, 25, 26, 27, 28, 2002; and April 1, 2, 3, 4, 8, 9, 10, 11, 15, 16, 17, and 18, 2003.

RESPONSE: Denied. The records provided indicate that close-outs were scheduled on the dates enumerated, as well as on other dates that plaintiff did not list. Pl. App. 62-91. The records do

not indicate that the close-outs actually were held on the dates enumerated by plaintiff. Id.

64. Plaintiff Chalmers is claiming 55 minutes/day overtime four days each week that he worded - 25 minutes preshift and 30 minutes postshift. App. 110.

RESPONSE: This assertion is only plaintiff's characterization of his action; if it is an assertion of fact it is denied.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

s/Kathryn A. Bleecker
KATHRYN A. BLEECKER
Assistant Director

s/Domenique Kirchner
DOMENIQUE KIRCHNER
Senior Trial Counsel
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
8th Floor
1100 L Street N.W.
Washington, D.C. 20530
Tele: (202) 307-0290
Attorneys for Defendant

Of Counsel:
ERIKA TURNER
Assistant General Counsel
Bureau of Prisons
December 22, 2006