IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| LEROY BISHOP, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No. 03-446C |
| | ) | Senior Judge Bruggink |
| UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

REPLY BRIEF IN SUPPORT OF PLAINTIFF CRAIG CHALMERS'S MOTION FOR PARTIAL SUMMARY JUDGMENT AND BRIEF IN OPPOSITION TO DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT

Plaintiff Craig Chalmers hereby replies to Defendant's Opposition to his Motion for Partial Summary Judgment and opposes Defendant's Cross-Motion for Summary Judgment.

I. The Court Should Not Apply *Doe II* to the Bureau of Prisons

In its Opposition to Plaintiff Chalmers's Motion for Partial Summary Judgment and Cross-Motion for Summary Judgment ("Def. Br."), at 1-2, defendant argues that plaintiff Chalmers has failed to demonstrate a violation of the Federal Employees Pay Act ("FEPA"), 5 U.S.C. § 5542, and has not met the regulatory requirements of the Office of Personnel Management (OPM), 5 C.F.R. § 550.111(c),[1] as interpreted in this Court's recent decisions applying *Doe v. United States*, 372 F.3d 1347 (Fed. Cir. 2004) ("*Doe II*"), *cert. denied*, 544 U.S. 904 (2005), to the Bureau of Prisons ("BOP"). In those rulings, *Carlsen v. United States*, 72 Fed. Cl. 782 (2006); *Bishop v. United States*, 72 Fed. Cl. 766, 2006 U.S. Claims LEXIS 266 (2006) ("*Bishop I*"); and *Bishop v. United States*, 2006 U.S. Claims LEXIS 380, No. 03-446C (Nov. 20, 2006) ("*Bishop II*"), the Court held that the four plaintiffs in *Carlsen* and Lt. Patrick

[1] 5 C.F.R. § 550.111(c) provides, in relevant part, that to be compensable overtime, it must have been "ordered or approved . . . in writing by an officer or employee to whom this authority has been specifically delegated."

Shea in *Bishop I* and *Bishop II* had not demonstrated evidence of explicit, written orders for overtime and dismissed their claims.

As stated in Plaintiffs' Brief in Support of Plaintiff Chalmers's Motion for Partial Summary Judgment and Appendix ("Pl. Br.") at 7-8, *Doe II* is factually distinguishable from this case. There are a multitude of reasons why the Court should not apply *Doe II* to BOP or any other law enforcement agency which require immediate obedience to oral orders to work overtime in a dangerous, high-security environment where the failure to obey orders may, at most, result in the loss of life or injury or, at least, in discipline or the end of a career.[2] As Plaintiff Chalmers explained, "If it's not illegal and it doesn't put you in a life-threatening situation, you do what you are told and you . . . grieve later." App. 127. It makes no difference whether the order is oral or written. *Id.*

In short, *Doe II* is factually distinguishable from this case for the following reasons: 1) DOJ attorneys are professionals, who operate independently, unlike BOP employees; 2) BOP employees work in a more secure, dangerous environment; 3) BOP employees' mobility into and around their workplace is restricted; 4) BOP's mission necessitates rigid work scheduling; 5) Congress recognizes that law enforcement employees are unique; 6) BOP employees must follow all orders, whether oral or written, and if they do not, they would suffer an even greater penalty than the attorneys in *Doe*; and 7) the BOP discourages requests for overtime.[3] If the Court does not permit Plaintiff Chalmers and the other BOP plaintiffs to recover overtime pay here, it would give them a Hobson's choice: to obey oral orders and BOP customs to work

[2] Plaintiff adopts and incorporates by reference those arguments, which Plaintiffs also made in the *Carlsen* and *Shea* cases.

[3] In addition to the record reference previously provided to the Court, see AW Anthony Haynes's testimony in *Shea* that the Bureau tries to minimize the overtime it pays employees. Shea Trial Tr. 346, 420 [Supp. App. 28-32].

overtime, without compensation, thereby lose millions of dollars, or refuse to work overtime without written orders and run the clear risk of discipline or at least of ruining their careers. In its brief, Defendant does not respond to these arguments.

Alternatively, if the Court does apply *Doe II* to Plaintiff Chalmers (and other BOP employees), it should take a much less restrictive approach as to what documents constitute written orders than it did in *Carlsen* and Shea cases, as explained below.

The documents referenced herein -- program statements, standards of conduct, training materials, position descriptions, institutional manuals and supplements, e-mail meeting reminders and other instructions to attend off-shift meetings, and government travel – all implicitly compel overtime and satisfy the underlying objective of the regulation -- to provide "a necessary safeguard against subjecting the Government to improper expense" (*Post v. United States*, 121 Ct. Cl. 94, 99 (1951)).

## II. Plaintiff Chalmers **Has** Demonstrated FEPA Violations

Defendant denies that Plaintiff Chalmers has demonstrated any FEPA violations. Def. Br. at 1-2 *et seq*. However, Plaintiff Chalmers has identified documents which demonstrate written, explicit orders, especially in conjunction with other documents, oral orders, and a BOP culture that expects and even demands overtime.

