No. 03-446C
(Judge Bruggink)

---

IN THE UNITED STATES COURT OF THE FEDERAL CLAIMS

---

LEROY BISHOP, et, al.,

Plaintiffs,

v.

THE UNITED STATES,

Defendant.

---

PLAINTIFF'S APPENDIX FOR PLAINTIFF'S REPLY BRIEF IN SUPPORT OF PLAINTIFF CRAIG CHALMER'S MOTION FOR PARTIAL SUMMARY JUDGMENT AND BRIEF IN OPPOSITION TO DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT

---

ALAN BANOV
Alan Banov & Associates
1819 L Street, N.W.
Suite 700
Washington, D.C. 20036-3830
(202) 822-9699
Fax: (202) 842-9331
Ab@banovlaw.com

Attorneys for Plaintiffs

Of Counsel:
WENDY BYNDLOSS
Alan Banov & Associates
1819 L Street, N.W., Suite 700
Washington, D.C. 20036-3830

February 12, 2007

Table of Contents of Plaintiff's Appendix

Documents Appendix Pages

1. Excerpts from Deposition of Craig Chalmers, 8/5/04, 11/30/04 ..........................1

2. Excerpts from Deposition of William Ey, Jr., 1/30/04......................................11

3. Excerpts from Deposition of Joseph Wilner, 1/27/05 ......................................15

4. Transcript, Trial of Lt. Patrick Shea in *Bishop v. United States,* 8/16/06..................20

5. Transcript, Trial of Lt. Patrick Shea in *Bishop v. United States,* 8/17/06..................24

6. Travel Voucher Summaries and Authorizations/Advances................................63

7. BOP Program Statement No. 3420.09, dated 2/5/99.......................................69

8. Excerpts from Appendix to Brief in Support of Plaintiff Patrick Shea's Motion for Partial Summary Judgment in *Bishop v. United States* (Shea App.)................75

IN THE UNITED STATES COURT OF
FEDERAL CLAIMS

- - - - - - - - - - - - - - - - - - - -x

GARY L. AARON, et al.,
DARYL A. AABERG, et al.,
CHARLES CARLSEN, JR., et al.,
JOSE L. ACEBAL, et al.,
FRIEDA ADKINS, et al.,
BUDDY J. ADELSBERGER, et al.,
ANGIE CRUZ ALDRIDGE, et al.,
MICHAEL ATTY, et al.,
JANINE A. BANKS, et al.
DENNIS AVRIPAS, et al.

Plaintiffs,

v.

THE UNTIED STATES,

Defendant.

- - - - - - - - - - - - - - - - - - - -x

Federal Correctional Facility
Two Mile Road
Otisville, New York

August 5, 2004
3:30 p.m.

DEPOSITION of CRAIG CHALMERS in the above-entitled action, held at the above time and place, taken before Kathleen Piazza Luongo, a Notary Public of the State of New York.

Chalmers

attend a lieutenants' meeting on their day off or outside of their shift?

A. For lieutenants' meetings?

Q. Yes.

A. Overtime pay?

Q. Yes.

A. I don't believe so.

Q. Are you sure?

A. I'm reasonably sure.

Q. And why is it the case that you were signing off on comp time for the lieutenants' meetings but not the overtime pay?

A. Because it wasn't authorized. At some point, I don't know if it was while I was at Phoenix or when I got to Los Angeles, a decision was made at the executive staff level, as far as I know, that lieutenants would be paid comp time for attending lieutenants' meetings and prior to that you came in on your own, you were expected to come in on your own and you asked for nothing.

Q. I want to ask you a few more

IN THE UNITED STATES OF FEDERAL CLAIMS

Case Nos. 00-315C, 00-454C, 00-617C, 01-47C, 01-313C, 01-314C, 01-480C, 02-35C, 03-446C, 03-2363C

Senior Judge Bruggink

-----------------------------------------x

GARY L. AARON, et al.,

Plaintiffs,

- against -

UNITED STATES,

Defendant.

-----------------------------------------x

November 30, 2004
12:21 p.m.

CONTINUED DEPOSITION of

Plaintiff CRAIG CHALMERS, taken by Defendant, pursuant to Notice, held at Otisville Correctional Facility, Two Mile Drive, Otisville, New York, before Reva Weiss, a Shorthand Reporter and Notary Public of the State of New York.

