**your wife work at Danberry?**
A. Yes.
**Q. Did you need to leave to pick up your children after leaving the institution?**
A. Yes.
**Q. Did you sometimes tell your fellow AWs let's keep the questions down at the closeout so I can get out of here and pick my kids up?**
A. Yes. Yes, I did.
**Q. And isn't it true that the Warden would control the tempo of those closeouts?**
MS. KIRCHNER: Objection, ambiguous.
THE WITNESS: The Warden was the last one to speak at the closeouts, business-wise.
BY MR. BANOV:
**Q. Would the -- were captains at the closeouts in Otisville?**
A. Yes.
**Q. Does this vary from institution to institution sometimes, some places have captains there, some places don't?**
A. I think that's at the Warden's



discretion. Everywhere I have been the captain has been involved.
**Q. Okay.**
**Would the captain normally speak first at the closeout at Otisville?**
A. Yes.
**Q. And was there a reverse pecking order? Who would speak after the captain?**
A. You know, after the captain went I think it was just random at that point. There wasn't no you go next, you go next, I think he -- the Warden would just call on somebody and keep us -- he would call us out of order on different times of what you would think would be the order.
**Q. The captain would speak first but the captain would wait until the closeout was over before he would leave; right?**
A. Yes.
**Q. Do you recall Warden Menifee looking out from his office onto the compound to see if there were any department heads who were leaving before 4 o'clock?**



A. Looking out? I mean, his office looked out over the compound so as you sit in his office -- there was a period of time when he had closeouts in his office, which moved to a small conference room.
So, during the time that he was in his office you could see out in the compound and anybody who was heading up in an inordinate amount of time early than their shift ended he would notice that, yes.
**Q. He would comment about that, wouldn't he.**
A. Sure he would.
**Q. Did the Warden's secretary normally leave at 4:00 p.m.?**
A. Yes.
**Q. And would she knock on the door or doing something to indicate when she left?**
A. Yes, are you talking -- which Warden?
**Q. Menifee.**
A. There were two secretaries when I was there, two warden's secretaries.



**Q. They were?**
A. Cathy Grubowski (sp.) and Jenine Banks.
**Q. Okay, Cathy Grubowski --**
A. Um-hum.
**Q. -- did she normally knock on the door or do something at 4 o'clock to indicate that she was leaving?**
A. Yes.
**Q. And that was because after that point the Warden left answers on the telephone or something?**
A. I don't believe it was a telephone issue, I believe it was just letting him know that she was going.
**Q. Okay.**
**How did you know to go to a closeout meeting at Warden Menifee's office?**
A. Upon my arrival at Otisville the other Associate Wardens told me that we have closeout at 3 o'clock.
**Q. Did you regard the closeout as a**

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| LEROY BISHOP, et al., | ) |
| Plaintiffs, | ) |
| v. | ) Docket No. 03-446C |
| UNITED STATES, | ) |
| Defendant. | ) |

Ballroom
Holiday Inn
68 Crystal Run Road
Middletown, New York

Wednesday,
August 16, 2006

The parties met, pursuant to notice of the Court, at 10:02 a.m.

BEFORE: HONORABLE ERIC G. BRUGGINK
Judge

APPEARANCES:

<u>For the Plaintiffs</u>:

ALAN BANOV, Esquire
Alan Banov & Associates
1819 L Street, N.W., Suite 700
Washington, D.C. 20036-3830
(202) 822-9699

<u>For the Defendant</u>:

DOMENIQUE KIRCHNER, Esquire
U.S. Department of Justice
Civil Division
Commercial Litigation Branch
1100 L Street, N.W.
Washington, D.C. 20530
(202) 307-0290

APPEARANCES: (Cont'd.)

Also for the Defendant:

NICOLE HEISER, Esquire
ERIKA TURNER, Esquire
Federal Bureau of Prisons
320 First Street, N.W., Room 818
Washington, D.C. 20530

off the 583, finishes or collects the memorandums that are outstanding.

Q You've testified that outgoing lieutenants give information to incoming lieutenants, is that correct?

A Yes, they pass on information.

Q Okay. Isn't it true that when you were a lieutenant at MDC Brooklyn, the post orders required you to brief your replacement and give that replacement certain information?

A Yes.

Q Thank you. And didn't the post order require you to pick up keys in the control center at MDC Brooklyn?

