specific at a certain institution that might be beneficial to them for the operation of the security of the institution.

Q And FCI Otisville had institution supplements, did it not?

A Yes, they did.

Q And one of the supplements that it had related to meetings, did it not?

A I believe it did.

Q That includes in fact lieutenants meetings, department head meetings, close-outs?

MS. TURNER: Objection, relevance.

THE COURT: What is the relevance?

MR. BANOV: What to do and where to be.

THE COURT: I don't recall preserving the question of lieutenant's meetings for this trial.

MR. BANOV: I know. But my questions were raised in preshifts.

THE COURT: That would be a different question. Do you want to put a different question to him?

MR. BANOV: I need to establish that they do relate to lieutenant's meetings, department head meetings, as part of the preamble to what I'm doing.

THE COURT: Go ahead.

THE WITNESS: What was your question again, sir?

BY MR. BANOV:

Q The question is, isn't it true that at FCI Otisville there was institution supplements on meetings that indicated when lieutenant and department head meetings were held?

A I believe there were.

Q And did it indicate the time of that meeting?

A I'd have to look at the document.

Q And did it indicate that the time was 7:30 a.m.?

A Again, I'd have to look at the document, then I can give you a definitive answer.

Q Is it true that at FCI Otisville combined lieutenant/department head meetings were held once a month usually on the Wednesday of the first pay week and began at 7:30 a.m.?

MS. TURNER: Objection, relevance.

THE COURT: How is this setting up anything?

MR. BANOV: I don't want to give it away. I can tell you without him present, but I assure you I'm relating to pre-shift, not attending the meeting per se.

THE COURT: All right. Go ahead.

THE WITNESS: We had department head meetings and the question you are asking is?

BY MR. BANOV:

Q I'm asking you, isn't it true that at FCI Otisville the combined lieutenant/department head meetings were held usually the Wednesday of the first pay week at 7:30 a.m.?

A I believe that's possibly true, yes.

Q Possibly true?

A If I can look at --

Q Do you want to look at page 146 of your deposition to refresh your recollection?

(Pause.)

A Yes, I said ordinarily once a month -- which one are you talking about, the department head meeting and the doubles? Once a month and I said usually at 7:30.

Q And isn't it true those meetings were held in the warden's conference room?

A Yes.

Q And that's not the same place as the control center, is it?

A No, it's not.

Q At the time that you were a captain at FCI

Otisville, did the day shift begin at 7:30?

A For which staff are you talking -- 7:30, correct.

Q Was that person regarded as being on time if he or she was at the control center at 7:30?

A Yes, they would be on time.

Q And could a person be at the control center at 7:30 and the warden's conference room at 7:30, the same time?

A No, they could not.

Q Thank you. Back to Exhibit 55, have you found it?

A Yes.

Q And this is a post order that you wrote or approved?

A Yes, I approved it.

Q Was it the captain's responsibility to approve the language of a post order?

A To approve the contents in it.

Q So if you thought that the contents were incorrect, you could change it, couldn't you?

A Yes, I could.

Q You testified before what you'd rather it said, but you didn't ever change post orders to coincide with your testimony here this morning, did

you?

A No, and the reason is I admit that you can --

Q You testified it didn't accurately reflect your expectation but you still approved the post order, right?

A Yes, I did.

Q And do you know whether you routinely had the same language in your post orders for a given shift regarding roll calls, for example?

A It's probably in several of them that same language.

Q Back to that, that issue, did the control center officer attend the roll call?

A I don't know if they did or not.

Q The control center officers could not be in the control center and the break room at the same time, right?

A No, you could not, but there are three shifts. So which one are you asking me about? Which control center officer?

Q There's a roll call held around 3:45 to 3:50?

A Yes.

Q And it began sometimes at 3:45 and it also

began at 3:50, correct?

A Yes, it could have.

Q Did it?

A It could have. I can't quote every time it happened. My testimony was it could be at 3:45, 3:50, when I was the operations lieutenant.

Q When you say "could have," are you saying historically that it's correct? I'm trying to figure out if it could and did.

A What I'm saying is, depending on who the lieutenant was, it could be 3:45 or 3:50.

Q So is it true that the evening shift roll call at FCI Otisville was typically held at 3:45 or 3:50?

A Yes.

Q Thank you. The control center officer on duty at that time, i.e., 3:45 or 3:50, had to be in the control center at that time?

A It depends on their shift. If their shift starts at 4:00, they need to be in the control center at 4:00. If it starts at 3:45, then they should be in the control center at 3:45.

Q And you said the same control center officer is emailing the outgoing lieutenant a draft of the lieutenant's log for that shift?

