# In the United States Court of Federal Claims

No. 03-446C
(Filed: July 11, 2007)

* * * * * * * * * * * * * * * * * * * * * * *

LEROY BISHOP, *et al.*,

*Plaintiffs*,

v.

THE UNITED STATES,

*Defendant*.

* * * * * * * * * * * * * * * * * * * * * * *

Partial Summary Judgment; Overtime Pay; Federal Employees Pay Act, 5 U.S.C. § 5542; 5 C.F.R. § 550.111(c); Travel-Related Overtime; Statute of Limitations; Relation Back under RCFC 15(c)(2).

*Alan Banov*, Washington, DC, for plaintiffs.

*Domenique Kirchner*, Trial Attorney, Commercial Litigation Branch, Department of Justice, Washington, for defendant. With whom were *Peter D. Keisler*, Assistant Attorney General, *Jeanne E. Davidson*, Director, and *Kathryn A. Bleecker*, Assistant Director. *Erika Turner*, Bureau of Prisons, of counsel.

## OPINION

BRUGGINK, *Judge*.

This is an action brought under the Federal Employees Pay Act, 5 U.S.C. §§ 5541 *et seq.* (2000) ("FEPA") by numerous current and former employees of the Bureau of Prisons ("BOP") seeking compensation for overtime work. There are several hundred plaintiffs involved in this and other similar actions against the BOP. Pending are cross-motions for partial summary judgment with respect to one of ten remaining plaintiffs in this case, Craig Chalmers ("plaintiff"). Plaintiff claims compensation primarily for overtime he worked attending various meetings before and after the start and end of his regularly scheduled shifts. He also claims overtime for time

traveling overseas to repatriate prisoners. Plaintiff believes the requirement, described in *Doe v. United States*, 372 F.3d 1347 (Fed. Cir. 2004) ("*Doe II*"), that overtime be ordered or approved in writing to be compensable, is not applicable in this case. And, even if *Doe II* applies, plaintiff argues that his claims satisfy the requirement. Defendant argues that the court has previously resolved all legal issues in this case, including the applicability of *Doe II* to employees of the BOP and whether the evidence presented by plaintiff is sufficient to satisfy the writing requirement. The matter is fully briefed. Oral argument was heard on June 6, 2007. For the reasons discussed below, we deny plaintiff's motion for partial summary judgment, and grant in part defendant's cross-motion.

## BACKGROUND

### I. Procedural History

While we assume general familiarity with the facts in *Bishop v. United States*, 72 Fed. Cl. 766 (2006) ("*Bishop I*") and *Bishop v. United States*, 74 Fed. Cl. 144 (2006) ("*Bishop II*"), *appeal docketed sub nom.*, *Shea v. United States*, No. 2007-5099 (Fed. Cir. Feb. 9, 2007), a brief summary of the procedural background is warranted. During discovery in this and other related actions against the BOP, the Federal Circuit issued *Doe II*, an important decision interpreting FEPA and one of its implementing regulations, 5 C.F.R. § 550.111(c), the statute and regulation that are pertinent to this and other related actions. The regulation requires, among other things, that overtime be ordered or approved in writing to be compensable. In *Doe II*, the Federal Circuit held that the writing requirement of the regulation, which is not expressly mandated by FEPA, was valid.

Following the Federal Circuit's ruling in *Doe II*, we resolved two sets of cross-motions for summary judgment in related actions. The first set, filed in response to our invitation, related to the claims of plaintiff Patrick Shea in *Bishop*. The second set, submitted in *Carlsen v. United States*, 72 Fed. Cl. 782 (2006), *appeal docketed*, No. 2007-5011 (Fed. Cir. Oct. 31, 2006), related to the claims of all remaining plaintiffs in that case. In both cases, we found that *Doe II* applied to employees of the BOP, even though the plaintiffs in *Doe II* were Department of Justice ("DOJ") lawyers, a distinction plaintiffs believed was significant. Additionally, we determined that most of plaintiffs' evidence of written orders purporting to order or approve overtime did not satisfy the writing requirement of 5 C.F.R. § 550.111(c). The one exception was written

post orders requiring lieutenants to be present at the same time to exchange pertinent information and equipment before or after their shifts. In *Carlsen*, we concluded that the limited amount of overtime worked as a result of those post orders was de minimis and, thus, not compensable. In *Bishop II*, we held a trial to ascertain the amount of overtime Shea expended to exchange information and equipment, but found that the overtime was also de minimis, and, therefore, not compensable. Accordingly, we entered judgment in favor of the government in both cases, dismissing the claims of all plaintiffs in *Carlsen* and the claims of Shea in *Bishop I* and *II*.

While we were considering the summary judgment motions in *Bishop* and *Carlsen*, two additional related sets of cross-motions were pending: motions for partial summary judgment with respect to the claims of plaintiff Lindsey Bledsoe in *Acebal v. United States*, No. 01-47, and motions for partial summary judgment with respect to the claims of plaintiff Craig Chalmers, the motions before us now. Consideration of both sets of motions had been stayed pending resolution of the motions in *Bishop* and *Carlsen.* The motions in *Acebal* will be the subject of a separate order. We now turn to the factual background of Chalmers' claim for overtime.