### A. Plaintiff's Claims as Associate Warden at FCI-Otisville

#### 1. Program Statements and Standards of Conduct Constitute Explicit Orders to Work Overtime

In its brief, defendant contends that program statements and standards of conduct do not expressly direct an employee to work overtime. Def. Br. 5-6. Defendant further argue that these documents "only implicitly necessitate[] working overtime." Def. Br. 5. However, defendant has misconstrued plaintiff's argument regarding these documents. Plaintiff Chalmers does not

contend that these documents *by themselves* ordered him to work overtime, but in conjunction with other documents, they do require employees to obey all orders of their supervisors, written or oral. Pl. Br. 10-11; Chalmers PFUF ¶8. For instance, at the end of BOP Standards of Conduct 3420.09 (Supp. App. 73-74), the BOP includes a table of penalties for employees who fail to follow all orders of their supervisors -- oral or written. This directive thus has the effect of enforcing BOP's policy requiring its employees to follow any sort of order from their supervisor, without distinguishing between written and oral orders. Thus, in conjunction with other documents, these documents satisfy the "ordered or approved" requirement of the statute. Chalmers PFUF ¶8.

2. BOP Training Materials Constitute Explicit Orders to Work Overtime

Defendant also argues that training materials are "not an order to work overtime." Def. Br. 13. However, BOP's training documents not only inform employees, generally and repeatedly, about a culture requiring punctuality, extra effort, and strict obedience to any sort of orders from supervisors, but also direct them to engage in overtime activities specifically or at least to perform functions which necessarily have to be done on overtime. *See* Pl. Br. 12-13. These documents were also read by BOP employees in conjunction with other documents and oral orders and had the cumulative effect of ordering plaintiffs to work overtime without a specific document explicitly directing them to work overtime.

Further, this Court should not isolate each of these documents, but should consider them in context and in their entirety. While some documents explicitly require BOP employees to work overtime, some implicitly compel overtime, particularly when considered in their context, including oral orders to work overtime and a culture that expects it. In the workplace, courts and arbitrators look to the "law of the shop" to interpret contracts and other documents. *See*

*Alexander v. Gardner-Denver Co.*, 415 U.S. 36, 53 (1974) (arbitrators interpret collective-bargaining agreements by considering the "law of the shop"); *Greene v. Howard Univ.*, 134 U.S. App. D.C. 81, 88, 412 F.2d 1128, 1135 (1969) ("Contracts are written, and are to be read, by reference to the norms of conduct and expectations founded upon them"). So do Plaintiffs here. Where, as here, written personnel regulations require obedience to oral orders and employees may be disciplined, and <u>are</u> disciplined, for not following oral orders, the Court should allow employees to claim overtime pay for overtime work which results from such oral orders. The Court should hold that all instructive and directional documents comply with *Doe II* if they even indirectly require employees to work overtime, for that is the result intended by BOP.

3. <u>Institution Supplements Constitute Explicit Orders to Work Overtime</u>

All BOP institutions have Institution Supplements. App. 119. "Institution Supplements are generally used to implement policy from the Bureau of Prisons into the [local] level." Supp. App. 4 [Chalmers Depo. 158]. "They cover virtually everything that happens in an institution, from meetings to how [employees] stand, perhaps mainline, affirmative action. It runs the gamut of a lot of the Program Statements that [BOP has]." Supp. App. 4-5 [Chalmers Depo. 158-159]. Plaintiff Chalmers, who was a BOP manager for many years, further explained: Institution Supplements have the effect of "implement[ing] Bureau policy and United States law. It can't change the [BOP] program, it can't change the policy, it can't change the law, but can implement it into that institution. Because of the physical characteristics of institution and [such] things, it allows some latitude." Supp. App. 4-5 [Chalmers Depo. 159]. He stated: "For example, [the] law may say that staff work eight hours, anything over eight hours is overtime, anything over 40 hours a week is overtime, but it doesn't dictate how the shifts are done. The Supplement may

dictate the hours of work, the shifts and assignments and things like that." *Id.* It "often" has the effect of an order. Supp. App. 5-6 [Chalmers Depo. 159-160].

Similarly, in the Shea trial, AW Hyanes testified:

> Institution supplements could tell [employees] things to do . . . . Institution supplements can give procedures on how to do certain things in a correctional environment. Shea Trial Tr. 428 [Supp. App. 37].

He also testified that at FCI-Otisville one Institution Supplement relates to meetings, including lieutenants' and department head meetings. Shea Trial Tr. 430-431 [Supp. App. 39-40].

Like program statements and standards of conduct, Institution Supplements do not by themselves order employees to work overtime, but in conjunction with other documents, they do require employees to attend meetings at certain times and dates. Therefore, if the required meetings extend beyond the scheduled periods, the work done during that time necessarily becomes overtime work.

The Court in *Carlsen*, 72 Fed. Cl. at 793, found:

> The Institution Supplement is not addressed to specific employees, however, and does not mandate attendance at the listed meetings. Nor does it direct that employees must attend meetings outside of their normal shift.

However, the statute, regulations, and *Doe II* do not require that written orders be directed at "specific employees"; employees can be collectively ordered as a group, both verbally and in writing. And, as explained herein, the natural consequences of an order to attend a specific meeting, in a culture which obligates employees to follow all orders and to complete all their work before leaving, is that if the meeting does not end before the employee's shift ends, the employee must remain, regardless of any specific new order to work overtime.