CHALMERS

A. Well, it looks like an estimate of what type of benefits I'm going to receive.

Q. And this would be an estimate as of March 27th, 2003?

A. It would make sense to me, yes.

Q. But you don't recall getting a copy of this?

A. No. I don't recall.

MS. KIRCHNER: I have no further questions.

MR. BANOV: I have some.

EXAMINATION BY
MR. BANOV:

Q. In your deposition the first time you referred to Institution Supplements. Explain what they are.

A. Institution Supplements are generally used to implement policy from the Bureau Of Prisons into the legal level.

Q. What do they cover?

A. They cover virtually everything that happens in an institution, from

meetings to how we stand, perhaps mainline, affirmative action. It runs the gamut of a lot of the Program Statements that we have.

Q. What is the effect of an Institution Supplement?

MS. KIRCHNER: Objection. Compound, ambiguous.

A. It implements Bureau policy and United States law. It can't change the program, it can't change the policy, it can't change the law, but can implement it into that institution. Because of the physical characteristics of institution and things, it allows some latitude.

For example, law may say that staff work eight hours, anything over eight hours is overtime, anything over 40 hours a week is overtime, but it doesn't dictate how the shifts are done. The Supplement may dictate the hours of work, the shifts and assignments and things like that.

Q. Does it have the effect of an

CHALMERS

order?

MS. KIRCHNER: Objection.

Ambiguous, compound.

A. Often.

Q. Do all BOP institutions have Institution Supplements?

A. Yes.

Q. And then let's refer to Exhibit Number 50 from Warden Menifee's deposition that he mentioned before.

Do you recognize that document.

MS. KIRCHNER: 50?

MR. BANOV: The one that was referred to before.

Q. Now, Attachment 1 lists various meetings there, right?

A. Yes.

Q. Were any of these mandatory at that time?

MS. KIRCHNER: Objection.

Ambiguous.

A. Yes.

Q. Take your time. From the top down, which ones were mandatory?

CHALMERS

them getting off shift. That was a courtesy that was always extended.

To show up right at the time that you are supposed to, particularly before overlapping shifts, meant that if the person that you relieved was supposed to get off at four and you didn't show up until four, and you had to turn over all your equipment and keys and get a brief, that means that the guy didn't get out until 4:15. Those people were termed "minute men." Basically it's a self-explanatory term.

There's not one person who has worked in the institution of Bureau Of Prisons who does not know that term.

Q. When did you first hear the term "minuteman"?

A. Probably my first day on the job. Because there were always people that were -- that's what they were, they were minute men.

Q. Do you recall hearing any wardens use that term?

CHALMERS

A. Absolutely.

Q. Do you recall which ones?

A. Not specifically.

Q. And do you recall the context in which you heard them use the word "minuteman"?

A. The word "minuteman" is typically used in a derogatory fashion.

Q. Back to Los Angeles. How long did it take for a good verbal count in Los Angeles?

A. A typical good verbal count in most institutions take approximately a half-hour if you do them correctly.

Q. At Los Angeles, what locks did your 24-hour keys open?

A. To the captains' and Lieutenants' complex.

Q. Did you need any additional keys besides the 24-hour keys to do your job at Los Angeles?

A. Typically not.

MR. BANOV: Can you show him Exhibit 2.

CHALMERS

(Pause.)

Q. I just have one question about that exhibit you identified in the first part of your deposition. Why did you write that?

A. I believe monthly or quarterly the Warden, at least in the Western Region, had to send up major accomplishments and major initiatives happening in those institutions to the Regional Director to let the Regional Director know what we are doing, and so basically I was asked to provide input from the Correctional Services Department to the Associate Warden, and I'm sure the Associate Warden was asking the same from all his department heads so he would have something good to present to the Warden so the Warden had something good to present to the Regional Director.

Q. In Los Angeles, about how long, average, did it take you to walk from the Control Center to your office?

A. That's a difficult question to

CHALMERS

answer because we had elevators. So it could take five minutes, it could take an hour.