A They changed, so you have to give me a specific time period.

Q At a certain time when you were at MDC Brooklyn, isn't it true that the post orders required you to pick up keys in the control center?

A Yes.

Q Isn't it true to be well-informed an incoming lieutenant would want to read the materials in the packet given to him or her by the outgoing lieutenant?

A Rephrase that.

Q Isn't it true that to be well-informed an incoming lieutenant would want to read the materials in the packet given to him or her by the outgoing lieutenant?

A Yeah, he could do that. He could read those.

Q You were a good lieutenant, were you not?

A Some years I was an outstanding lieutenant; some years I was an exceeding lieutenant.

Q And wasn't it your practice to read the packet to be fully informed about what had happened on the prior shift when you were lieutenant?

A When I was lieutenant, it depended on what I had going on in the institution. If I was the evening watch and they had something and the lieutenant passed that information on to me and I wanted to take 4:00 count at that time, I wouldn't sit down and read the packet. I could take it down to control center while I was taking a count and breeze through it, or I'd wait until after I'd taken the count.

Q But wouldn't you want to read the packet to be fully informed about what happened on the prior shift?

A I don't have to read the full packet to get an understanding of what has happened. I could go -

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| LEROY BISHOP, et al., | ) |
| Plaintiffs, | ) |
| v. | ) Docket No. 03-446C |
| UNITED STATES, | ) |
| Defendant. | ) |

Ballroom
Holiday Inn
68 Crystal Run Road
Middletown, New York

Thursday,
August 17, 2006

The parties met, pursuant to notice of the Court, at 9:02 a.m.

BEFORE: HONORABLE ERIC G. BRUGGINK
Judge

APPEARANCES:

For the Plaintiffs:

ALAN BANOV, Esquire
Alan Banov & Associates
1819 L Street, N.W.
Washington, D.C. 20036-3830
(202) 822-9699

For the Defendant:

DOMENIQUE KIRCHNER, Esquire
U.S. Department of Justice
Civil Division
Commercial Litigation Branch
1100 L Street, N.W.
Washington, D.C. 20530
(202) 307-0290

APPEARANCES: (Cont'd.)

Also for the Defendant:

NICOLE HEISER, Esquire
ERIKA TURNER, Esquire
Federal Bureau of Prisons
320 First Street, N.W., Room 818
Washington, D.C. 20530

C O N T E N T S


| WITNESSES: | DIRECT | CROSS | REDIRECT | RECROSS | VOIR DIRE |
|---|---|---|---|---|---|
| For the Plaintiffs: | | | | | |
| Patrick Shea | -- | 304 | 325 | 335 | -- |
| For the Defendant: | | | | | |
| Anthony Haynes | 336 | 420 | 479 | 484 | -- |
| | -- | -- | 486 | -- | -- |
| Billy Romero | 487 | 520 | 544 | -- | -- |
| Donna Hill | 548 | 556 | 563 | -- | -- |

# E X H I B I T S

| DEFENDANT'S EXHIBITS: | IDENTIFIED | RECEIVED | DESCRIPTION |
|---|---|---|---|
| 6 | 345 | 345 | BOP P.S. 3000.02, CN-5, 3/27/95, Attendance and Leave |
| 11 | 344 | 344 | 6/30/03 message from Menifee |
| 18 | 308 | 308 | Daily assignments of Shea, 9/26/04 through 3/4/06 |
| 19 | 312 | 312 | Shea assignment card |
| 20 | 305 | 305 | SF-50 form re Shea's retirement effective 3/5/06 |
| 69 | 549 | 549 | Work history of Hill |
| 71 | 554 | 554 | Hill notes of 8-04 time study of walking times, FCI Otisville |
| 72 | 337 | 337 | Work history of Haynes |
| 73 | 488 | 488 | Work history of Romero |
| 74 | 314 | 314 | SF-50 forms for Romero |
| 79 | 473 | 473 | 8-10-05 declaration of Haynes |

officer or designee will delegate the responsibility for communicating it."

THE COURT: What paragraph?

MS. TURNER: That's paragraph 4(a), Your Honor.

THE COURT: Who is a possible designator?

THE WITNESS: I would be as a captain of the institution, sir.

THE COURT: You could grant overtime or comp time?

THE WITNESS: Yes, sir.