A It wouldn't be that same one. You're asking me about 3:45 p.m., that'd be the evening watch control center coming on. The one who would email it is the day watch control center officer who would hand it to the day watch operations lieutenant anywhere from 3 p.m. to 3:30 depending on when they would send it. The lieutenant can call for it earlier.

Q So if the day watch lieutenant is emailing the log to the office of the lieutenant on the day shift at around that time, you said a half hour before the shift ends, would they also be in the roll call for that shift?

A So you're asking me if the day shift lieutenant would email the log.

Q Right.

A The day shift lieutenant wouldn't email it. It's the control center officer in the control center on day watch who would email the log to the day watch lieutenant.

Q And would that same day watch control center officer attend the roll call that was held at 3:45 or 3:50?

A No, they would not.

Q If the control center officer did not attend the roll call, how would he know the topic of the roll

call given by the operations lieutenant?

A The operations lieutenant could call him and tell him what it was. The control center officer could hand it to the operations lieutenant and he or she could put it in.

Q Isn't it true that ordinarily the operations lieutenant on duty would input into the log the topic of his or her roll call?

A I can't confirm that. They could, but you're saying typically, and I can't contest to that.

Q Did you say before that at 4:00 there would be a meeting in the vicinity of the warden's office?

A Sometimes, yes.

Q Did Warden Menifee have closeouts?

A Yes, he did.

Q And is a closeout a meeting that he held with executive staff at the end of the day?

A Yes, I believe during my tour we would start some days 2:30 p.m. or 3:15.

Q Isn't it true that sometimes those closeouts extended beyond 4 p.m.?

A Yes.

Q And as a captain, you attended those closeouts?

A Yes.

Q So generally speaking at 4:00 you were in the warden's conference room at that closeout?

A Yes, some days we went past 4:00 and some days we ended before 4:00. It just depends on what was being said.

Q And did the warden require you to attend those meetings?

A At his closeouts, yes.

Q If you can turn to another page in Exhibit 55, please. If you turn please, to page 4. This is the post order for operations lieutenant for the evening watch. I thought you testified regarding 12:00 midnight that that was an incorrect statement. It shouldn't say 12:00 midnight.

A No, this is one that we were looking at the lieutenant's log and it said Lt. Shea was working from 4 p.m. to 12 p.m., and I said that shouldn't be p.m. -- midnight or 12 a.m.

Q I'm confused. Were you only stating that Lt. Shea should complete the lieutenant's log at 11:59 p.m. when he was on the evening watch?

A I am saying, yes. If you're on shift as the operations lieutenant, you can watch operations. When you come on shift you have between 4 p.m. and midnight to complete your log. So the last entry at the 12

keys?

A No, I do not.

Q Would it be safe to say that the total was more than 10?

MS. TURNER: Objection, asked and answered. He already said he didn't know.

THE COURT: Well, you're welcome to take a guess.

THE WITNESS: If I were to guess, it could be 10 keys.

BY MR. BANOV:

Q Isn't it true that operations lieutenants at FCI Otisville could not leave their posts before being relieved?

A Yes.

Q You testified that you were required to attend these closeouts with Warden Menifee, and sometimes you were there at 4:00. Do you have any firsthand knowledge about when lieutenants completed lieutenant's logs on the day watch?

A Are you asking me do I know when they completed them?

Q Do you have any firsthand knowledge about when they completed the logs on the day watch?

A No.

require the day watch operations lieutenant to stay beyond 4 p.m. for the 3:45 p.m. count?

A No.

Q What responsibilities, if any, did the day watch operations lieutenant have with regard to the 3:45 p.m. count?

A The day watch operations lieutenant was responsible for ensuring that the paperwork authorizing the inmates to be outcounted was approved by him or her and in the control center. He or she was also responsible for ensuring that all of the supporting documentation for the actual count was in the control center prior to the 3:45 p.m.

Q At what point did this paperwork you said for approval of an outcount have to be submitted to the control center? At what time?

A There was no set time that it had to be in the control center.

Q Did this paperwork for the approval of the outcount have to be at the control center prior to the start of the count?

A Yes.

Q And you said that the operations lieutenant was also responsible for supporting documentation. Is that the same type of paperwork?

[redacted]

Q If you were missing an inmate, did you require the day watch operations lieutenant to stay beyond 4 p.m. until you found that inmate?

A It was not a requirement. I would probably have the lieutenant stay.

Q And if you had the day watch operations lieutenant stay past 4 p.m. to find the missing inmate, would that operations lieutenant be compensated?

A Absolutely.