## II. Factual Background

Chalmers' claim for overtime compensation involves assignments at three different institutions during the final years of his employment with the BOP. Chalmers began his career with the BOP in May 1980 and served in a variety of positions and locations until his retirement in May 2003. Beginning in October 1995, Chalmers was employed as captain at the Metropolitan Detention Center ("MDC") in Los Angeles, California. MDC-Los Angeles is a high-rise detention center for pre-trial inmates. In May 1999, Chalmers was promoted to associate warden and assigned to the Federal Detention Center ("FDC") in Philadelphia, Pennsylvania. FDC-Philadelphia is also a high-rise detention center for pre-trial inmates. In January 2001, Chalmers was transferred to the Federal Correctional Institute ("FCI") in Otisville, New York. FCI-Otisville is the institution described in our decisions in *Bishop I* and *Bishop II*. Chalmers remained associate warden at FCI-Otisville until his retirement in May 2003.

1. FCI-Otisville

As an associate warden at FCI-Otisville, Chalmers served as a deputy to Warden Frederick Menifee, responsible for exercising control and supervision over various functions at the institution. Chalmers' scheduled shift began at 7:30 a.m. and ended at 4:00 p.m. He believes that he worked approximately twenty-five minutes of pre-shift overtime and thirty minutes of post-shift overtime because he arrived at the institution between 7:00 and 7:10 a.m. each morning and did not leave before 4:30 p.m.

According to Warden Menifee's calendar, department head meetings were scheduled once a week at 8:00 a.m. Approximately every fourth week, these meetings were combined with a monthly lieutenants' meeting scheduled for 7:30 a.m. Both of these meeting times fell within Chalmers' scheduled shift. Chalmers argues that he had to arrive at the institution early either to prepare for these meetings or to otherwise be fully prepared to brief Warden Menifee at the start of his shift at 7:30 a.m. Chalmers' preparation included reading the lieutenants' logs and sensitive reports describing noteworthy activities that occurred during the previous shift. Chalmers believes he was obligated to learn about any concerns at the institution before Warden Menifee arrived.

Warden Menifee typically scheduled executive closeout meetings Tuesday through Friday beginning around 3:00 or 3:30 p.m. These meetings were held in the Warden's conference room with the institution's executive staff. The executive staff consisted of Warden Menifee, two associate wardens, an executive assistant, a captain, and the superintendent of UNICOR.[1] On various occasions, executive closeout meetings lasted beyond 4:00 p.m., the end of Chalmers' scheduled shift.

2. FDC-Philedelphia

As an associate warden at FDC-Philadelphia, Chalmers served as a deputy to Warden John Vanyur, and later, Warden Joe Smith. Chalmers' scheduled shift was 7:30 a.m. until 4:00 p.m. He claims approximately ten minutes of pre-shift overtime because he typically arrived at the lieutenants' office between 7:20 and 7:30 a.m. to prepare for the start of his shift.

---

[1]UNICOR is a trade name for the Federal Prisons Industries.

Upon arrival at the front entrance of the institution on a routine day, Chalmers would go through an interior door and a secondary lobby before reaching the control center. As an associate warden, Chalmers kept his duty-keys twenty-four hours a day, seven days a week. As a result, Chalmers did not need to stop at the control center to retrieve keys before his shift began. After passing the control center, Chalmers would then go through a sally-port and walk to an elevator. The elevator would take Chalmers to the floor where the lieutenants' office is located. At the lieutenants' office, Chalmers would read the lieutenants' logs and sensitive reports, and receive a briefing by the captain. Reading the logs and sensitive reports could take five to ten minutes and the briefing by the captain could last anywhere from five to thirty minutes.

Additionally, Chalmers claims overtime for time spent traveling from Philadelphia to London and back to repatriate a prisoner in March 2000. Chalmers' claim includes, among other things, time spent driving to the airport, flying to and from London, driving to and from his hotel, and taking custody of the prisoner.

3. MDC-Los Angeles

While employed at MDC-Los Angeles, Chalmers was a captain. His scheduled shift went 6:00 a.m. until 2:30 p.m. Chalmers claims approximately thirty minutes of pre-shift overtime and ten minutes of post-shift overtime because he arrived at the control center around 5:30 a.m. every morning, and left after 2:30 p.m. every afternoon.

As a captain, Chalmers reported to duty at the captains' complex on the third floor of the institution. To get there, Chalmers had to go through a sally-port on the first floor to gain access to the control center. Even though Chalmers kept his duty-keys twenty-four hours a day, seven days a week, he still had to retrieve a radio from the control center before he could begin his shift. Chalmers claims that the walk from the control center on the first floor to the captains' office on the third floor could take anywhere from five minutes to one hour.[2] After arriving at the captains' office, Chalmers would review the

---

[2]Plaintiff suggests that the time to walk from the control center to the captains' office depended on waiting for the elevators. *See* Pl.'s Reply and Opp'n at 15. It is not clear, however, why it would take so much time to wait (continued...)

lieutenants' logs and the sensitive reports and also receive a briefing from the outgoing morning watch lieutenant, which might take approximately five to ten minutes. Chalmers believed that he was not at his assigned post each morning until he reached the captains' office.