The combined lieutenant/department head meetings were usually held in the Warden's conference room at 7:30 a.m. on the Wednesday of the first pay week of the month. Shea Trial

Tr. 432 [Supp. App. 41]. The day shift began at the sane tune. Shea Trial Tr. 432-433 [Supp. App. 41-42].

This culture involved considerable verbal and non-verbal pressure on Plaintiff Chalmers to keep abreast of what was happening at the institution ahead of the warden, which often necessitated arriving early and staying late. Pl. Br. 15-17; Chalmers PFUF ¶32-35, 44. Not following orders comes at a cost at BOP. It not only could result in injury, loss of life, or property damage property, could also at least impede, if not end, an employee's career.[4] Supp. App. 73-74. Conversely, BOP's culture rewards those who follow orders and penalizes those who do not. *See, e.g.*, App. 122-23; Supp. App. 12 (Ey Depo. 71).

4. Position Descriptions Constitute Explicit Orders to Work Overtime

Defendant, pointing to this Court's ruling in *Carlsen*, 72 Fed. Cl. 795-795, argues that Mr. Chalmers' position description ("PD") "does not direct him to come in early or stay late after the end of his shift" or state that he had to attend Department Head meetings or combined lieutenants'/department head meetings. Def. Br. 8. However, Plaintiff Chalmers's PD specifically required him to "serve on, or preside over, various committee meetings." Pl. Br. 23; Pl. App. 38; Chalmers PFUF ¶15. This is an explicit statement requiring him to attend or preside at a certain type of meeting; if those meetings extended beyond Plaintiff Chalmers's shift, they necessarily required him to work overtime. And, as explained herein, the natural consequences of an order to attend a specific meeting, in a culture which obligates employees to follow all orders and to complete all their work before leaving, is that if the meeting does not end before the employee's shift ends, the employee must remain without any specific new order to work overtime. As Plaintiff Chalmers stated, "If it's not illegal and it doesn't put you in a life–

---

[4] *See Honcho v. Ashcraft*, 2001 U.S. Dist. LEXIS 4901 *10 (S.D. Ind. 2001) (history of unresponsiveness to emergencies led to discharge of Bureau employee).

threatening situation, you do what you are told and you ask or grieve later." Pl. Br. 10; Chalmers PFUF ¶8.

5. Correctional Services Manuals Constitute Explicit Orders to Work Overtime

Defendant argues that the Correctional Services Manual ("CSM") "is not an order to work overtime."[5] Def. Br. 9. The argument lacks merit. First, as a policy document, a manual does carry the weight of an order. Pl. Br. 11. *See Byrnes v. United States*, 163 Ct. Cl. 167, 171, 330 F.2d 986 (1964) (policy directives by agency officials requiring overtime work considered "orders"); *Cooley v. U.S. Dep't of Energy*, 1982 U.S. Cl. Ct. LEXIS 2501 (1982) (activities mandated by employee manuals are compensable overtime), *aff'd*, 26 Wage & Hour Cas. (BNA) 49 (Fed. Cir. 1983).

Second, since the Appeals Court in *Doe II* did not reject manuals as a source of written orders, see 372 F.3d at 1363, this Court should also credit manuals as sources of written overtime orders. The Court found, "A statement in a manual announcing to employees that they must follow the orders of supervisors does not amount to a written order to perform overtime" (*Carlsen*, 72 Fed.Cl. at 793), citing *Doe II*, but in *Doe II* the Court of Appeals rejected the argument that the U.S. Attorneys' Manual constituted a written order to work overtime only because the document stated the opposite! 372 F.3d at 1363. Thus, in *Doe II* the Court pointed to a passage in that Manual which "instructs attorneys not to expect overtime compensation rather than instructing them to work particular amounts of overtime" and explained:

> The Manual repeatedly emphasizes the following two directives: overtime under 5 U.S.C. §5542 must be approved in writing, in advance, by a person authorized to do so and U.S.

---

[5] In its brief Defendant asserts that Plaintiff Chalmers is not requesting overtime compensation for his attendance at these meetings. Def. Brief 9, citing Def. App. 16. However, the deposition transcript reference is to opening meetings, which were on the clock, and Plaintiff Chalmers is requesting overtime for overtime work he performed before he attended these meetings.

> Attorneys are not authorized to approve overtime for attorney personnel, . . . indicating, if anything, that the plaintiffs' overtime work was not officially ordered or approved.

372 F.3d at 1363. By contrast, BOP's Standards of Employee Conduct, as well as other written agency policies, require BOP employees scrupulously to obey oral and written orders, including orders to work overtime. See above.

Third, defendant misconstrues Plaintiffs' intent (see Pl. Br. 22-23) in pointing to the CSM as an direction to perform overtime. Deft. Br. 9. While the CSM does not state that employees will work overtime, it does state that attendance at lieutenants' meetings is mandatory. Again, if those meetings necessary fell outside of Plaintiff Chalmers's shift, he would have to perform overtime to attend them or work overtime in preparing for them if they started earlier than his shift. See pp. 9-11 below.