Q. What were the variables that would influence the time it took?

A. Well, where the elevators were at the time you got to the elevator Sallyport and if the elevators were working or not.

Q. Did Los Angeles change its schedules in any way as a result of Operations Memorandum 214-95?

A. That's the Ops Memo for protocols?

Q. Yes.

A. Yes.

Q. How did they do that?

A. I was asked to chair a committee meeting to determine the best way to implement the changes that were required to reduce the portal to portal issue.

Q. What changes, if any, did they make in Los Angeles?

A. Exchanging keys and equipment on

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

. . . . . . . . . . . . . . . . . . . . . . . . X

GARY L. AARON, et al., DARYL A. AABERG, et al., CHARLES CARLSEN, JR., et al., JOSE L. ACEBAL, et al., FRIEDA ADKINS, et al., BUDDY J. ADELSBERGER, et al., ANGIE CRUZ ALDRIDGE, et al., MICHAEL ATTY, et al., JANINE A. BANKS, et al., DENNIS AVRIPAS, et al.,

Plaintiffs,

-against-

Nos. 00-315C, 00-454C, 00-617C, 01-47C, 01-313C, 01-314C, 01-480C, 02-35C, 03-446C, 03-2363C

THE UNITED STATES,

Defendant.

. . . . . . . . . . . . . . . . . . . . . . . . X

80 29th Street
Brooklyn, New York

January 30th, 2004
1:50 p.m.

DEPOSITION of WILLIAM HARRY EY, JR., the Non-Party witness, taken on behalf of the Plaintiffs, pursuant to Notice, held at the above-mentioned time and place, before Maria Cirillo, a Notary Public of the State of New York.

Q It hadn't happened?

MS. KIRCHNER: Objection, ambiguous.

A Not to my knowledge. If it happened they did it on their own.

Q What you mean "on their own"?

A That means they did it on their own. They went and did it because they did it.

Q They volunteered their time to the Bureau of Prisons?

A Exactly. I have no knowledge of them doing it on their own time.

Q Are you aware of any lieutenants who conducted roll calls at times when they are not regularly scheduled to work and asked for overtime or comp time for the time spent?

A No.

Q Is there a culture at the Bureau of Prisons for management officials to set an example to line staff?

MS. KIRCHNER: Objection, ambiguous.

A The answer is yes, there is a standard that we should set. Be a role model for line staff, yes.

Q And is it also part of the culture

of Bureau of Prisons for management to go the extra mile to devote their service to the bureau?

MS. KIRCHNER: Objection, ambiguous.

A It is a culture for the supervisors to go the extra mile. How they do that is their decision and on their own volition, nobody forces them to spend their own time. If they do it, they do it because they want to do it. Nobody tells them to do it. It is because they are dedicated and that is what they want to do.

Q Isn't it true that employees who put in the extra effort would generally be recognized with better evaluations?

MS. KIRCHNER: Objection. Ambiguous and compound.

A It is true that employees that go the extra mile and do a good job are going to be rewarded by good evaluations.

Q And the same employees who go the extra mile and do good work would also have better opportunities for promotions within the bureau?

MS. KIRCHNER: Objection, ambiguous.

A It goes without saying if you do a

W. Ey, Jr.

better job than your peers you are going to get promoted.

Q Isn't it true that the work sometimes requires management officials to put in extra time before or after the regularly scheduled shifts?

MS. KIRCHNER: Objection. Ambiguous, compound.

A And I would answer that by saying it is not true.

Q Do you recognize Exhibit 61? Did I ask you about that yet?

A Yes.

Q This is one of the documents you reviewed in preparation for today's deposition?

A Yes.

Q You asked Lieutenant Beck to give you a history?

A Yeah, that is what I told you.

Q This is accurate as far as you know?

A Yes, as far as I know.

Q Are you aware of any reports or surveys or any kind of inquiries by management

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

```
- - - - - - - - - - - - - - x Case Nos.: 00-315C
GARY L. AARON, et al.,        : 00-454C, 00-617C,
          Plaintiffs,         : 01-47C, 01-313C,
        Vs.                   : 01-314C, 01-480C,
UNITED STATES,                : 02-35C, 03-446C,
          Defendant.          : 03-2363C, 04-1134C
- - - - - - - - - - - - - - x
```

CONDENSED

Thursday, January 27, 2005

Washington, D.C.