THE COURT: Could you require it? I mean could you order somebody to work?

THE WITNESS: Yes, I can.

THE COURT: Overtime?

THE WITNESS: What we would normally do is if -- we try to stay away from mandating staff to work overtime. So we try to use volunteers. If it comes to the point where we don't get a volunteer, at least under my tour as captain, then I would have to use the seniority roster and go that route.

THE COURT: Who decides whether it's comp time or overtime?

THE WITNESS: The employee.

THE COURT: Is that true for all grades?

the counts, verbal counts over the phone from the housing unit officers, they would announce the verbal count over the radio.

Q How long would it take to get a good verbal count?

A Anywhere from 15 to 20 minutes depending on -- if we had a good count, 15 minutes, 20 minutes.

Q Can the inmates leave before there is a good verbal count?

A No, they cannot.

THE COURT: The inmates?

THE WITNESS: You did say the inmates, correct?

BY MS. TURNER:

Q Right. Move -- can the inmates move before a good verbal count is announced?

A They would not be released out of the housing unit, but if they get a good verbal count in the units, they could let them out inside the units but they should wait until they get a clear count.

Q Are you familiar with the term clear institutional count?

A Yes, I am.

Q What does that term mean?

A The control center would announce to all

let the inmates go get medication before the evening meal starts, you're talking maybe 4:15, 4:20 before inmates will move out of that housing.

THE COURT: How many locations are generating the piece of paper saying this is our count?

THE WITNESS: The way that that institution -- you might have seven different locations if you have a satellite camp.

THE COURT: And they all have runners that carry these slips of paper?

THE WITNESS: The compound officer, officers delegated to go to certain areas to pick up the count slips and bring them up to the control center.

THE COURT: Okay. And how many times a day is this drill?

THE WITNESS: We do a count five times a day, at 12 a.m., 3 a.m., 5 a.m., and then they have one at 4 p.m. which is a stand-up count, and then they have one at 9 p.m.

THE COURT: What is the difference between a stand-up and another count?

THE WITNESS: The other counts, the regular counts, they can just be in their cells. They can be laying down, sitting down. The Bureau of Prisons

Q When you were the captain at FCI Otisville, if a lieutenant worked 11 minutes of overtime, how much compensation could he receive?

A Fifteen minutes.

Q Why is that?

A Policy, and I don't want to try to quote it, but the policy I think in 5 U.S.C., whatever it is, we pay overtime in increments of 15 minutes. We pay them in increments of 15 minutes. So if they work 8 minutes, 11 minutes, 10 minutes, they're going to get a minimum of 15 minutes overtime.

Q If I could please direct your attention to Exhibit 55.

A Okay.

Q If you could turn to page 4.

A I'm there.

Q In the very first paragraph, was the evening watch operations lieutenant required to come in early to exchange for equipment?

A No, and in this post order, if I wanted them to come in early, I would have had 3:45, 3:20, 3:50, et cetera. This is a bullet statement that provides them a model for details. Just make sure you get there in a timely manner which means 4:00, which is when you start your shift.

A F T E R N O O N   S E S S I O N

(12:50 p.m.)

Whereupon,

ANTHONY HAYNES

having been previous duly sworn, was recalled as a witness herein and was examined and testified further as follows:

CROSS-EXAMINATION

BY MR. BANOV:

Q Mr. Haynes, you testified before we try to avoid mandating staff to work overtime. Isn't that to minimize the cost to the Bureau of Prisons?

A No, sir. Mandating in that reference for me is, I like to have lieutenants volunteer. So if I have overtime shifts come available, I want them to volunteer versus me mandating saying that a certain lieutenants will stay.

Q Doesn't the Bureau of Prisons want to minimize the overtime it pays employees?

A That's one of their initiatives, yes.

Q And does it discourage the employees from working overtime?

A Does it discourage them from working overtime?

Q Yes.

A I don't see how it discourages them.

Q Do you recall seeing a memo before from Warden Menifee? Do you see Exhibit 11, please? You testified that you received this when you were a captain at FCI Otisville.

A Yes.

Q And the sentence that you read there towards the bottom, "As a reminder...", that sentence. Do you know whether Warden Menifee wrote that in order to minimize the overtime worked by employees at FCI Otisville?

A You'd have to ask Warden Menifee. This statement to me means that prior to allowing staff to stay without being compensated, it must be approved by the associate warden. That's how I view that.