Q Who actually physically counted the inmates?

A The staff members that were assigned to the areas that the inmates were actually in.

Q Did the operations lieutenants have any responsibility with regard to counting the inmates?

A Do you mean to actually physically count an inmate?

Q Yes.

A No.

THE COURT: Why do you need the day lieutenants to stick around if you've got the evening ones presumably there at 4:00?

A Yes, that would be accurate.

Q Could lieutenants at Otisville learn where to be and what to do when their shifts began by looking at certain documents?

A Yes.

Q And that include post orders?

A Yes.

Q Did you ever time Lt. Shea on how long it took him to walk from the control center to the lieutenant's office?

A No.

Q Sometimes lieutenants talk with inmates on their way to their duty posts?

A Yes.

Q And where typically would Lt. Shea receive the keys and equipment from the outgoing lieutenant?

A Either at the control room or the lieutenant's office.

Q Isn't it true that it was typically at the lieutenant's office?

A Yes.

Q You issued post orders for the Otisville lieutenants when you were captain?

A I'm sorry. I didn't hear you.

Q You issued post orders for the FCI Otisville

A Yes.

Q Do you know how long it takes to get from the control center to some of the major departments at FCI Otisville?

A Yes.

Q How do you know this?

A I did a time study in August 2004.

Q Why did you do the time study?

A I was asked.

Q Who asked you to conduct the time study?

A Domenique Kirchner.

Q Did you use a watch in order to conduct the time study?

A I used a stop watch.

Q Were you familiar with the operation of the stop watch?

A Yes.

Q Did you use test the stop watch to see if it was working before you actually conducted the time study?

A Yes.

Q How did you test the operation of the stop watch?

A I clocked it from my office down to the warden's office, and I also was shown how to operate

it by the operations specialist.

Q Can you please explain how you conducted your time study?

A I started on the side of control, of the control center, waved my hands to the officer to let me through the sallyport doors. He opened the first sallyport door. I went into the sallyport and I waited for him to open the second sallyport door. Then I went on to the compound and went to the various departments. Then I stopped the stop watch.

Q At what point did you turn your stopwatch on?

A As soon as I got to the side of the control center.

THE COURT: And you turned it off when?

THE WITNESS: When I got to doors of the various departments.

THE COURT: It's more than one.

THE WITNESS: I turned it on when I got the control center. Then I went to the sallyport doors. When I went to the gym and I went through the doors, that's when I cut it off.

THE COURT: I see. Did you go to the lieutenant's office?

THE WITNESS: Yes.

THE COURT: Okay. When you got to the front door, you would have turned it off?

THE WITNESS: When I got in the door, I turned it off. I went inside the door because they wanted me to go to the office.

BY MS. TURNER:

Q Why did you wave your hand when you were at the side of the control center at the beginning of your timing?

A Because I'm short and I just have a habit of waving for them to see me. I don't know if they're looking at their monitors or doing something else. So I just have a habit of doing that.

Q When you conducted your time study, how many times did you take each measurement?

A Just once.

Q Did anyone interrupt you when you were doing the timing?

A No.

Q And did you record your times anywhere?

A Yes.

Q Where did you record your times?

A On a piece of paper. I probably had a pad.

Q And did your notes truly and accurately reflect the measurements you took?

A Yes.

Q I would like to now direct your attention to Exhibit 71. Can you please identify this document?

A That's the document I prepared as result of the time studies I performed.

(The document referred to was marked for identification as Defendant's Exhibit No. 71 and was received in evidence.)

BY MS. TURNER:

Q If you look down to the seventh line, can you please read what appears next to lieutenant's office?

A "Lieutenant's office equals 1.25 seconds."

Q What does that mean?

A That means that's how long it took me to get from the side of control through the sallyport doors and down to the lieutenant's office.

Q So when you started your walk to the lieutenant's office, where exactly were you?

A I can't tell you exactly, but I was on the side of the control center.

Q Did you then have to go through a sallyport?

A Yes.

Q How was the door to the sallyport opened?
A By a control, it's electronic.
Q Did you look at your stopwatch when you were in the sallyport? .
A No.
Q At what pace did you walk when you went from the control center to the lieutenant's office?
A Just a normal pace. I wasn't running or I wasn't, you know, really walking slow. It was just a normal pace.
Q Did anyone walk the route with you to the lieutenant's office?
A Not that I can recall, no.
Q Was your walk from the control center to the lieutenant's office uninterrupted?
A One time it was interrupted. When I was doing the unit FME, I had to stop and do it all over again.
Q I'm sorry. I'll ask the question again. Was your walk from the control center to the lieutenant's office interrupted?
A No.
THE COURT: It was uninterrupted?
THE WITNESS: It was uninterrupted. I was not interrupted when I went to the lieutenant's

office.