At the end of his shift at 2:30 p.m., Chalmers would review paperwork, check messages, and generally make sure his desk was ready for the next day of work. Chalmers would also brief the incoming and outgoing lieutenants before leaving his office. When Chalmers was ready to leave, he would walk from the captains' office to the control center, return his radio, and leave the institution.

Chalmers also claims travel-related overtime when he was a captain at MDC-Los Angeles. In April 1997, Chalmers traveled from Los Angeles to Bangkok with other BOP staff members to repatriate thirteen prisoners. Chalmers claims approximately forty-nine hours of overtime during this trip.

## DISCUSSION

### I. Overview

The issue is whether Chalmers is legally entitled to payment for overtime he allegedly worked. If the law does not provide for compensation in his circumstance, then the quantity of pre- or post-shift overtime or travel-related overtime is immaterial. Summary judgment is appropriate when the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Rule 56(c) of the Rules of the Court of Federal Claims; s*ee Moden v. United States*, 404 F.3d 1335, 1342 (Fed. Cir. 2005). Because there is no dispute of fact relating to Chalmers' entitlement to overtime compensation with respect to his pre- and post-shift activities, it is proper to decide that portion of his claim on summary judgment.[3] For this purpose, we may assume

---

[2](...continued)
for an elevator.

[3]Plaintiff requests a trial to determine the actual amount of time he spent on certain pre-shift activities. The amount of time he worked before or
(continued...)

*arguendo* that Chalmers did work the pre- and post-shift overtime claimed. Summary judgment with respect to his travel-related overtime, however, is not appropriate because material facts are in dispute.

II. Writing Requirement for Overtime Compensation Applies to Employees of the BOP

FEPA requires that "hours of work officially ordered or approved in excess of 40 hours in an administrative workweek, or . . . in excess of 8 hours in a day, performed by an employee are overtime work and shall be paid for . . . ." 5 U.S.C. § 5542(a). The implementing regulation, 5 C.F.R. § 550.111(c), promulgated by the Office of Personnel Management ("OPM"), further mandates that "overtime work in excess of any included in a regularly scheduled administrative workweek may be ordered or approved *only in writing* by an officer or employee to whom this authority has been specifically delegated." 5 C.F.R. § 550.111(c) (emphasis added) ("OPM regulation").

In *Doe II*, the Federal Circuit upheld as valid the additional requirements set forth in the OPM regulation that overtime be ordered or approved in writing and by an authorized employee. In so doing, the Federal Circuit rejected plaintiffs' argument that the writing requirement of the regulation was merely an "administrative directive that is not enforceable in litigation." *Doe II*, 372 F.3d at 1357. Following *Doe II*, we held that the writing requirement of the OPM regulation was enforceable against employees of the BOP. *See Bishop I*, 72 Fed. Cl. at 776; *Carlsen*, 72 Fed. Cl. at 792. As such, plaintiffs were not entitled to overtime compensation because, with the exception of certain post orders, they could not present evidence showing that the overtime was ordered or approved in writing.

Despite our previous rulings in *Bishop I* and *Carlsen*, wherein we held that the facts in *Doe II* were indistinguishable from the facts in these cases, Chalmers reasserts the argument that the court should not apply the reasoning

---

[3](...continued)
after each shift, however, is only material if Chalmers first establishes his legal entitlement to overtime. Because we find that plaintiff was not ordered or approved in writing to work overtime (and, therefore, not entitled to compensation), it is unnecessary to determine the amount of time spent before and after each shift.

of *Doe II* to law enforcement agencies such as the BOP. Chalmers believes that BOP employees should be exempt from the writing requirement of the OPM regulation because, unlike DOJ attorneys, employees of the BOP must obey oral orders to work overtime in a "dangerous, high-security environment where the failure to obey orders may, at most, result in the loss of life or injury or, at least, in discipline or the end of a career." Pl.'s Reply and Opp'n at 2. Chalmers provides various characteristics of the BOP that he believes distinguishes it from other federal agencies, including that BOP employees work in a dangerous environment, their mission requires rigid working schedules, employees face serious consequences if they do not follow orders, and the BOP discourages requests for overtime compensation. These same reasons were presented, and rejected, in both *Bishop I* and *Carlsen*. *See Bishop I*, 72 Fed. Cl. at 775-76; *Carlsen,* 72 Fed. Cl. at 792. It is thus unnecessary to address them here. Overtime claims of employees of the BOP, like employees of other federal agencies, must satisfy the writing requirement of the OPM regulation.[4]

III. Documents For Pre- and Post-Shift Overtime Claims Do Not Satisfy Writing Requirement

Chalmers presents a variety of documents that he believes, in conjunction with other documents and certain non-verbal pressure, "implicitly compel[led]" overtime during his employment at the three institutions. Pl.'s Reply and Opp'n. at 3. None of these documents explicitly directed Chalmers, in particular, to work overtime. Chalmers believes, however, that the documents collectively satisfy the writing requirement of the OPM

---

[4]Chalmers places considerable emphasis on the dangerous working environment of a federal prison, where failure to obey orders could result in serious injury or death. While we are sympathetic to that perspective, the law does not provide an exception to the writing requirement for "dangerous" working environments. Moreover, we note that few, if any, of Chalmers' overtime claims involve situations in which Chalmers' failure to follow an oral order to work overtime would have resulted in loss of life or injury, or where an imminent security threat rendered a written order to work overtime impracticable. Instead, for the most part, the overtime Chalmers allegedly worked appears to involve routine situations, such as daily briefings with an incoming or outgoing officer, picking up equipment, or attending meetings before or after his scheduled shift.

regulation. Many of these documents are familiar from the court's previous decisions in *Bishop I* and *Carlsen*.