B. Plaintiff Worked Overtime Preparing to Attend Meetings at the Start of His Shift

As explained above, BOP required Plaintiff Chalmers to attend executive close-outs, lieutenants' meetings, and combined lieutenants/department Head meetings, which were mandatory and often fell outside of his shift. See pp. 7-8 above; Chalmers PFUF ¶23-26; 30-31. The combined lieutenants/department head meetings were usually held in the Warden's conference room at 7:30 a.m. on the Wednesday of the first pay week of the month. The day shift began at the same time. Shea Trial Tr. 432 [Supp. App. 41].

Plaintiff Chalmers also had to spend time preparing for these meetings. Again, defendants denigrate the verbal and non-verbal pressure upon Plaintiff Chalmers and other BOP employees to prepare for meetings which were mandatory, and which required them to be informed of matters before the Warden was informed of them at the meeting. Def. Br. 9-11. Conversely, not to be prepared would certainly mean discipline or professional suicide. Pl. Br.

20-22; Chalmers PFUF 11-14; 18, 32-35.[6] As former AW John Crerand testified, "There are certain standards that [are] set throughout the Bureau; one of them, particularly in [Warden] Spears' case, you never let the warden beat you to the institution. If he couldn't look over and see your cars [in the parking lot,] you were asked[, 'W]here were you this morning[?'], and he would make it a point to be very close between seven and 7:15 to get in, and it's just a game, it was just a way to put pressure on you to do what he expected you to do." App. 228.[7] Similarly, AW Wilner testified that an employee would be "in the penalty box" if he left his post too early and could be disciplined. Supp. App. 16 (Wilner Depo. 110-111). Warden Menifee's office overlooked the compound and he could see if anyone left before 4 p.m. or earlier than they should have, and he would comment on that. Supp. App. 19 (Wilner Depo. 223-224). And if a supervisor did not arrive at the Control Center or his duty post by the start of his shift without a good excuse, Mr. Wilner "would have a discussion with that supervisor and as to the reason why [he/she] was late," and the tardiness could result in discipline. Supp. App. 18 (Wilner Depo. 188-189).

C. <u>Plaintiff Incurred Overtime in Executive Close-out Meetings</u>

Defendant disputes Plaintiff Chalmers's claims for overtime in attending executive close-out meetings. Def. Br. 11-13. Defendant minimizes e-mail reminders from the warden's secretary and Warden Menifee's weekly calendar schedules as insufficient evidence that BOP

---

[6] Former AW Wilner, on whose testimony defendant relies, testified that when he was an AW at FCI-El Reno, the warden verbally told him to come in early, so he did so regularly, even though he never received any <u>written</u> order to perform preliminary overtime. Supp. App. 17 (Wilner Depo. 135-137).

[7] In the *Shea* trial, Capt. Douglas White admitted that when he was a lieutenant, and an "outstanding" one at that, he would make it a practice to be fully informed about what had happened on the prior shift. Shea Trial Tr. 220-21 [Supp. App. 22-23]. Similarly, AW Haynes testified that it was important, after he came to work, to learn as much as he could about the prior shift. Shea Trial Tr. 422 [Supp. App. 34].

ordered plaintiff to stay for these meetings. *Id.* Defendant also argues that Plaintiff Chalmers's testimony should be inadmissible under the best evidence rule. *Id*. The Court should reject these arguments.

First, the directives to attend closeouts were in writing through e-mail reminders, schedules, and other written directives. Pl. Br. 18-19. They made it clear to Plaintiff Chalmers that he "had to be there." App. 112.[8] Although these e-mail announcements may not have ordered overtime per se, like the other documents mentioned above, in combination with other written instructions and oral orders, they required BOP employees to work overtime when the meetings extended beyond their scheduled duration, since realistically AW's could not leave closeouts until the warden, who spoke last, concluded them. App. 128.

While it is true that e-mail reminders from the warden's secretary to Plaintiff Chalmers would be the best evidence of the contents of those e-mails, in their absence, his testimonial recollection of the e-mails is the best evidence he can produce on the communication of an order to attend executive close-out meetings, so it should be considered by the Court. *See* FED R. OF EVID 1004 (stating exceptions to Best Evidence Rule). Evidence other than the original is admissible under certain exceptions applicable here. Thus, other evidence is allowed to prove the contents of a writing if all originals are lost. See FED. R. OF EVID 1004(1). Plaintiff Chalmers may properly testify that he received a schedule with meetings times and followed the schedule. *See Cooley v. Director of Revenue*, *State of Missouri*, 896 S.W.2d 468, 470 (Mo. App. 1995)("proof of the mere existence, execution, delivery, or identity of a document is not considered proof of the terms of the document, and may be given without producing the original

[8] Similarly at the Shea trial, AW Haynes testified when he was a captain at FCI-Otisville, that Warden Menefee ordered him to attend closeouts and that they sometimes extended beyond 4 p.m. Shea Trial Tr. 437-438 [Supp. App. 46-47].