Deposition of:

JOSEPH WILNER,

the Witness, called for examination by counsel for the Plaintiffs, pursuant to notice, commencing at 9:50 a.m., at the law offices of Alan Banov & Associates, 1819 L Street, Ste. 700, Washington, D.C., before Curtis R. Cloward, CSR, a Notary Public in and for the District of Columbia, when were present on behalf of the respective parties:

A. Yes.

**Q. Aren't they told that being a lieutenant is not an eight-hour job?**

A. I've never heard that.

**Q. Isn't there a term in the Bureau called penalty box?**

A. That's a term I've heard before.

**Q. And is that a term used at Otisville?**

A. I mean, that's a term used across the Bureau.

**Q. Is that a term that applies to somebody who has been put in a figurative penalty box for making some mistake?**

A. That would probably put them in that, yes.

**Q. If someone were disciplined they could be in the penalty box?**

A. With that term, yes.

**Q. And you were in the penalty box at Otisville, were you not?**

A. Someone could construe that.

**Q. And are employees put in the penalty**



**box at Otisville if they don't come in early enough?**

A. No.

**Q. And aren't employees at Otisville put in the penalty box for not staying on the job long enough?**

A. If they leave the job early?

**Q. Yeah.**

A. If they leave their scheduled time early?

**Q. Um-hum.**

A. There would be some problems if they left their duty.

**Q. If they leave on time.**

A. No, there's no problem with that.

**Q. Does the Bureau expect supervisors to perform work outside of their scheduled shift without compensation?**

A. No.

**Q. We established you know Charles Carlsen, did you supervise him in any way?**

A. Periodically. Again, they rotate the



Associate Wardens so there's periods of time when I did supervise him and periods of time I didn't supervise him.

**Q. Do you know what this duties were?**

A. He was the employee development manager at Otisville.

**Q. He did training?**

A. He -- he didn't do the training per se, but he organized it and set it up.

**Q. Did he organize training at the Training Center?**

A. That's where it happened. Yeah, that's where we would normally have our training sessions.

**Q. Did he need to go there?**

A. He needed to go to make sure directions were given, depending on the type of training, that it was going to be conducive to whoever was going to give the training class the next day.

**Q. Did he need to open up the Training Center for the training?**



A. 7:30, yes.

**Q. And that would be training for IF?**

A. It could be IF, it could be special training, it could have been any kind of training that needed to be at the Training Center. I mean, you have escort training, we have communications training, department -- there's many trainings happen at that Training Center, it's not just annual refresher training.

**Q. Typically the training is at 7:30 in the morning; right?**

A. For annual refresher training it does. Other training, it could vary. There's different -- could be a half-a-day training, like they show up there at lunch, so it varied on that end.

**Q. And so the Training Center is locked at night; correct?**

A. Periodically, because we have inmates that clean that Training Center and it's left open for them to go clean or set up for the following day's training.

That was one of the responsibilities

A. Yes.
**Q. Who schedules training at Otisville?**
A. The training itself -- are you talking all training?
**Q. Well, let's talk about IF, break it down. IF.**
A. IF? The training for IF is coordinated through the employee development manager, approved by the Warden. He presents the Warden with the agenda, the classes and the Warden will sign off on that and give his approval of that and the EDM will then implement it at that point.
**Q. So there's a document that explains to people when the IF training will begin and ends and so on?**
A. Yes.
**Q. That's also true of the annual training, there's a document that tells people that the Warden approves the training schedule, that certain people will have training at certain days and certain times?**



A. Yes.
**Q. Did anybody in the Bureau ever instruct you to arrive at any institution before your scheduled shift began?**
A. And not be compensated?
**Q. I didn't ask that question.**
**Did anybody from the Bureau of Prisons ever instruct you to arrive at any institution before your scheduled shift began?**
A. Yes.
**Q. Okay, who?**
A. Previous warden.
**Q. Who was that?**
A. Arnet Flowers (sp.).
**Q. What institution was that?**
A. FCI El Reno.
**Q. And what did Warden Flowers say?**
A. He asked me to be there at a particular time.
**Q. What did say?**
A. He says I need you to be here at 7 o'clock today. I said okay.