Q You testified that you arrived at FCI Otisville at 7:00?

A Sometimes 7 a.m., yes, sometimes 7:10, 7:15, 6:55.

Q Isn't it true that early in your career, your supervisor told you to come in early?

A That's not true.

Q Isn't it true the post orders made you come in early when you were a lieutenant?

A That's not true also.

Q When you came in at 7:00, did you read the lieutenant's logs?

A It depends. I could be talking to staff. I could be making coffee. I could go in and look at the lieutenant's logs. It depends on I had going on. My intent only was to prepare for my coffee and get relaxed.

Q Did you relax for a half an hour?

A It depends. I came in to get coffee, et cetera, and get ready for my day's events.

Q You didn't do any Bureau business in that half hour?

A I could have, yes.

Q You did?

A I could have done work. Talking to staff, some people consider that work. I could have read the logs during that timeframe.

Q You did read the logs during that timeframe?

A I could have, yes.

Q And wasn't it important to you to learn as much as you could about the prior shift when you came into work?

A Sometime during that shift, correct.

Q Isn't it true that obtaining information about what went on during a prior shift played the

premium in an employee's life at FCI Otisville?

A What did you mean by premium?

Q Let me rephrase it. Isn't it true that it's important for lieutenants to learn as much as they can about what happened on the prior shift when they come on duty?

A They're going to receive a briefing verbally or reading the lieutenant's log. They do need to know what's going on for their shift, but the timeframe of when they do that is totally up to them.

MR. BANOV: Move to strike the last sentence.

THE COURT: I'm not going to strike it. Why is this relevant?

MR. BANOV: Why is what he does relevant?

THE COURT: No, why is what happens for this shift relevant?

MR. BANOV: It's clear that it's very important for lieutenants and people higher especially to learn as much as possible when they come on board.

THE COURT: Well, okay. Then put it on the other side of the clock. What's the relevance of that? The question under Doe really is when was work ordered?

MR. BANOV: I'm going to get there. I may

A Yes.

Q And isn't it true that you instructed the lieutenant to include your topic at roll call and how many staff attended roll call?

A Yes, that's in the post orders that I signed.

Q Thank you. When you were at FCI Otisville, you approved the quarterly rosters?

A Yes, I was one of them that approved them.

Q And the quarterly rosters are posted in the lieutenant's office?

A Yes.

Q And the shift assignments for lieutenants and correctional officers are set forth in the quarterly rosters?

A Yes, they are.

Q And by looking at post orders, institution supplements and rosters, lieutenants could learn where to be and what to do when their shifts began?

A That's not correct. Institution supplements don't tell the operations lieutenants or any lieutenant what time to be on the shift.

Q Could lieutenants learn where to be and what to do when their shifts began by looking at certain documents?

A Yes, they can.

Q And isn't it true that those documents included post orders?

A Yes, post orders.

Q And didn't it include institution supplements?

A Institution supplements could tell them things to do, not the time to show up. That's the question I believe you asked. Institution supplements can give them procedures on how to do certain things in a correctional environment.

Q Let me show you your deposition. Do you recall taking part in a telephone deposition with me on August 3 when you were at USP Atlanta?

A Yes, I do.

Q Let me show you page 30. Do you see there on page 30, I start off asking you the question, line 3, and the question I've got is:

"Q Do lieutenants learn where to be and what to do when their shifts began by looking at certain documents?"

Do you see that question, line 3?

A Yes.

Q And then you see on line 13, I ask you:

"Q Help me out with those documents."

A Okay.
Q In part of your answer, you said:
"A It could be anything from a generalized post order to give them instructions for the day. It could be from institution supplements."
A Yes.
Q And you also referred to contingency plans.
A Yes.
Q So isn't it true that one of the documents that would give lieutenants information about where to be and what to do when their shifts began would be the institution supplement?
A Sir, the question you asked me was where lieutenants learn where to be and what to do. Those are two different things than the question. Institution supplements can tell them what to do. The general post orders can tell them where to be and what time. The contingency plans would tell them what to do but not where to be. That's a two-part question that I viewed and that's the answer that I gave you.
Q How much are we going to decide on the record -- are institution supplements documents which individual institutions create to supplement general BOP policy?
A Yes, institution supplements are used to be