MS. TURNER: Thank you. Nothing further, Your Honor.

THE COURT: Do you recall what time of day it was when you did the lieutenant's walk?

THE WITNESS: No, I can't recall exactly the time of day. I just know it wasn't early in the morning and it wasn't at the end of the shift. I do know that, but I can't recall exactly what time.

THE COURT: It was during your normal work hours?

THE WITNESS: Yes, between the hours of 7:30 and 4:00.

THE COURT: Okay.

CROSS-EXAMINATION

BY MR. BANOV:

Q Ms. Hill, do you recall if there was a line at the key line at the time that you clocked the time you thought it would take to go from the control center to the lieutenant's office?

A No, I can't recall.

THE COURT: Well, if there had been, where would you have started the stopwatch?

THE WITNESS: I still would have started it on the side of the control center.

THE COURT: When you queued up in line or when you --

THE WITNESS: Well, I wouldn't have been in the line.

THE COURT: Why not?

THE WITNESS: You know where the control centers are in the office? The place where you actually get your keys is on one side and the side of the control is in the other side. So I was right on the side of control.

THE COURT: But if there had been other people trying to either pick up equipment or go through the sallyport, they might have been in front of you.

THE WITNESS: Yes, they would have been on the side of me or they could have been in front of me if they had the keys.

THE COURT: I see. There are two lines, one to get your equipment and one to go through the sallyport doors?

THE WITNESS: There could be. It all depends on who's starting to do what.

THE COURT: So you queued up on what might have been a line or not just to go through the sallyport.

THE WITNESS: Just to go through the sallyport.

THE COURT: Okay.

BY MR. BANOV:

Q Do you recall when Ms. Kirchner asked you to measure what times in the facility?

A I just know it was in August of 2004. I can't recall the exact date.

Q Do you recall in August of 2004 I was at the institution and looked around the institution?

MS. TURNER: Objection, relevance.

THE COURT: Well, that's okay. Go ahead and answer.

THE WITNESS: I know that you visited the institution. Whether it was in August 2004, I don't know.

BY MR. BANOV:

Q Did you walk us around the institution?

A I don't recall walking you around the institution. I don't think I did.

Q Do you recall that there were depositions during the first of the month of August 2004?

A I recall that there were depositions and that's why you were there at the institution.

Q Do you recall whether this clocking exhibit

was before, during or after the depositions?

A No, I can't recall.

Q What did Ms. Kirchner say about recording the time?

A Actually, she sent the email to me. Actually, the email came through my warden to me asking me to do a time survey to the departments within the institution.

Q Did anybody tell you how to go about this project?

A No.

Q Did anybody from the Bureau's central office such as statisticians give you the advice on how to perform this project?

A No.

Q You didn't record the walking time from the control center to the lieutenant's office at 7:30 in the morning, did you?

A I know it wasn't at 7:30 in the morning. That's the time I get in. So I didn't start right when I got in. I know it wasn't at 7:30.

Q Did you write down your findings on a piece of paper?

A Yes, I did.

Q Isn't it true that you no longer have that

paper?
A That's true.
Q Isn't it true you may have shredded that paper?
A Most likely, yes.
Q Looking to Exhibit 71, is there a date on that?
A No, there isn't.
Q Can anybody tell from this when you did the time measurements?
A No, you can't.
Q Why didn't you do your time measurements at the time of the shift change?
A I wasn't asked or told to do it at any specific time so I just did it when it was convenient for me.
Q Did you clock how long it took any operations lieutenants to brief oncoming operations lieutenants?
A No.
Q Did you clock how long it took for operations lieutenants to give keys or radios to oncoming replacements?
A No.
Q During any of your time measurements that

you said you recorded in Exhibit 71, were you stopped by any inmates as you were doing that?

A No.

Q Were you stopped by any staff?

A Yes.

Q Was it unusual for you to walk across the compound and be stopped by a staff member?

A No.

Q Do you recall the sequence in which you measured the walking time that's indicated on Exhibit 71?

A I measured them exactly the way I wrote them out here.

Q Recreation first?

A Yes. Recreation first.

Q Where exactly were you again when you started the measurements by putting your hand up?

A On the side of the control center, right in front of the sallyport doors.

Q Was there a line in front of you when you went through the sallyport door?

A I said I don't recall if there was a line.

Q Do you recall if anybody was in the sallyport with you at the time you were walking to the lieutenant's office?