Chalmers believes the time he spent prior to the start of his shift preparing for various meetings, and the time he spent in meetings that lasted beyond the end of his shift, was ordered or approved in writing because certain documents required him to attend the meetings. In particular, Chalmers believes the Position Description for associate warden, a document that described the duties of an associate warden, constitutes a written order to work overtime because it included the requirement that the associate warden "serve on, or preside over, various committee meetings." Pl.'s App. at 38. Chalmers argues that the Position Description was an "explicit statement requiring him to attend" certain meetings. Pl.'s Reply and Opp'n at 7. Additionally, Chalmers suggests that the Correctional Services Manual, a policy manual for employees within the BOP, should be construed as a written order to work overtime because it stated when lieutenants' meetings would be held. While Chalmers acknowledges that the manual "does not state that employees will work overtime," he argues that the manual required attendance at lieutenants' meetings. *Id*. at 9. Chalmers concludes that because these lieutenants' meetings typically began at the start of his scheduled shift, or extended beyond the end of his scheduled shift, he would have to work overtime preparing for or attending the meetings.

Chalmers also relies on Institution Supplements, which are various directives issued to implement BOP policy at the institution level. One Institution Supplement described what meetings various employees should attend and when they were to be held. At FCI-Otisville, for example, the Supplement stated that the department head meetings were scheduled for the second pay-week Wednesday of each month. The combined lieutenants' meetings and department head meetings were scheduled for the first pay-week Wednesday of each month.

Further, Chalmers believes that meeting minutes, which were recorded at the lieutenants' meetings, department head meetings, and executive closeout meetings, reinforced the need for each supervisor to attend all meetings. Chalmers argues that attendance was recorded and the minutes were posted on the BOP intranet to remind employees that they were required to attend the meetings. Chalmers also notes that meeting minutes were specifically provided to lieutenants and department heads, which provided additional "moral suasion to compel attendance." Pl.'s Mot. at 15. Likewise, Chalmers

believes that various emails written by the Warden's secretary to remind employees of the various meetings reinforced Chalmers' obligation to attend. Chalmers argues that these emails were "effectively instructions from the warden to attend such meetings." *Id*. at 17.

Furthermore, Chalmers points to a variety of training materials that emphasized a "culture requiring punctuality, extra effort, and strict obedience to any sort of orders" and directed employees to "engage in overtime activities." Pl.'s Reply and Opp'n at 4. The training materials were distributed to employees when they first began working at FCI-Otisville during what was called Institution Familiarization, a training program that lasted approximately two weeks. Various documents that reinforced the importance of punctuality included post orders, rosters, schedules, meeting announcements, and meeting minutes, presumably because these included precise starting times.

Chalmers' argument that these various documents satisfy the writing requirement is linked to a certain culture that he believes permeated the BOP. This culture was one of strict punctuality, adherence to orders, and discipline. Chalmers believes verbal and non-verbal pressure was put on employees at FCI-Otisville under Warden Menifee. For example, he argues that it was an unspoken rule that supervisors should never let Warden Menifee arrive at the institution before they did. Warden Menifee would give what became known as "the look" to supervisors who might come into a meeting late. Employees who arrived precisely on time and left on the minute at the end of their shifts were known disparagingly as "minutemen." As a result, employees felt pressured to arrive early and stay late. Chalmers argues that he needed to arrive early on certain mornings to properly prepare for a meeting because not being prepared would mean "discipline or professional suicide." *Id*. at 9.

Finally, Chalmers presents the BOP's Standards of Employee Conduct, Program Statement 3420.09, which stated that all employees "are to obey the orders of their superiors at all times." Pl.'s Supp. App. at 70. Chalmers argues that, as an employee of the BOP, he was required to obey his superior's orders, whether they were written or oral. Essentially, Chalmers believes that the overtime he worked resulting from either oral orders or non-verbal pressure should satisfy the writing requirement of the OPM regulation because the Program Statement stated in writing that employees must obey orders at all times.

None of the documents presented are sufficient to satisfy the OPM regulation and *Doe II*. Overtime must be explicitly ordered or approved in writing to be compensable. *See Carlsen*, 72 Fed. Cl. at 793 ("[T]he only orders that lead to compensable overtime are those that explicitly order or approve overtime in writing."); *Doe II*, 372 F.3d 1347 at 1363 (written documents must include an "express directive to work overtime" to be compensable). We have previously ruled in *Bishop I* and *Carlsen* that most of these documents fail to qualify as written orders or approvals to work overtime. None of the additional documents presented by Chalmers explicitly ordered or approved him to work overtime. In fact, none of the documents even mentioned overtime.

The Program Statement merely informed employees that they had to obey orders, not that they were ordered or authorized to work overtime. Chalmers would have us construe the generic provision in the Program Statement as a blank check for employees to claim overtime compensation. Under Chalmers' theory, presumably any pressure to work overtime would qualify as a written order when linked with the Program Statement. Such an argument has already been rejected. *See Carlsen*, 72 Fed. Cl. at 793 ("This kind of bootstrapping we view as inconsistent with *Doe II*.").