document or accounting for its absence. McCormick on Evidence § 233 (4th ed. 1992); 2 Jones on Evidence § 7:5 (6th ed. 1972)."). Rule 1002 does not "require production of a document simply because the document contains facts that are also testified to by a witness." *Allstate Insurance Co. v. Swann*, 27 F.3d 1539 (11th Cir. 1994)(quoting *United States v. Finkielstain*, 718 F. Supp. 1187, 1192 (S.D.N.Y. 1989)). "[N]o evidentiary rule . . . prohibits a witness from testifying to a fact simply because the fact can be supported by written documentation." *Jinks-Umstead v. England*, 2005 U.S. Dist LEXIS 34547, 14-15 (D.D.C. 2005)(quoting *R&R Associates, Inc. v. Visual Scene, Inc.*, 726 F.2d 36, 38 (1st Cir. 1984)). Mr. Chalmers at one time possessed and followed these schedules and therefore, has personal knowledge of their existence. "[A]ny witness with knowledge of facts that exist independent of the contents of a writing . . . may testify without raising an issue under Rule 1002." *Jinks-Umstead*, at *15 (quoting 31 Charles Alan Wright & Victor James Gold, Federal Practice & Procedure, §7184 (2000); *see also Cooley*, 896 S.W.2d at 470 ("the best evidence rule does not exclude evidence based on personal knowledge even if documents or other writings would provide some of the same information."). It should also be noted that in Defendant's Proposed Findings of Fact, ¶14, it relies on Warden Menifee's weekly calendar.

Defendant misinterprets the cases it cites, Def. Br. 12. In *United States v. Wells*, 262 F.3d 455, 459 (5th Cir. 2001), the issue was whether the court should admit testimony regarding destroyed drug ledgers pursuant to the business records exception of Rule 803(6) and under Rule 1004. The court of appeals stated, "[W]e hold only that, <u>under the circumstances of this case</u>, the oral testimony regarding the destroyed ledgers falls outside the hearsay exception under Rule 803(6)." *Id*. at 462-63 (emphasis added). The court made its decision based on the fact that the

oral testimony of the witness, a drug dealer, lacked "sufficient indicia of trustworthiness," required under Required under Rule 803(6). 262 F.3d at 462.

*United States v. Marshall*, 762 F.2d 419 (5th Cir. 1985), which defendant cites (Def. Br. 12), is also distinguishable. In *Marshall*, the court rejected the testimony of a government investigator, who attempted to testify on the basis of business records she examined during the course of her investigation. Unlike Mr. Chalmers, the investigator was not able to authenticate the records, "including a query into their trustworthiness," and did not have personal knowledge as to their use in the regular course of business. *Id*. at 428; *See also United States v. Davis*, 792 F.2d 1299, 1305 n.4 (5th Cir. 1986)("Davis' reliance on *United States v. Marshall* . . . is misplaced, for there the witness did not purport to testify from personal knowledge but only as to conclusions drawn from examining a large group of records not placed in evidence."). Mr. Chalmers used the schedule in the regular course of business and would be able to authenticate it and testify as to its trustworthiness.

Moreover, where as here the originals are in the possession of the opponent and the opponent is on notice that the contents would be a subject of proof, evidence other than the original may be admitted. See FED. R. OF EVID. 1004(3). Here BOP has, or should have, the e-mails it sent out, and defendant become aware of plaintiffs' reliance on those e-mails during discovery in these cases, even before Plaintiff Chalmers's deposition. See Shea App. 313-14, 378-379 (Supp. App. 75-79). Also, Plaintiff Chalmers's testimony is consistent with other testimony that wardens, captains, and others used e-mails to order or remind lieutenants and department heads to attend meetings. See above, pp. 10-11; Pl. Br. 16-19; Chalmers PFUF ¶¶27-29.

D. Plaintiff's Incurred Overtime as an Associate Warden at FDC Philadelphia

MDC Philadelphia is a 10-story, high-rise detention center housing pretrial inmates. Chalmers Depo. 58 (Def. App. 12). It was a brand new institution when Mr. Chalmers went there. *Id.* at A19. When he was AW at MDC-Philadelphia, he served as Acting Warden. *Id.* at A18. The entire time Plaintiff Chalmers served as AW for Programs, until the last month or so, his supervisor was Warden John Vanyur; the last month it was Joe Smith. *Id.* at A12. His shift hours were 7:30 to 4 p.m. *Id.* His post was the AW's office. *Id.* at A13.

To get to the Control Center, Plaintiff Chalmers would have to go through the control door in the front lobby to the secondary lobby. *Id.* at A12. After leaving the Control Center, he would go through the sallyport to the elevators to go to the lieutenants' office, where he would read logs and sensitive reports, and be briefed by the captain. *Id.* He typically arrived at the lieutenants' office between 7:20 and 7:30. *Id.* This preliminary overtime averaged "about ten minutes or so." *Id.* at A14. Reading logs and other sensitive information took about five to ten minutes. *Id.* at A12. Briefing by the captain took "[a]nywhere from a couple of minutes to a half hour." *Id.* Plaintiff Chalmers claims preliminary overtime of "about ten minutes or so" daily. Chalmers Depo. 66.