**Q. And your shift began at 7:30 at that time?**
A. Excuse me, back up. The shift there began at 7:00, so to be there at 6:30.
**Q. So your shift began at 7 o'clock and Warden Flowers said to be there at 6:30?**
A. Um-hum.
**Q. And so, did you follow his direction?**
A. I came in at 6:30, yes.
**Q. Was that every day?**
A. He had an opening meeting every day, yes.
**Q. And who was in the opening meeting?**
A. Executive staff, the Associate Warden, executive assistant, supervisor, industries.
**Q. So-called union core?**
A. Yes.
**Q. Did he ever put anything in writing to require you to be there at 6:30?**
A. No.
**Q. So based upon the oral direction you knew to be there at 6:30?**



A. Yes.
**Q. You didn't ask him for a written order before you said you would be there at 6:30, did you?**
A. No.
**Q. The oral order was good enough; right?**
A. He didn't really give me an order, he just said that was his scheduled time for us to come in and have a morning meeting.
**Q. Did you ever arrive after 6:30?**
A. No.
**Q. To be at his meeting at 6:30 you had to be at the institution at what time?**
A. 6:30. His office is right up front. There's -- I have 24-hour keys, you walk right in.
**Q. Did anybody in the Bureau of Prisons ever instruct you not to leave your institution until after your scheduled shift ended?**
A. No.
**Q. At FCI Otisville did any employees have to pick up any keys or anything else at the**

compound.

MR. BANOV: Sorry?

THE WITNESS: No.

BY MR. BANOV:

**Q. Are you aware of anyone who's been disciplined at the Bureau for not arriving at their post at or before the beginning of their scheduled shift without due cause?**

A. No.

**Q. Can't somebody be disciplined if they don't arrive at their duty post on time?**

MS. KIRCHNER: Objection, ambiguous, compound.

THE WITNESS: No.

THE WITNESS: Question.

MR. BANOV: Go ahead.

THE WITNESS: Duty post versus the institution Control Center. If they are not at the Control Center on time there could be issues.

BY MR. BANOV:

**Q. Okay, let me go back to before operations memorandum 214-95 was issued.**



A. Yes.

**Q. Isn't it true that before the changes you discussed before employees could be disciplined if they didn't arrive at their duty posts on time?**

MS. KIRCHNER: Objection, ambiguous, compound. It's beyond the scope of the 30(b)(6) designation unless you're talking about Otisville.

MR. BANOV: Go ahead.

THE WITNESS: Prior to that `ops' memo coming out and their duty post was where they needed to be, if they didn't arrive there at that time they could disciplined if it came problematic.

BY MR. BANOV:

**Q. Okay, and you were just saying, I believe, that -- correct me if I'm wrong -- you said if a person did not arrive -- if an employee did not arrive at the Control Center at or before the beginning of his or her scheduled shift he could be disciplined; is that what you said?**



A. Could be.

**Q. So it's clearly important to be at the Control Center by a certain point; right?**

A. Yes.

**Q. Correct me if I'm wrong, I think you testified before that Warden Menifee did not telephone his AWs right after he arrived at FCI Otisville?**

A. Not to my knowledge. I didn't get any phone calls.

**Q. Did you ever call subordinates right after you arrived at your office?**

A. No.

**Q. When you were at Otisville what would have happened if supervisory staff did not arrive at the Control Center before the start of their shifts?**

A. I would hope I would have a discussion with that supervisor and as to the reason why.

**Q. And that discussion could amount -- could result in discipline if you got the wrong answer; right?**



MS. KIRCHNER: Objection, ambiguous, compound.

THE WITNESS: If it became problematic, a habit of doing it and there was no reason that they were late other than they didn't feel like coming at that time.

As you know, in Otisville there are some snow issues, they might be late coming in and that would be a reason. I wouldn't have a problem with that.

BY MR. BANOV:

**Q. There are people who live in Middleford and Middletown and distances away; right?**

A. (Nodding head up and down, inaudible response.)

**Q. After the operations memorandum came down when you were at La Tuna, were there any changes in the pay practices at FCI La Tuna on when people were paid for work?**

A. I'm not familiar with the pay practices.