V1093327

# Travel Voucher Summary

JMD 4/3/01

**1. Voucher**

| Local Voucher No | Submit Org | Voucher Date | Voucher Type | Ref Doc No | Preparer's Name |
|---|---|---|---|---|---|
| MJP001764 | P0211 | 03/27/2001 | [x] Orig [ ] ReClaim | NA | PRICE |

**2. Traveler**

Name (FNF): Craig Chalmers

SSN: [redacted]

[x] 1. Employee [ ] 2. Contractor [ ] 3. Invitational [ ] 4. Other

Address: FCI OTISVILLE

Address: PO BOX 600

City: OTISVILLE State: NY Zip: 10963

Country: USA

[ ] Payment Notification Email:

**3. Purpose**

Type Travel: [x] A. TDY [ ] B. Ext TDY (Over 30 Days) [ ] C. Taxable Ext TDY

Travel Purpose: [ ] A. Operational [x] B. Training [ ] C. Meeting/Conf

**4. Obligation Liquidation** [x] Final [ ] Partial [ ] NPO

Traveler YRegDoc: 1TA10171 RCN (8 Alpha): NA

**5. Itinerary**

Description*: ASSOCIATE WARDENS TRAINING

Trip Began: 03/19/2001 Trip Ended: 03/23/2001 Trip GT 12 Hrs: [ ] No [x] Yes

[x] 1. Domestic [ ] 2. O/CONUS [ ] 3. Foreign

Highest Class of Travel: [x] 0. NA [ ] 1. Coach [ ] 2. Bus Class [ ] 3. First Class

Reason for upgrade:
- [ ] 1. Coach not available
- [ ] 2. Emp Disability
- [ ] 3. Security
- [ ] 4. Foreign -no coach
- [ ] 5. Cost Savings
- [ ] 6. Paid by NonFed
- [ ] 7. Travel GT 14 hrs
- [ ] 8. Other
- [x] 9. NA

LOU SENSITIVE

| State | [illegible] | |
|---|---|---|
| PA | Philadelphia | [ ] Multiple Destinations |

**6. Expense Summary**

FMIS Upload (•) Yes ( ) No

Standard Travel Expenses

| | |
|---|---|
| Traveler Paid Transp | 0. |
| Lodg Total (from back) | 472. |
| Lodg Tax Total (from back) | 0. |
| M&IE Total (from back) | 207. |
| Mileage Total (from back) | 0. |
| ATM Fees (from back) | 3. |
| Taxi/Limo (from back) | 0. |
| Business Calls (from back) | 0. |
| Personal Calls (from back) | 0. |
| Parking (from back) | 60. |
| Car Rental | 0. |
| Laundry | 0. |

Other Expenses

| [illegible] | [illegible] | [illegible] |
|---|---|---|
| GAS | 2155 | 24. |
| | | 0. |
| | | 0. |
| | | 0. |
| | | 0. |

Total Voucher: 767.

Disposition

| | |
|---|---|
| Advance Repayment | 0. |
| Taxes Withheld Fed | 0. |
| Taxes Withheld State | 0. |
| To Travel Card | 767. |
| Amount to Traveler | 0. |

BOP 70933

DistMode: [x] 1. Dir Dep [ ] 2. Tres Ck [ ] 3. Draft [ ] 9. None [illegible]: BOP 144

**7. Accounting Distribution**

| FY | Fund | [illegible] | [illegible] | [illegible] | Project | [illegible] | [illegible] |
|---|---|---|---|---|---|---|---|
| 01 | 02 | FP021121N1 | NA | NA | 71N | NA | 100.0% |
| NA | NA | NA | NA | NA | NA | NA | 0.0% |
| NA | NA | NA | NA | NA | NA | NA | 0.0% |
| NA | NA | NA | NA | NA | NA | NA | 0.0% |
| NA | NA | NA | NA | NA | NA | NA | 0.0% |
| | | | | | | Total.. | 100.0% |

**8. Approval** Note: Falsification of an item in an expense account works a forfeiture of claim (28 U.S.C. 2514) and may result in a fine of not more than $10,000 or imprisonment for not more than 5 years or both (18 U.S.C. 287;1001).

**Traveler Sign Below**

I certify this voucher is true and correct to the best of my knowledge and belief, and that payment or credit has not been received by me.

Date: 3/27 Phone:

**Approving Official Sign Below**

The amounts claimed on this voucher are approved official travel expenses, which appear to be reasonable for the travel performed.

Submission Date:

Approval Date: 3/27/01 Frederick Menifee

**Certifying Official Sign Below**

This voucher is certified correct and proper for payment

Date: 4/3/01