The Position Description directed Chalmers, as associate warden, to preside over various committee meetings. It did not order or approve Chalmers to work overtime. It also did not schedule meetings to start or end before or after Chalmers' regularly scheduled shift. In fact, the lieutenants' meetings, department head meetings, and the executive closeout meetings were all scheduled to begin and end during Chalmers' regularly scheduled shift. The requirement to attend a certain meeting does not, by itself, explicitly order or approve overtime. *See Carlsen*, 72 Fed. Cl. at 795-97.

The Correctional Services Manual did not mention overtime. It merely stated that certain meetings would be held at a particular frequency. We previously rejected this manual as a source of written approval to work overtime because it did not direct anyone to work before or after their scheduled shifts. We also noted that the manual merely encouraged the executive staff to attend. *See Bishop I*, 72 Fed. Cl. at 778. The Institution Supplement, which Chalmers also believes required attendance at the meetings, is similarly devoid of any order or approval to work overtime. As we stated in *Bishop I*, the supplement "merely recites the name of the meeting, the day of the month, the time, and the location" of the various meetings. *Id*.

Even if these documents required Chalmers to attend the meetings, his argument that they served as written approval to work overtime is undermined by the fact that none of these meetings were scheduled outside of his regularly scheduled shift.

Nor do the meeting minutes satisfy the OPM regulation. That attendance was recorded during the meetings and the minutes were available to BOP employees does not mean that attendance at the meetings was required. Moreover, any "moral suasion" to compel Chalmers to attend the meetings has no impact on whether the minutes qualify as written orders or approvals for Chalmers to arrive early or stay beyond regular work hours. Chalmers does not point to any explicit statement in the minutes that ordered overtime work. Chalmers' argument that email reminders from the Warden's secretary reinforced his obligation to attend certain meetings fails for the same reason. Notwithstanding the fact that Chalmers has not produced the actual emails, an email reminding Chalmers about a scheduled meeting does not mean that he was ordered or approved by his superior to work overtime. Chalmers does not allege that the emails contained such an explicit statement. *See Carlsen*, 72 Fed. Cl. at 793; *Bishop I,* 72 Fed. Cl. at 779.

To the extent Chalmers believes various training materials qualify as written orders or approvals to work overtime, these documents must be rejected as well. Chalmers argues that the training materials emphasized the importance of punctuality, discipline, and following orders within the BOP. He also argues that the training materials directed employees to "engage in overtime activities specifically or at least perform functions which necessarily have to be done on overtime." Pl.'s Reply and Opp'n at 4. Chalmers does not point to any provision among the various training materials that required Chalmers to work overtime, however. Additionally, we are unpersuaded by the virtues apparently emphasized in the training materials. Punctuality, discipline, and the importance of following orders have no bearing on whether Chalmers' claimed overtime passes the minimum requirements of the OPM regulation and *Doe II*. As we held in *Carlsen*, "[u]nder *Doe II*, these documents cannot qualify as instructions to perform uncompensated overtime because they do not explicitly require work to be performed outside of normal shift hours." *Carlsen*, 72 Fed. Cl. at 793.

Finally, we reject Chalmers' argument that all of these documents should be read in conjunction with each other and with various non-verbal pressure that existed within the BOP. Chalmers argues that the "natural

consequence" of an order to attend certain meetings when there is a "culture which obligates employees to follow all orders" is that employees will not leave a meeting that they are required to attend until it is over. Pl.'s Reply and Opp'n at 6. While we recognize the practical consequences of this pressure, the Federal Circuit has rejected the argument that such indirect pressure satisfies the certainty requirement. In *Doe II*, the Federal Circuit found that one of the flaws in the documents presented by plaintiffs was that the document did not order plaintiffs to "work any amount of overtime" or even an "indefinite number of overtime hours." *Doe II*, 372 F.3d at 1363. Moreover, the Federal Circuit rejected plaintiffs' argument that overtime had been authorized and approved because officials within DOJ expected, encouraged, and induced plaintiffs to work overtime, and had knowledge that plaintiffs worked a considerable amount of overtime. *See id.* at 1350. The Federal Circuit strictly construed the OPM regulation to require an express directive to work overtime, rejecting plaintiffs' argument that they felt pressured and expected to work overtime. Chalmers' reliance on non-verbal pressure and a culture of certain expectations must, accordingly, be rejected.