At MDC-Philadelphia, the warden held closeouts at the end of the day, starting at 3:30 p.m. However, unlike FCI-Otisville, the closeouts in Philadelphia typically ended at 4, the end of the day shift (and plaintiff's shift). *Id.* at A13. Most of the time, after closeouts ended, Plaintiff Chalmers would leave directly out of the institution. *Id.* at A14. Accordingly, unlike FCI-Otisville, he has no claims for postliminary overtime in attending closeouts. *Id.*

Plaintiff Chalmers signed off on compensatory time for lieutenants to attend lieutenants' meetings, but not overtime pay, because it was not authorized. While he was at Phoenix or at

Los Angeles, a decision was made at the executive staff level, that lieutenants would be paid comp. time for attending lieutenants' meetings. Supp. App. 2 (Chalmers Depo. 42.) Previously "you were expected to come in on your own and you asked for nothing." *Id.* He himself never requested comp. time for such overtime. Def. App. A20. "I would have ended up in Brooklyn if I [had] done that." *Id.*

E. <u>Plaintiff's Incurred Overtime as Captain at MDC-Los Angeles</u>

MDC-Los Angeles is a high-rise building of twelve or fourteen floors. Def. App. A3. The MDC had elevators. The Control Center was on the first above-ground floor. *Id.* Plaintiff Chalmers was a Captain at MDC-LA for the beginning of his backpay period. App. 100-01.

Plaintiff Chalmers had 24-hour keys, which opened the captain and lieutenants' complex, Supp. App. 8 (Chalmers Depo. 169), but on a daily basis he had to stop at the Control Center and pick up a radio. Def. App. A3. To pass the Control Center, one first had to go inside a sallyport. *Id.* at A4. One could walk up to the Control Center, but to retrieve keys, an employee had to go inside the sallyport. *Id.* It took anywhere from five minutes to one hour for him to walk from the Control Center to his office. Supp. App. 9-10 (Chalmers Depo. 170-171).

Plaintiff Chalmers typically arrived at the Control Center at 5:30 a.m. Def. App. A4. After he obtained his radio at the Control Center, he would go the captains' complex on the third floor. *Id.* The lieutenants' office was one office down. *Id.*

The time it took to go from the Control Center to the captain's complex varied. The time depended on the elevators. Plaintiff Chalmers had to wait for the elevators –from two minutes to over an hour. *Id.* He typically arrived at the captains' complex at 5:40-5:45. *Id.* Upon arriving at the captain's complex, Plaintiff Chalmers usually dropped off his bag in his office, turned on his computer, and immediately looked at the sensitive log and the lieutenants' logs. *Id.* This

would take 5-10 minutes. *Id.* at A5. Then he would be briefed by the morning watch lieutenant, whose hours were 12 midnight-8 a.m. *Id.* at A4, A5. This lasted five minutes or so. *Id.* at A5. Plaintiff Chalmers would talk to the lieutenant as he was reading the logs. *Id.* Then he would wait for the AW's to come in and start asking him questions. *Id.* at A4.[9]

Plaintiff Chalmers did not consider himself at his post until he got to his office, for the following reasons: "It's a place of doing business, every correctional worker who works in a federal prison, their whole institution they're responsible for in one form or another, but everyone has a place to report to." *Id.* at A13.

At the end of a typical day, Plaintiff Chalmers would review Labor and Management Relations (LMR) paperwork, check any messages, make sure his desk was ready for the next day, and brief oncoming and off-going lieutenants. *Id.* at A6. Barring an emergency, Plaintiff Chalmers dropped off his radio at the Control Center between 2:30 and 3:00 p.m. On a typical day at the Los Angeles facility Plaintiff Chalmers did not have to meet with the warden at the end of his shift. *Id.*

The BOP discouraged Plaintiff Chalmers from requesting overtime. *See id.* at A19. He did not ask for overtime for extra hours when he was captain at MDC L.A. and traveled overseas. *Id.* at A25. "You didn't ask [for overtime]. If I asked I would have been turned down anyhow. You were a manager, and managers typically don't get it. So you learn not to ask." *Id.*

F. Plaintiff Incurred Overtime as a Result of Government Travel

Plaintiff Chalmers claims 49 hours of overtime he spent in required traveling from Los Angeles to Bangkok, Thailand, and back in April 1997 to pick up prisoners and 12 hours of

[9] The warden had a morning briefing, but the captain, not being a member of the executive staff at MDC-LA, was not required to be present. Def. App. A4.

overtime he spent on required travel from Philadelphia to London, England, and back in March 2000, to pick up a prisoner. *Id.* at A22, A23.

In about April 1997, when he was assigned to MDC-Los Angeles, the BOP ordered Plaintiff Chalmers to travel to Bangkok to "repatriate" prisoners.[10] *Id.* He went with 13 other BOP staff to pick up 13 prisoners. Plaintiff Chalmers spent two hours traveling from home to the Los Angeles airport (LAX), checked in at the airport, and then flew for 12 hours to Hong Kong. *Id.* at A23, A34, A35. After a layover in Hong Kong, Plaintiff Chalmers flew from Hong Kong to Bangkok, then passed through customs, obtained his luggage, and arranged transportation before going to a hotel in Bangkok. *Id.* at A23. This travel took 30 hours, of which the BOP paid him for only 8 hours. *Id.* at A22. Plaintiff Chalmers also spent an additional hour going from his hotel to the immigration office, two hours securing custody of the prisoners and completing paperwork, and an hour from immigration to the airport. He spent three hours checking in at the airport and waiting for his flight, then flew first to Hong Kong. *Id.* at A23, A34, A35. This was a seven-hour flight. After a layover of four hours in Hong Kong, Plaintiff Chalmers then had a 12 hour flight to Los Angeles. *Id.* at A23. It took an hour at LAX to turn over the prisoners over to his staff, pass customs, and obtain luggage and two hours driving from LAX to his home. *Id.* Of the 35 hours Plaintiff Chalmers spent on this required trip, BOP paid Plaintiff Chalmers for only 8 hours. Plaintiff Chalmers did not request overtime or comp. time at the time because, if he asked, he would have been turned down anyhow. *Id.* at A25.