In the absence of an explicit order or approval directing Chalmers to work overtime, none of the claimed pre- and post-shift overtime activities are compensable. As an associate warden, all of the meetings were scheduled within Chalmers' scheduled shift of 7:30 a.m. to 4:00 p.m. Chalmers cannot present any writings indicating that he was approved to work overtime by arriving early to prepare for a meeting, or staying late when a meeting lasted beyond 4:00 p.m. Likewise, Chalmers cannot point to any order or authorization to work overtime as a Captain to conduct briefings, exchange equipment, review logs and reports, or walk to his post.[5]

Ultimately, Chalmers believes that even though he is unable to produce a single document that explicitly approved him to work overtime, the expectation within the BOP left him with no real choice. He could either work uncompensated overtime or choose to leave meetings early, or attend meetings

[5]We note that the overtime activities described by Chalmers relating to his time as a captain at MDC-Los Angeles are nearly identical to those described by plaintiff Shea in *Bishop I*. Unlike *Bishop I*, however, Chalmers does not present any post orders that necessarily required two employees to be on duty at the same time to exchange pertinent information and equipment, the only document that satisfied *Doe II* in that case.

unprepared, and face disciplinary action from the Warden. In *Doe II*, the Federal Circuit recognized this potential dilemma. An employee may be expected to work uncompensated overtime. If the employee declines to work uncompensated overtime, and, as a result, the agency takes adverse personnel action against the employee, that adverse personnel action may be found invalid by the Merit Systems Protection Board. The Federal Circuit, however, explained that even if such adverse personnel action were found invalid, "that is not a ground for awarding overtime compensation that was not ordered or approved in strict compliance with the regulation." *Doe II*, 372 F.3d at 1364. Chalmers does not present any evidence that he requested overtime compensation, or that he was disciplined for not working uncompensated overtime. We might well disapprove of a practice of pressuring employees to arrive early and stay late on various occasions, but that practice does not qualify such hours as compensable overtime work.

## IV. Plaintiff's Claim For Travel-Related Overtime

Chalmers also argues that he is entitled to compensation for overtime spent during his two trips to London and Bangkok. We address each trip individually.

### A. London Trip

On March 11, 2000, Chalmers traveled to London with two other BOP employees to repatriate a prisoner held in British custody. Prior to that trip, Michael Cooksey, Assistant Director of the BOP's Correctional Programs Division, recommended in a memorandum to Kathleen Hawk Sawyer, Director of the BOP, that Chalmers serve as one of the three escorts.[6] The memorandum noted that the "Regional Director and Warden are in agreement with the selection of . . . Mr. Chalmers" as one of the escorts. D.'s App. at A344. On March 1, 2000, Jeff George, Correctional Programs Specialist, contacted the Department of State regarding the upcoming prisoner exchange and noted, among other things, that "[w]e have authorized the following BOP escorts to travel to England on official passports," including "Craig Butler

[6]Although this memorandum is undated and unsigned, we believe it serves a useful evidentiary purpose in determining whether Chalmers was approved to travel on the trip, particularly because it was produced by the government.

Chalmers." *Id*. at A339. On March 7, 2000, Chalmers was notified in a memorandum from Jeff George that the "Director has authorized your travel to London, England, to return [one] American citizen pursuant to the terms of the International Treaty Transfer" and that "[y]our trip is <u>confirmed</u> for March 11-15, 2000." *Id*. at A336 (emphasis in original). The memorandum also provided details relating to the upcoming trip, including Chalmers' hotel reservation confirmation number, estimated pricing for taxi rides to the hotel from the airport, and various contact information. Chalmers was scheduled to fly on United Airlines Flight No. 918, departing Washington Dulles International Airport on Saturday evening, March 11th, and arriving at London's Heathrow Airport on Sunday morning, March 12th. Chalmers' return flight departed London on Wednesday, March 15th.

Chalmers claims overtime for the various times he was obligated to travel as part of this trip and does not claim overtime for various free or down time while in London. His claim for time traveling to London includes approximately two hours of travel from his home in Philadelphia to the airport in Washington, three hours checking-in at the airport, passing through security, and waiting for departure, seven hours of flight time, two hours debarking from the plane, obtaining his luggage, passing through customs, and arranging transportation, and one hour traveling to his hotel in a taxi. His claim for time securing the prisoner and returning him to the United States includes approximately four hours obtaining custody of the prisoner and waiting at a safe-house with a security team in London, one hour traveling from the safe-house to the airport, one hour passing through customs and boarding the plane, and seven hours flying to New York.

Chalmers was compensated for sixteen hours of work for the entire London trip, which is short of the total amount of hours he spent traveling. Hours of travel in excess of eight hours a day or forty a week, however, are not always compensable. Two conditions must be satisfied before such travel-related overtime is compensable. First, the travel hours must qualify as "hours of work." *See* 5 U.S.C. § 5542(a). Second, the overtime must have been ordered or approved in writing by an authorized official. *See* 5 C.F.R. § 550.111(c).

Travel time is only considered hours of work (for purposes of calculating overtime) when:

> (A) the time spent is within the days and hours of the regularly scheduled administrative workweek of the employee, including regularly scheduled overtime hours; or
>
> (B) the travel (i) involves the performance of work while traveling, (ii) is incident to travel that involves the performance of work while traveling, (iii) is carried out under arduous conditions, or (iv) results from an event which could not be scheduled or controlled administratively, including travel by an employee to such an event and the return of such employee from such event to his or her official-duty station.

5 U.S.C. § 5542(b)(2); *see also* 5 C.F.R. § 550.112(g).

Much of the travel-related overtime claimed by Chalmers qualifies as travel that "involves the performance of work while traveling" or travel that was at least "incident to travel that involves the performance of work while traveling." 5 U.S.C. § 5542(b)(2)(i) and (ii). Specifically, during Chalmers' return trip, he secured the prisoner and waited at a safe-house, traveled to the airport, cleared customs, boarded the plane, flew to New York, debarked from the plane, and turned over custody of the prisoner. Undoubtedly, Chalmers was performing work during these particular stages of his trip because he maintained custody of the prisoner throughout until his arrival in New York. In other words, Chalmers was on duty and working when he traveled with the prisoner in custody. Chalmers' hours of travel to London to retrieve the prisoner are also hours of work because they are, at a minimum, incident to the work of returning the prisoner to the United States.