In March 2000, while assigned to FDC-Philadelphia, Plaintiff Chalmers went on a prisoner treaty transfer to London, England. The warden directed Plaintiff Chalmers to go

---

[10] On the return trip, there were 13 inmates and 14 BOP staff members. Def. App. A23.

London. Def. App. at A15.[11] Plaintiff Chalmers left Philadelphia on a Monday and came back on a Thursday. He spent two hours in driving from home to the airport, and then three hours waiting at the airport, followed by seven hours of flight time. *Id.* at A24, A31-33. Def. App. 31. There were an additional two hours for debarking and getting through customs and arranging transportation and an hour taxi ride to the hotel. *Id.* He spent 30 hours, of which BOP paid only 8. *Id.*

On the return trip, Plaintiff Chalmers spent two hours going from the hotel to take custody of the prisoner and an additional four hours at the safe house. Def. App. A25, A31. He spent 35 hours in travel from London to home in Philadelphia, but BOP paid for only 8 hours. Def. App. A14-15. On March 30, 2000, after his return, Dennis Hasty, then Warden at the Metropolitan Correctional Center-Manhattan, wrote Plaintiff Chalmers a letter expressing appreciation for his fine work in participating in the prisoner transfer from England. Def. App. 33. While Warden Hasty was not the official who ordered the travel, the letter shows that BOP authorities ordered and approved it. The BOP paid for the part of the travel (eight hours) which he "spent . . . within the days and hours of the regularly scheduled administrative workweek of the employee" (5 U.S.C. §5542(b)(2)(A)). Plaintiff Chalmers claims overtime pay for the 22 hours going over and 27 hours of unpaid overtime returning.

Plaintiff Chalmers claims overtime pay for the unpaid travel time under FEPA, 5 U.S.C. §5542(b)(2), because some of the travel "involve[d] the performance of work while traveling"; because the overseas travel "could not be scheduled or controlled administratively"; and because the trips were "under arduous conditions" (5 U.S.C. §5542(b)(2)(B)). Thus, on these trips, Plaintiff Chalmers needed not only to go to and from airports and travel on airplanes for long

[11] The order is not in the record. However, it would be impossible for any federal employee to travel, particularly to another country, without a written travel order.

distances; he had to perform work in connection with the prisoner exchanges; and it was arduous to spend so many hours –about an entire 24-day day—in each direction. Also, although the agency could control when Plaintiff Chalmers was supposed to reach his destinations to pick up the prisoners, it could not control the fact that it took an additional 14 to 27 hours in travel to accomplish the assigned task. Such overtime should be compensable. See 5 U.S.C. §5542(b)(2)(B)(iv).

Defendant disputes these claims. Def. Br. at 17-20, citing *Aletta v. United States*, 70 Fed. Cl. 600 (2006). Its principal argument is that "Mr. Chalmers has not demonstrated that he was expressly ordered in writing to work overtime with regard to these two trips." Def. Br. 20, citing Def. App. A15. The argument has no merit.

First, even assuming that the Court will require written orders, it is clear that Plaintiff Chalmers could not travel overseas at Government expense unless he was given an order to do so in writing. The fact that he cannot locate the order now should not be held against him. See above, pp. 11-13. As indicated by other documents, it is Government practice to reimburse employees for travel expenses only if they have written travel orders. See, e.g., Supp. App. 63-68.

Second, *Aletta* is distinguishable because there the travel was entirely within the United States, 70 Fed. Cl. at 601; the plaintiffs, IRS lawyers, worked "flexible schedules," id. at 602; and the claimed overtime hours were nothing like Plaintiff Chalmers's overtime and overseas travel here.

Therefore, Plaintiff Chalmers's overtime travel is compensable.

III. Under 5 U.S.C. § 5543(a), Plaintiff Chalmers's Overtime
Was Not "Irregular or Occasional" Work

Defendant argues that Plaintiff Chalmers performed overtime on an "irregular or occasional" basis, and that as a GS-13 or GS-14 employee during the period for which he is claiming overtime, he should be limited to compensatory ("comp") time under FEPA, 5 U.S.C. § 5543. Def. Br. 21-22. However, the statute's stipulation regarding "irregular or occasional work" does not apply to overtime which employees perform on a regular basis and which is continuous, regular and predictable. See Pl. Br. 6-7. Defendant also contends that OPM's interpretation of the statue, defining "irregular or occasional overtime work," as "overtime work that is not part of an employee's regular scheduled administrative workweek" should apply. Def. Br. 22.