Chalmers, therefore, would be entitled to compensation to the extent these travel-related "hours of work" exceeded eight hours a day or forty hours a week and if such hours were ordered or approved in writing as required by 5 C.F.R. § 550.111(c). The writing requirement of section 550.111(c), which we have applied to all other overtime claims by the plaintiffs in the related actions against the BOP, also applies to claims relating to hours of travel. In *Aletta v. United States*, 70 Fed. Cl. 600 (2006), a case involving overtime claims by Internal Revenue Service ("IRS") lawyers, we held that section 550.111(c) "unquestionably applies to the FEPA section at issue, 5 U.S.C. § 5542(b)," because we could not identify an "explicit exception stating that travel hours do not require written approval." *Aletta*, 70 Fed. Cl. at 604. Defendant argues that Chalmers is unable to produce documents reflecting that

he was ordered or approved to work overtime on the London trip and, thus, his claim should be denied. We disagree.

The memoranda from Jeff George reflect that Chalmers was "authorized" by the Director to "travel to London, England" and to "return [one] American citizen" to the United States. D.'s App. at A336, A339. He was also authorized to travel on "official passports" to accomplish this mission. *Id.* at A339. The American Embassy in London arranged Chalmers' hotel location. *See id.* at A340. And, the BOP scheduled Chalmers' flights to and from London. *See id.* at A336, A338. The commercial flight time for the return trip alone was scheduled for more than eight hours on one day.[7] We believe these writings are minimally sufficient to satisfy the "approved in writing" requirement of section 550.111(c) because they approved and directed Chalmers to travel on a schedule that lasted more than eight hours in one day.[8]

Thus, while none of these documents explicitly mention "overtime," the nature of the long-distance mission inherently required Chalmers to work some amount of overtime. Like the written post-orders in *Bishop* and *Carlsen*, which required two lieutenants to be on duty either before or after their assigned shifts, Chalmers could not have escorted the prisoner to New York without working more than eight hours in one day. Specifically, taking custody of the prisoner at the safe-house in London, transporting him to the airport, checking-in and clearing customs, and flying to New York inherently required more than eight hours to accomplish when the flight time alone was scheduled for more than eight hours. Chalmers was thus directed to perform the job by the means provided and approved by the BOP, irrespective of whether the job required him to work more than eight hours in one day.

---

[7]Chalmers' return flight on United Airlines Flight No. 905 was scheduled to depart London at 1:50 p.m. Greenwich Mean Time (or 8:50 a.m. Eastern Standard Time ("EST")) on March 15, 2000, and arrive in New York at 5:05 p.m. EST, a difference of eight hours and fifteen minutes. *See* D.'s App. at A338.

[8]Defendant argued at oral argument that Jeff George does not have the requisite authority to approve overtime as required by 5 C.F.R. § 550.111(c). We note, however, that the memorandum states that the Director authorized the travel, not the author, Jeff George.

Defendant argues that authorization to travel, alone, is insufficient to satisfy the writing requirement because it does not explicitly order or approve overtime. Defendant relies on this court's treatment of travel vouchers in *Aletta* to support its argument that Chalmers needs specific authorization to work extra hours, not just authorization to travel. In *Aletta*, we held that a "travel voucher is not a request by an employee, or an order or approval by an authorized official, for extra hours of work or overtime compensation for the time spent traveling." *Aletta*, 70 Fed. Cl. at 605.

The facts in *Aletta*, however, are distinguishable. In *Aletta*, the IRS lawyers claimed compensation for overtime hours that were "induced, encouraged, or expected" while traveling for various court appearances or trials. *Id.* at 602. Often, the lawyers had to work additional hours while traveling to meet the demands of their workload or court deadlines. The lawyers argued that travel vouchers, which authorized individual trips, should qualify as written orders or approvals to work overtime. In rejecting that argument, the court noted that overtime that is merely induced, encouraged, or expected (i.e., lacks a written order or approval) is not compensable under *Doe II*. *See id.*

We agree. But Chalmers' authorization to serve as an escort on the London trip was much more than the open-ended vouchers in *Aletta*. In that case, the IRS lawyers essentially wanted the government to treat the travel vouchers as blank checks to work as much overtime as the lawyers felt was necessary while traveling. In this case, however, Chalmers' travel authorization was limited to performing a specific BOP mission, namely, "to travel to London, England" and "return [one] American citizen." D.'s App. at A336. Indeed, the travel itself was the very work to be performed as authorized by the Director.[9] This mission obligated Chalmers to follow a

[9]In this regard, we note the distinction between this case and many other instances in which federal employees seek compensation for time traveling to a distant duty station. Here, Chalmers is not merely seeking compensation for hours of travel to and from London for work that was performed solely in London. Instead, the travel itself to and from London was the BOP-approved mission. We note that Congress recently created a new type of compensatory time off for travel for federal employees. *See* 5 U.S.C. § 5550b; 5 C.F.R. § 550.1401 *et seq*. Such compensatory time off for travel now credits employees (continued...)

schedule prearranged by the BOP. Because the schedule exceeded eight hours in one day, the BOP necessarily approved work in excess of eight hours in one day. Moreover, the authorization to travel on the London trip was not open-ended and, thus, did not expose the government to unlimited liability for overtime compensation or liability at the discretion of the employee.