The Court should reject these contentions. Consistent with FEPA, Federal agencies must compensate employees for preliminary and postliminary activities when they are closely related to, and part and parcel of, the principal work they regularly assign employees. *See IBP, Inc. v. Alvarez*, 546 U.S. 21, 126 S.Ct. 514 (2005); *Bobo v. United States*, 37 Fed. Cl. 690, 693 (1997) (stating that preliminary and postliminary activities are compensable if they are "integral and indispensable to principal duties"); *Riggs v. United States*, 21 Cl. Ct. 664, 676-78 (1990); *Amos v. United States*, 13 Cl. Ct. 442, 449-450 (1987); *Baylor v. United States*, 198 Ct. Cl. 331, 337-38 (1972). In any event, paying Plaintiff Chalmers compensatory time is more difficult now that he has retired, but if the Court rejects his claim for overtime pay, he requests regular pay for his overtime hours. See Amended Complaint, ¶42.

IV. Plaintiff's Overtime at Otisville Was Not De Minimus

Defendant disputes Plaintiff Chalmers's testimony about how much time it took him to engage in preliminary activities at FCI-Otisville. Deft. Br. 11n.3. It relies on an unscientific

measurement by FCI-Otisville Executive Assistant Donna Hill, Def. App. 100-102. Ms. Hill assertedly timed how long it took her to walk from the Control Center to Mr. Chalmers's office. Id. She timed the walk only one time, not during the morning "rush hour," without obtaining any keys or equipment at the Control Center, without taking the time to engage in any conversations with staff or inmates, and stopping the watch when she arrived at the doors of various departments. See her testimony in Shea, Shea Trial Tr. 552-555, 559-560 (Supp. App. 53-56; 60-61). She never timed Plaintiff Chalmers on how long it took him to engage in preliminary overtime before the start of his shift. She did not obtain advice from a statistician on how to perform this project. Shea Trial Tr. 559 (Supp. App. 60). Her study has no scientific value as an accurate measurement. For these reasons, the amount of time Plaintiff Chalmers spent in preliminary overtime activities is a disputed issue of fact for a trial, as it was in Lt. Shea's case.

Under OPM's regulations, 5 C.F.R. § 551.412 (a)(1), "If . . . a preparatory or concluding activity is closely related to an employee's principal activities and is indispensable to the performance of the principal activities, and . . . the total time spent in that activity is more than 10 minutes per workday, the agency shall credit all of the time spent in that activity, including the 10 minutes, as hours of work." The Court likewise has held that if the daily claimed overtime is 10 minutes or more, it is not de minimis. Thus, in *Bull v. United States*, 2005 U.S. Claims LEXIS 284, *39-40 (Fed. Cl. Sept. 27, 2005), it pointed out:

> Adopting the OPM standard, "[d]ecisions of this court construing the FLSA have developed a rule of thumb that [10] minutes of preliminary or postliminary work that would otherwise be compensable because it is closely related to principal activities will nonetheless be treated as non-compensable if it totals less than [10] minutes per day." [*Riggs v. United States*, 21 Cl. Ct. 664, 682 (1990)] (citing *Amos*, 13 Cl. Ct. at 450) (footnote added); *Int'l Bus. Invs., Inc. v. United States*, 11 Cl. Ct. 588, 593 (1987); *Whelan Sec. Co. v. United States*, 7 Cl. Ct. 496, 499 (1985); and *Graham v. United States*, 3 Cl. Ct. 791, 796 (1983)); accord *Cobra Constr. Co. v. United States*, 14 Cl. Ct. 523, 531 (1988) ("[The employer] argues that 15–20 minutes of extra work performed as part of a continuing work regimen is de minimis. The case law holds otherwise.");

> *Abrahams v. United States*, 1 Cl. Ct. 305, 311 (1982) ("[P]laintiffs . . . must show that they performed some significant work . . . . In addition, the work must involve a substantial period of time of at least 10 minutes or more.").

Also, "Courts have granted relief for claims that might have been minimal on a daily basis but, when aggregated, amounted to a substantial claim." *Lindow v. United States*, 738 F.2d 1057, 1063 (9th Cir. 1984). "The factors that trial courts must examine when assessing whether the work underlying a compensation claim is de minimis were properly set forth in *Lindow* . . ., which suggested analysis of '(1) the practical administrative difficulty of recording the additional time; (2) the aggregate amount of compensable time; and (3) the regularity of the additional work.'" *Bobo v. United States*, 136 F.2d 1465, 1468 (Fed. Cir. 1998). Here, according to Former FCI-Otisville Capt. Anthony Haynes, BOP's policy is to pay employees for 15 minutes of overtime if they work 8 minutes or more on a shift. Shea Trial Tr. 393 (Supp. App. 31).

In sum, Plaintiff Chalmers's claimed daily overtime was ten minutes or more and, in any event, the amount of his daily overtime is in dispute, so cannot be resolved on a motion for summary judgment.

## V. CONCLUSION

For the reasons stated above, Plaintiffs request that the Court grant their motion for partial summary judgment, deny defendant's cross-motion for summary judgment, and schedule a trial on the material factual issues herein.

Respectfully submitted,

________/s/_____________

ALAN BANOV
Alan Banov & Associates
1819 L Street, N.W.
Suite 700
Washington, D.C. 20036-3830
(202) 822-9699
Fax: (202) 842-9331
Ab@banovlaw.com
Attorney for Plaintiffs

Of Counsel:
WENDY BYNDLOSS
Alan Banov & Associates
1819 L Street, N.W., Suite 700
Washington, D.C. 20036-3830