Defendant makes much of the fact that Chalmers volunteered to participate in the prisoner transfer, suggesting that the BOP did not order the extra hours of work. We view that as irrelevant. Clearly, Chalmers was authorized to escort the prisoner back to the United States in his official capacity. Once designated an official escort on the trip, regardless of whether he had the option of choosing not to go in the first place, Chalmers was obligated to finish the job. That job required him to take custody of the prisoner in London and return him to New York, a job that could not be accomplished in less then eight hours in one day. With the prisoner in custody and in flight to New York, Chalmers clearly did not have the option to stop working once he reached eight hours of work for that day. In short, there was nothing voluntary about Chalmers' overtime work.

In conclusion, we believe the written authorization for Chalmers to travel to London and return with the prisoner, along with the written BOP-arranged flight schedule and prisoner exchange location, constituted approval to work overtime insofar as the work could not be accomplished in less than eight hours a day. The extent to which the London mission could be accomplished without working overtime, however, is uncertain. We are able to conclude that the return flight, at a minimum, required some amount of overtime because the flight itself exceeded eight hours. It is not clear, however, how may hours of work per day were expended traveling to and within London before the return flight home. Thus, judgment on this issue must be postponed pending proof.

---

[9](...continued)
for time spent traveling when the employee is required to travel and the travel time is not otherwise compensable. This new type of compensatory time essentially ensures that federal employees receive some form of credit for all additional hours outside of their normal workday when they are required to travel. Thus, this new type of compensatory time off would have been available to Chalmers had it been law at the time of the London trip and had we found that 5 C.F.R. § 550.111(c) was not satisfied.

B. Bangkok Trip

In April 1997, while assigned to MDC-Los Angeles, Chalmers traveled from Los Angeles to Bangkok, Thailand to repatriate various prisoners held in Thai custody. Chalmers claims nearly fifty hours of overtime for various travel, similar to that claimed for the London trip, that he believes was approved and necessary to accomplish this particular mission. Unlike the few documents available for the London trip, however, no documents relating to this trip are available.

Defendant argues that the claim relating to the Bangkok trip should be dismissed because it falls outside the statute of limitations. We agree. Chalmers' recovery of overtime compensation is subject to a six-year statute of limitations. *See* 28 U.S.C. § 2501; 5 U.S.C. § 5596(b)(4). Chalmers' claim period began to accrue in April 1997, when he allegedly worked uncompensated overtime, and extends six years to April 2003. Chalmers' original complaint was filed on February 25, 2003. Chalmers did not assert any travel-related claims, however, until June 28, 2004, when he filed an amended complaint, placing his claim relating to the Bangkok trip outside the statute of limitations period.[10]

Chalmers believes that the travel-related claims, first raised in the amended complaint, should relate back to the date of the original complaint for statute of limitations purposes, as allowed by Rule 15 of the Rules of the Court of Federal Claims. Rule 15(c)(2) allows an amended pleading to relate back to the original filing date when the "claim or defense asserted in the amended pleading arose out of the conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading." Defendant believes that allowing the amended complaint to relate back to the original complaint would be prejudicial to the government because the BOP has a two-year retention period for various documents, including those related to employee travel.

While we do not necessarily agree with defendant's prejudice argument, we believe relation back of Chalmers' travel-related claim is still

---

[10]On July 29, 2004, we granted plaintiffs' motion to amend its complaint, but reserved the question of whether the new claims related back to those in the original complaint.

inappropriate. First, the travel-related claim is separate and distinct from the conduct, transactions, or other occurrences explained in the original complaint. It does not involve any of the same instances of alleged orders to work overtime or documents purporting to be written orders to work overtime, pre- and post-shift duties at the prisons, or various meetings obligating Chalmers to arrive early or stay late, that were set forth in the original complaint. Indeed, the merits of Chalmers' claim relating to the trip to Bangkok are wholly independent of his primary claims for overtime. Second, this is precisely the kind of situation in which the lack of documentary evidence is highly relevant. We are unprepared to take judicial notice of the terms of the various documents allegedly ordering Chalmers to travel to Bangkok. The documents that would be necessary to support his travel-related claim under 5 C.F.R. § 550.111(c) are no longer available. It may very well have been easier to find documentary or oral evidence had this portion of Chalmers' claim been presented within the statute of limitations. For these reasons, we will not allow the claims relating to the Bangkok trip to relate back to the original complaint. Because this portion of Chalmers' complaint falls outside of the statute of limitations, we dismiss it.

## CONCLUSION

For the foregoing reasons, we deny plaintiffs' motion for partial summary judgment with respect to Craig Chalmers, and grant in part defendant's cross-motion. Resolution of the claim relating to the London trip is deferred pending further order.

s/Eric G. Bruggink
ERIC G. BRUGGINK
Judge